# EXHIBIT 1

CIN-TEL CORPORATION

PH. 513-621-7723                                           FX. 513-621-6558

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

AT COVINGTON

———

| | |
|---|---|
| GUANGZHOU CONSORTIUM PRODUCT | : |
| COMPANY, et al., | : |
| Plaintiffs, | : |
| vs. | : CIVIL ACTION NO.: |
| PNC BANK, NATIONAL ASSOCIATION, | : 2:11-CV-00005-DLB |
| et al., | :       VOLUME I |
| Defendants. | : |

———

DEPOSITION OF:   CONSORTIUM COMPANIES, INCORPORATED

Roger Schreiber, 30(b)(6) witness

May 30, 2012

9:17 a.m.

REPORTED BY:

Renee Rogers, Registered Professional Reporter

Page 22

1  mischaracterizes --
2       THE WITNESS: I'm sorry.
3       MR. PAPAKIRK: -- his prior
4  testimony.
5       Go ahead.
6    A  I would say yes, I -- that's to my
7  understanding.
8    Q  One of those three or a combination
9  of those three, correct?
10   A  Okay. Yes.
11   Q  Is that fair?
12   A  I believe so. Yes.
13   Q  And let me correct the -- let me
14 correct the problem that caused the objection
15 there.
16      It's my understanding that it's your
17 testimony that the original draft of the CCA was
18 prepared by or as a joint exercise in some way of
19 involving Joyce Xu, CCC's office manager/financial
20 manager, Standard Chartered Bank, and an outside
21 Chinese accountant that had been consulted to help
22 resolve this issue.
23      MR. PAPAKIRK: Objection.
24   Q  Is that fair?

Page 23

1       MR. PAPAKIRK: Objection. At what
2  point in time? He's already testified as
3  to the numerous drafts.
4       MR. CORYELL, II: I said Exhibit 1,
5  the first draft of Exhibit 1.
6       MR. PAPAKIRK: The first draft?
7       Mr. CORYELL, II: Yes. Now, let me
8  go back and ask the question again so the
9  record is clear.
10   Q  I'm talking about the first draft of
11 the CCA. Do you understand?
12   A  Yes.
13   Q  And I'm talking about who was
14 responsible for preparing the first draft of the
15 CCA. Do you understand that?
16   A  Yes.
17   Q  My understanding --
18      (Whereupon, Mr. McDowell joined the
19 deposition.)
20   Q  So the first draft of the CCA was
21 prepared by Joyce Xu, the Chinese accountant that
22 CCC had retained, Standard Chartered Bank, or a
23 combination of those three; is that correct?
24      MR. PAPAKIRK: Object as to form.

Page 24

1       Go ahead.
2    A  That is correct.
3    Q  PNC did not have any involvement in
4  the preparation of the first draft of the CCA?
5    A  PNC had involvement in the reasons
6  why the CCA was needed.
7    Q  I'm going to ask you about that
8  later.
9    A  Okay.
10   Q  But PNC did not have any involvement
11 in the preparation of the first draft of the CCA,
12 did it?
13   A  No.
14   Q  In fact, PNC did not even -- was not
15 even aware that the CCA was being considered or
16 prepared by Standard Chartered Bank, Joyce Xu, or a
17 Chinese accountant that CCC had retained, until --
18      MR. PAPAKIRK: Objection to form.
19   Q  -- until you sent it to Tom Dodd on
20 June 14?
21      MR. PAPAKIRK: Objection as to form,
22 and asked and answered.
23      Go ahead.
24   A  Yes.

Page 25

1    Q  That's correct?
2    A  That's correct.
3    Q  Thank you.
4       (Whereupon, Deposition Exhibit
5  Number 2 was marked for identification.)
6    Q  I'm handing you a document marked
7  Exhibit Number 2.
8       MR. MCDOWELL: Do you have a copy of
9  Exhibit 1?
10   Q  Mr. Schreiber, this is --
11      MR. MCDOWELL: This is Number 2?
12   Q  I'll represent to you that this is an
13 e-mail that was produced by -- this is a string of
14 e-mails that was produced by Consortium in this
15 litigation.
16   A  Yes.
17   Q  Do you recognize Exhibit 2 in the
18 string of e-mails as Consortium's documents?
19      MR. PAPAKIRK: Object as to form.
20      Go ahead.
21   A  I recognize them as our e-mails, yes.
22   Q  These documents, just for the record,
23 are Bates stamped Consortium 1423 -- I'm sorry --
24 1424 through 1436; is that correct?

Page 54

```
 1      Q  On page 1415?
 2      A  Yes.
 3      Q  And what was that option?
 4      A  The option to establish a secured
 5   account.
 6      Q  This was an alternative to Standard
 7   Chartered Bank's exercise on the Standby Letter of
 8   Credit?
 9      A  An alternative to it, correct.
10      Q  In other words, you were saying
11   Standard Chartered Bank -- Consortium was saying
12   Standard Chartered Bank will not exercise on the
13   Standby Letter of Credit if PNC does this?
14      A  If PNC would do this, the debt
15   obligation in -- PNC was going to be required to
16   fund to Standard Chartered approximately $1.6
17   million under the LC, and it was PNC's decision to
18   not renew that.  So they knew when they didn't
19   renew it that they were going to have to have those
20   funds obligated to China, Standard Chartered.
21      Q  Okay.
22      A  So they could pay it in this method
23   and it would satisfy the debt there, which was the
24   intent of the Letter of Credit, or they could do
```

Page 55

```
 1   option number one or option number two or option
 2   number three.
 3      Q  And what was the third option?
 4      A  The CCA.
 5      Q  Okay.
 6      A  The letter signed by the bank.
 7      Q  Is that option described in paragraph
 8   2(b) on page 1415?
 9      A  Yes.
10      Q  So the third option was that PNC sign
11   a letter, correct?
12      A  Which was referencing the CCA which
13   was the agreement.
14      Q  So the letter that's referenced in
15   paragraph b is the CCA, correct?
16      A  Correct.
17      Q  And that letter would say that the
18   funds transferred in a draw on the Standby Letter
19   of Credit were sent under the direction of CCI,
20   correct?
21      A  Correct.
22      Q  And you attached a draft of what you
23   called a letter in that e-mail, correct?
24      A  Yes.
```

Page 56

```
 1      Q  And that draft is what we've already
 2   looked at that's Bates stamped 1418, correct?
 3      A  Correct.  Sir, we seem to be missing
 4   the main point of these -- all these questions, and
 5   we seem to be skirting it, but I'm not sure that
 6   you want to or not.
 7      Q  The next-to-the-last paragraph on
 8   page 1415, can you read that to me.
 9      A  The cooperation requested with number
10   two, from our perspective -- I believe there was a
11   typo there -- are relatively minor items that could
12   go a long way to supporting the ongoing business in
13   China and our ability to support the new term loan
14   structure.
15      Q  So you were telling Mr. Dodd that
16   signing the letter, the CCA, you believed was a
17   relatively minor item, correct?
18         MR. PAPAKIRK:  Objection.  Go
19   ahead.  It's a form objection.
20         Go ahead.
21      A  I told him that we had done a lot of
22   work to set up the term loan arrangements, and that
23   this CCA was merely the culmination of all of that
24   work in the term loan arrangements and all the
```

Page 57

```
 1   terms and conditions associated with that, and that
 2   if -- this one action would then allow all of that
 3   pre-work to be done and it would satisfy the Letter
 4   of Credit obligations as they were intended.
 5      Q  Isn't it true that you described
 6   signing the letter that you referred to in
 7   paragraph two, which is the CCA, as a minor item?
 8         MR. PAPAKIRK:  Objection.  It speaks
 9   for itself.  You're mischaracterizing.
10         Go ahead.
11      A  I believe the cooperation requested
12   was a relatively minor item.
13      Q  The paragraph above that refers to
14   risk that LC payoff will not be able to -- will not
15   be able to be converted to -- yen?  Is that
16   correct?
17      A  Yuan.
18      Q  -- yuan, and will set in limbo as
19   disposition is worked out.
20         Is this the -- is that the currency
21   conversion issue?
22      A  Yes.
23      Q  Okay.  So you're describing to
24   Mr. Dodd the currency conversion issue in general
```

CIN-TEL CORPORATION
PH. 513-621-7723                                              FX. 513-621-6558

Page 70

1   modified, obviously, and sent these two to Tom
2   Dodd, and they are identical.
3       Q   Let's do that.  Let's say that Joyce,
4   Standard Chartered Bank, and the Chinese accountant
5   drafted the original version of the CCA.  Fair?
6           MR. PAPAKIRK:  Objection as to form.
7       A   I don't -- I don't know if Standard
8   Chartered was part of the draft of that.  I believe
9   the accountant drafted that.  We've said that
10  before.
11      Q   I thought you told me Joyce drafted
12  that.
13      A   Joyce, in cooperation with the
14  accountant, but it was the accountant's, I think,
15  original idea that said this could be a workable
16  option.
17      Q   So Joyce and --
18      A   The accountant.
19      Q   -- CCC's outside accountant in China
20  drafted the first version of the CCA?
21          MR. PAPAKIRK:  Objection.
22      Q   Is that fair?
23          MR. PAPAKIRK:  Objection as to form,
24  to CCC's accountant.

Page 71

1           Go ahead.
2       A   Yes, that's fair.
3       Q   Okay.  And they sent it to you --
4   Joyce sent it to you, correct?
5       A   Correct.
6       Q   You modified it?
7       A   Joyce translated it -- it was
8   initially fully in Mandarin.  Joyce translated it,
9   sent it to me, correct.
10      Q   You modified it?
11      A   Yes.
12      Q   So if you want to -- what did we --
13  on number two?
14      A   Number three.
15      Q   On number two what did we say?  Did
16  we say modified by Roger Schreiber?
17      A   We just said Schreiber.
18      Q   Why don't you say modified by
19  Schreiber.  You obviously didn't draft it; you just
20  changed some things, right?
21      A   That's correct.
22      Q   You wouldn't call what you did,
23  changing some things, adding some things, taking
24  some things away, as drafting, would you?

Page 72

1       A   I changed some things, yes.
2       Q   So you modified it?
3       A   Yes.
4       Q   Do you want to use modified, or do
5   you want to use drafted?  Whatever you're
6   comfortable with.  What did you do to it?
7           MR. PAPAKIRK:  I'm going to object
8   to the form of the question.
9       A   It was modified.
10      Q   Okay.  So number three --
11      A   Okay.
12      Q   -- modified by Schreiber.
13      A   (Complies.)
14      Q   And we know that it was transmitted
15  -- we know that it was transmitted at 10:24 a.m. on
16  June 14, right?
17      A   (Nods head.)
18      Q   Can you put that on it.
19      A   (Complies.)
20      Q   I'm handing you another document
21  we're marking as Exhibit 5.
22          (Whereupon, Deposition Exhibit
23  Number 5 was marked for identification.)
24      Q   Exhibit 5 is an e-mail from you to

Page 73

1   Steve Oberst, correct?
2       A   Yes.
3       Q   It's Bates stamped 1712, correct?
4       A   It is.
5       Q   This is an e-mail that you sent to
6   Mr. Oberst at 12:59 on June 14, correct?
7       A   Correct.
8       Q   So this was two and a half hours
9   after you sent your last e-mail to Mr. Dodd with a
10  version of the CCA, correct?
11      A   Correct.
12      Q   You tell Mr. Oberst that you haven't
13  heard from Tom Dodd yet, right?
14      A   That's right.
15      Q   And as soon as you hear from
16  Mr. Dodd, you will contact Joyce and Standard
17  Chartered Bank, correct?
18      A   Correct.
19      Q   And you talk about a declaration
20  letter, correct?
21      A   I don't see the term "declaration
22  letter."
23      Q   Paragraph two.  You tell Mr. Oberst
24  hopefully we will be able to confirm that PNC will

CIN-TEL CORPORATION
PH. 513-621-7723                                                          FX. 513-621-6558

Page 134

1  version. I believe what it is is certifying with
2  Chinese characters the signatures.
3       (Whereupon, Deposition Exhibit
4       Number 15 was marked for identification.)
5       Q  Just so we're clear, I marked the
6  document Bates stamped 1722 as Exhibit 15. And
7  it's your testimony that Exhibit 15 is not a
8  different version of the Capital Contribution
9  Authorization, correct?
10      MR. PAPAKIRK:  Objection as to
11  form.
12      Go ahead.
13      A  I don't believe so. I believe it's
14  merely certifying the signatures then with Chinese
15  characters.
16      (Whereupon, Deposition Exhibit
17      Number 16 was marked for identification.)
18      Q  Handing you another document that
19  we've marked as Exhibit 16. Exhibit 16 is an
20  e-mail string that came from Consortium's files,
21  correct?
22      A  Yes, it is an e-mail string.
23      Q  All right. And this came from
24  Consortium's files?

Page 135

1       A  Yes.
2       Q  It's Bates stamped 5234 through 5237,
3  correct?
4       A  Yes.
5       Q  And the top e-mail -- or the first
6  e-mail on Exhibit 16 -- I'm sorry. The e-mail at
7  the top of the first page of Exhibit 16 is an
8  e-mail from Joyce Xu to you and others, dated June
9  22, 2010, and it was sent at 3:31 a.m., correct?
10      A  Yes.
11      Q  And there is an attachment to the
12  e-mail, isn't there?
13      A  There is.
14      Q  And the attachment is Bates marked
15  5236 and 523 -- or 5236, correct?
16      A  It is.
17      Q  I'm handing you a separate copy of
18  5236. Is that the attachment that Joyce Xu sent to
19  you on June 22, 2010 at 3:31 a.m.?
20      A  It is.
21      Q  She's sending you another version of
22  the CCA, isn't she?
23      A  She is. A draft of one that she
24  eliminated some additional characters in it that

Page 136

1  she felt would work better.
2       Q  Did Mr. Dodd sign this? Well, strike
3  that.
4       Could you put number 11 on the top of
5  that.
6       A  (Complies.)
7       Q  And that was modified by Joyce Xu,
8  correct?
9       A  Yes, it was.
10      Q  Can you put -- write that on that
11  document, please.
12      A  (Complies.)
13      Q  And it was transmitted to you on June
14  22, 2010 at 3:31, correct?
15      A  Correct.
16      Q  And Ms. Xu is telling you in her
17  e-mail that Standard Chartered Bank could not use
18  the version of the CCA that you had sent her
19  before, correct?
20      A  She said it would not be used and
21  that this one appeared to be more workable.
22      Q  Ms. Xu told you that the version of
23  the CCA that was signed by Mr. Dodd was not
24  acceptable to Standard Chartered Bank, didn't she?

Page 137

1       MR. PAPAKIRK:  Objection as to form.
2       Go ahead.
3       A  She did. It did not work.
4       Q  Because Standard Chartered Bank did
5  not want any reference to the Standby Letter of
6  Credit issued by PNC, correct?
7       A  That is correct.
8       Q  So Ms. Xu changed the wording of the
9  CCA, correct?
10      A  Correct.
11      Q  And she forged Mr. Dodd's signature?
12      MR. PAPAKIRK:  Objection.
13      A  I don't believe that was the intent
14  at all.
15      Q  Is that Mr. Dodd's signature on -- at
16  the bottom of the document Bates stamped 5236?
17      MR. PAPAKIRK:  Objection as to form.
18      If you know.
19      A  It certainly appears to be.
20      Q  Mr. Dodd didn't sign the document
21  that's Bates stamped 5236, did he?
22      MR. PAPAKIRK:  Objection as to form.
23      Go ahead.
24      A  Not as yet. He had not, no.

WWW.CINTELCORPORATION.COM                      E-Mail   CINTELCO@GMAIL.COM

Page 138

1  Q  No. He didn't sign 5236, did he?
2  A  No.
3  Q  Somebody placed a signature that
4  appears to be his at the bottom of 5236, didn't
5  they?
6     MR. PAPAKIRK: Objection as to form.
7     Go ahead.
8  A  I believe that in China they were
9  trying to just merely communicate and try to get a
10 workable version of the documents and then would
11 ask for formal signatures at that point.
12 Q  Joyce Xu photocopied his signature
13 onto document 5236, didn't she?
14    MR. PAPAKIRK: Objection.
15    If you know.
16 A  I don't know how she did that. But
17 I'm trying to think if I sent her a PDF -- I would
18 have had to have sent a PDF. So, yes, that would
19 have probably been the process.
20 Q  Joyce Xu reproduced -- whether it was
21 photocopied or not, Joyce Xu reproduced Mr. Dodd's
22 signature on the document numbered 5236, didn't
23 she?
24    MR. PAPAKIRK: Objection as to

Page 139

1  form.
2     Go ahead.
3  A  I don't know for sure, but I -- it
4  appears she did.
5  Q  Did she have Mr. Dodd's permission to
6  put his signature -- to your knowledge, did she
7  have Mr. Dodd's permission to put his signature on
8  this document?
9  A  No.
10 Q  Did she ever talk to Mr. Dodd, to
11 your knowledge, about putting his signature on this
12 document?
13 A  No.
14 Q  To your knowledge, was his signature
15 on -- her putting his signature on this document
16 authorized by Mr. Dodd?
17    MR. PAPAKIRK: I'll object as to
18    form.
19    Go ahead.
20 A  No, it was not.
21 Q  That's forgery, isn't it?
22    MR. PAPAKIRK: Objection. Don't
23    answer the question.
24 Q  If someone signed your signature --

Page 140

1  strike that.
2     If someone took a photocopy of your
3  signature and attached it to a document without any
4  authorization, would you have a problem with that?
5     MR. PAPAKIRK: Objection; relevance.
6  A  I believe that Joyce was merely
7  intending to present a workable option and then
8  would get Mr. Dodd's signature at that time.
9     MR. CORYELL, II: Would you read my
10 question back, please.
11 Q  Listen -- listen to my question.
12    THE COURT REPORTER: Question: If
13 someone took a photocopy of your
14 signature and attached it to a document
15 without any authorization, would you have
16 a problem with that?
17 A  I certainly -- I did not have a
18 problem with this version, knowing that it was an
19 iterative process.
20 Q  If somebody who didn't work for you
21 or worked for a company that you were affiliated
22 with took a signature of yours and photocopied it
23 onto a document without your knowledge and without
24 your authorization, would you have a problem with

Page 141

1  that?
2     MR. PAPAKIRK: Objection as to form,
3     relevance.
4     Go ahead.
5  A  It depends on the circumstances.
6  Depends on the circumstances.
7  Q  Under these circumstances,
8  circumstances like this.
9     MR. PAPAKIRK: Objection; assumes a
10    fact not in evidence. Go ahead. It's
11    been asked and answered, and to form.
12    But go ahead.
13    MR. CORYELL, II: It's been asked,
14    it hasn't been answered.
15 Q  Go ahead.
16 A  Yes. That would concern me, okay? I
17 would look into that further.
18 Q  Did you ever tell Mr. Dodd that Joyce
19 had affixed his signature to a version of the
20 capital contribution without his authorization?
21    MR. PAPAKIRK: I'm going to object
22    as to the characterization. Exhibit 16
23    speaks for itself. You're asking him to
24    read into the mind of Ms. Xu.

CIN-TEL CORPORATION
PH. 513-621-7723                                           FX. 513-621-6558

Page 142

1  Go ahead, if it relates to
2  conversations you've had.
3      A  She said this is -- this will not
4  even be used; that the Chinese translation one is
5  the one that she wants to use.  This will not be
6  used.
7          MR. CORYELL, II:  Can you read my
8  question back, please.
9      Q  Listen to my question, please.
10         THE COURT REPORTER:  Question:  Did
11 you ever tell Mr. Dodd that Joyce had
12 affixed his signature to a version of the
13 capital contribution without his
14 authorization?
15         MR. PAPAKIRK:  Same objection.
16         Go ahead.
17     A  No, I did not.
18     Q  To your knowledge, did anyone else at
19 CCI or CCC tell Mr. Dodd that his signature had
20 been placed on this document?
21     A  To my knowledge, no.
22     Q  When you saw this document, what was
23 your -- for the first time, what was your reaction?
24     A  I recall the question going through

Page 143

1  my mind, but as I read Joyce's letter -- and I know
2  Joyce -- that she's merely working to find workable
3  options, and she said that this will not be
4  submitted, I will only submit the Chinese page to
5  SAFE.  That's what I thought.
6      Q  Did you tell Joyce that it was
7  improper to do this?
8          MR. PAPAKIRK:  Objection as to the
9  relevance.
10         Go ahead.
11     A  I don't know if I specifically
12 mentioned that at the time or not.  I would have --
13 as long as it was never going to be used, it was
14 just internal communication.
15     Q  But she did use it, didn't she?
16 Didn't she give document 5236 to Standard Chartered
17 Bank?
18     A  I believe she did, yes.
19     Q  Okay.  So she sends you an e-mail and
20 she says I didn't like the wording, Standard -- the
21 wording of the one you sent me was not acceptable,
22 right?
23     A  Correct.
24     Q  And so I changed the wording of the

Page 144

1  document, correct?
2      A  She did.
3      Q  And she attaches her modifications to
4  the document, correct?
5      A  Yes, she does.
6      Q  And she says:  I gave this to
7  Standard Chartered Bank, correct?
8          MR. PAPAKIRK:  I'll object as to
9  form.
10         Go ahead.
11     A  I believe what she was doing is she
12 transferred it to verify that it was going to be --
13 if we had an agreement like that, that it would be
14 workable from their perspective.
15     Q  She gave it to Standard Chartered
16 Bank?
17     A  She should have eliminated the
18 signatures on it for the draft.  Correct.
19     Q  And when you looked at it, you saw
20 that she hadn't eliminated the signatures, correct?
21     A  I did.
22     Q  And did you do anything -- did you
23 say anything to her, tell her to get -- strike
24 that.

Page 145

1          Did you -- what did you say to her,
2  if anything, when you saw that she had changed the
3  document and not eliminated the signatures?
4      A  I can't recall what I said at the
5  time.
6      Q  Did you tell her it was
7  inappropriate?
8      A  I can't recall what I said at the
9  time.
10     Q  Did you tell her to get the document
11 back from Standard Chartered Bank?
12         MR. PAPAKIRK:  Objection as to form.
13         Go ahead.
14     A  I don't recall exactly the stream of
15 conversations at that point.
16     Q  Did you tell her that she shouldn't
17 have done that?
18     A  I can't recall our conversations.
19     Q  So you saw this document, and you
20 don't recall saying anything to Joyce about whether
21 it was proper or improper for her to send this
22 document to Standard Chartered Bank, correct?
23         MR. PAPAKIRK:  Objection as to form.
24         Go ahead.

CIN-TEL CORPORATION
PH. 513-621-7723                                             FX. 513-621-6558

Page 178

1  and she thought it was workable, correct?
2      A  That's not what my last statement
3  said.  What is your question?
4         MR. CORYELL, II:  Can you read my
5  question, please.
6         THE COURT REPORTER:  Question:  So
7  that means Joyce met these people and she
8  thought it was workable, correct?
9      A  So what means?  I don't know.  So
10 "that" means.  I don't know what "that" is
11 referring to.  You have to go back to the previous
12 question.
13        MR. CORYELL, II:  Can you go back to
14 the previous question.
15        THE COURT REPORTER:  Question:  And
16 when you say in your e-mail "Based on
17 your findings and conclusion I would like
18 your recommendation on how and when to
19 proceed," what did you mean?
20        Would you like me to read your
21 answer back?
22        THE WITNESS:  Yes, please.
23        THE COURT REPORTER:  Answer:
24 Exactly what I said.  Based on what you

Page 179

1  learn when you're introduced to these
2  people, how does it feel?  Does it feel
3  like it could be workable, et cetera?  I
4  mean, it's being recommended to us, but
5  we need to do some due diligence
6  ourselves.
7         Question:  And if Joyce had felt
8  like it hadn't been workable, what would
9  you have done?  What would Consortium
10 have done?
11        There was an objection.
12        Answer:  That didn't happen, so I
13 would have to speculate.
14     A  Joyce was a later -- I had a trip to
15 China to actually meet these individuals, and
16 Charley and I went to their office, and I met with
17 them, felt comfortable with that.
18        But, again, not being as linked in on
19 the Chinese culture and various things, I wanted
20 our finance manager's opinion, and asked her to go
21 out and meet them also.
22     Q  So sometime before April 6, 2007, you
23 and Charley went and met with Standard Chartered
24 representatives --

Page 180

1      A  Yes.
2      Q  -- to see if you wanted to bank with
3  them?
4      A  Doing our due diligence.
5      Q  Did any National City Bank
6  representative participate in these meetings?
7      A  They participated by introducing us
8  and providing us the contacts.
9      Q  Did they participate in the meetings
10 that you actually had with the Standard Chartered
11 Bank representatives?
12     A  Not in those specific meetings, but
13 in others they did.
14     Q  Were any National City Bank
15 representatives present in attending the meetings
16 that you had with Standard Chartered Bank
17 representatives?
18     A  No.
19     Q  Were they present -- did they
20 participate by telephone?
21     A  No.
22     Q  So you and Charley met with Standard
23 Chartered Bank representatives and you got their
24 cards, and then --

Page 181

1      A  No, sir.  No, sir.  We got their --
2  we received the cards and introductions from Nancy
3  Downey.
4      Q  Fair enough.  You and Charley met
5  with Standard Chartered Bank representatives before
6  Joyce met with any Standard Chartered Bank
7  representatives, correct?
8      A  Yes.
9      Q  And National City did not participate
10 in your meetings with Standard Chartered Bank in
11 China, correct?
12     A  Did not.
13     Q  Then you told Joyce to go meet with
14 the Standard Chartered Bank representatives,
15 correct?
16     A  Yes, I did.
17     Q  And you told Joyce that you wanted
18 her findings and conclusions and recommendations on
19 how to proceed?
20     A  Yes.
21     Q  Meaning that you wanted Joyce to tell
22 you what her impressions were on whether CCC should
23 use Standard Chartered Bank in China?
24        MR. PAPAKIRK:  Objection; exceeds

CIN-TEL CORPORATION
PH. 513-621-7723                                                    FX. 513-621-6558

Page 294

1  2010 did PNC participate in any meetings with CCI
2  and Standard Chartered Bank concerning exercise on
3  the Standby Letter of Credit and how those proceeds
4  would be applied?
5      A  In a personal meeting, no, but phone
6  conversations, I believe there was some.
7      Q  PNC was never present during a
8  personal meeting?
9      A  A personal meeting in China, no.
10     Q  Okay.
11     A  Personal meeting here, yes, with us.
12     Q  And who was present during those
13 phone calls?
14     A  What phones calls?
15     Q  For PNC. The phone calls that I
16 thought you just referenced.
17     A  I said they were -- we were present
18 here for meetings.
19     Q  When you say "we," who are you
20 talking about?
21     A  I'm talking about myself, Steve
22 Oberst, and Tom Dodd from time to time. Oftentimes
23 it was myself and Tom.
24     Q  And was there any representative of

Page 295

1  Standard Chartered Bank participating in those
2  meetings?
3      A  No. Logistically the international
4  thing of being in China didn't facilitate a lot of
5  personal face-to-face meetings from time to time.
6      Q  So there were no meetings between
7  those three parties, Standard Chartered Bank, CCI,
8  and PNC concerning the draw on the Standby Letter
9  of Credit and how those funds would be applied?
10         MR. PAPAKIRK: Objection as to form.
11     A  If you can consider a phone
12 conversation here, then a phone conversation here
13 one meeting, I -- there was -- there was not a lot
14 of joint -- maybe we should have got on the phone
15 with everyone together, but I -- that was -- we
16 didn't have joint meetings.
17     Q  Okay. So when you say "This is
18 exactly what we asked Lucas to do in our meeting,"
19 I don't understand what you're referring to when
20 you say "what we asked Lucas to do."
21         What did you ask Lucas to do?
22     A  To utilize the LC proceeds to pay off
23 the line of credit that it was collateralizing.
24     Q  And that was a meeting that you had

Page 296

1  with Lucas Du after you found out that PNC was not
2  going to renew the Standby Letter of Credit?
3          MR. PAPAKIRK: Objection;
4      mischaracterizes.
5      A  That was a meeting we had after we
6  learned that PNC would not renew.
7      Q  Which was in March or so, 2010,
8  correct?
9      A  I would have to double check the
10 documents, but I believe so.
11     Q  Okay. And Lucas indicated that,
12 according to you, he could not use the funds to pay
13 off the CCC line of credit as our available GAP was
14 too small.
15         Now, you used the words there "our
16 available GAP was too small." What did you mean?
17         MR. PAPAKIRK: Objection to the
18     extent this deals with CCC and not this
19     corporate deponent.
20     A  I don't recall the specifics of GAP
21 accounting in China. I can't recall what I meant
22 specifically there.
23     Q  Then you go on to say: The capital
24 contribution was his suggestion. Whose suggestion?

Page 297

1      A  I believe initially it was Lucas
2  Du's, because that was a workable solution that
3  would satisfy the SAFE regulatory program. And
4  this earlier -- this was an earlier meeting, and it
5  was subsequent to that that we began the capital
6  authorization process.
7      Q  So Standard Chartered Bank is the
8  party that came up with the idea or the suggestion
9  for the capital contribution solution, correct?
10         MR. PAPAKIRK: Objection to form.
11     A  That's what I stated in this memo.
12     Q  And in the second paragraph, you
13 say: We are working -- capital contribution. We
14 are working a second step to get the LC payoff
15 considered as a capital contribution from CCI to
16 CCC. What did you mean by that?
17     A  I believe the same thing, because if
18 it was -- we knew that the obligation from PNC was
19 going to be, round numbers, $1.6 million, and that
20 if we would make that payment -- we knew the
21 obligation was there and we were working with Tom
22 Todd so when it happened that it would involve the
23 terms and conditions of the term loan agreement.
24         So if we could just make that a week

| | |
|---|---|
| **From:** | Joyce XU [joycexu@consortium-companies.cn] |
| **Sent:** | Tuesday, June 22, 2010 3:31 AM |
| **To:** | Roger C. Schreiber; Steven M. Oberst |
| **Cc:** | Nick Stothard |
| **Subject:** | FW: PNC letter |
| **Attachments:** | Capital Contribution Authorization.pdf |

Dear Roger,


Need explain this with you.

When I checked with SCB Olive about they sent an simple e-mail to PNC and confirm our Capital Account information.

I mentioned we got the Authorization Letter already. Olive think this is helpful for her communications with her colleagues, than asked scan it and sent to her.

But she mentioned in the Authorization Letter, can not has any wording about SBLC……


So…we canceled some words in the Letter accordingly. Please kindly find the attachment, that's the Letter I transferred to SCB finally.

I think if PNC can sign the Chinese translation on the other page, I will only submit the Chinese page to the SAFE. And this is only supporting document for our Capital Verification Reports, will no need from SCB finally.


Kindly let me know if you have any concern on this.

Thank you!


Best regards,

Joyce



件人: Nick Stothard
送：2010年6月22日 11:58
收件人: Joyce XU
主：RE: PNC letter



DEPOSITION EXHIBIT 16 S-30-12

CONS_05234

---

Nick Stothard

President AAI / GM CCC

Office: (020)39990500

Cell: 86-13602290007

---

CCEMAIL

From: Joyce XU
Sent: Tuesday, June 22, 2010 11:32 AM
To: Nick Stothard
Subject: " ": PNC letter

CONS_05235

## Capital Contribution Authorization

Consortium Companies, Inc. - PNC Bank, National Association

It is agreed that Consortium Companies, Inc. hereby authorizes PNC Bank, National Association to wire capital funds of USD 1,600,000 to Guangzhou Consortium Display Product Company Ltd.

Signature of the Authorizer:
Consortium Companies, Inc.

Date: June 16 2010

## Entrusted Capital Contribution

PNC Bank, National Association - Consortium Companies, Inc.

It is hereby acknowledged that under the authorization of Consortium Companies, Inc., PNC Bank, National Association is wiring funds on behalf of Consortium Companies, Inc. of USD 1,600,000 to Guangzhou Consortium Display Product Company Ltd. on June 16, 2010 which Consortium Companies Inc. advises it intends as capital.

Signature of the Bank:
PNC Bank, National Association

Date: June 16, 2010

CONS_05236



CONS_05237