**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 11-5-DLB-JGW**

**GUANGZHOU CONSORTIUM DISPLAY PRODUCT**        **PLAINTIFFS**
**COMPANY, LTD., et al.**

**VS.**        <u>**MEMORANDUM OPINION AND ORDER**</u>

**PNC BANK, NATIONAL ASSOCIATION, et al.**        **DEFENDANTS**

\* \* \* \* \* \* \* \* \*

## I.   INTRODUCTION

This action primarily concerns a loan security instrument known as a "standby letter of credit."   In this case, a Chinese bank loaned money to the wholly-owned Chinese subsidiary of a Kentucky corporation.   To secure that loan, the Kentucky corporation obtained a standby letter of credit from an American bank.   As explained below, the Chinese bank eventually demanded payment from the American bank under the letter.   The American bank made payment, but because of a currency conversion problem, the Chinese bank never effectively received the payment.   Consequently, Plaintiffs defaulted on their loan and brought the instant lawsuit.

This matter is currently before the Court on the Motion to Dismiss Plaintiffs' First Amended Complaint (Doc. # 57) filed herein by the Chinese bank, Defendant Standard Chartered Bank (China) Limited (hereinafter "Standard Bank").   This motion is fully briefed and ripe for review.   (*See* Docs. # 57-1, 68, & 79).   The central question raised in the instant motion is whether Standard Bank subjected itself to personal jurisdiction in Kentucky

1

by becoming a beneficiary of the standby letter of credit issued on behalf of a Kentucky corporation.  Because the Court finds that merely becoming a beneficiary of a standby letter of credit does not subject a party to personal jurisdiction in a particular forum, the Court will **grant** Standard Bank's Motion to Dismiss.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from Plaintiffs' First Amended Complaint (Doc. # 23), the Affidavit of Roger Schreiber (Doc. # 68-1) submitted by Plaintiffs, and the Affidavit of Yunni Tang (Doc. # 57-2) submitted by Defendant Standard Bank.

### A.   The Parties

Plaintiffs are a Kentucky corporation and its wholly-owned Chinese subsidiary.[1]  The Kentucky corporation is named Consortium Companies, Incorporated, and has its principal place of business in Kentucky.  The Chinese subsidiary is named Guangzhou Consortium Display Product, Ltd., and has its principal place of business in China.  The Court will refer to the Kentucky corporation as "Consortium USA" and to the subsidiary as "Consortium China."  It is important to note that the subsidiary, Consortium China, is organized under Chinese law and is considered an independent person under Chinese law.

Defendant PNC Bank, National Association[2] is a banking association established under United States law, with its principal place of business in Pennsylvania.  Defendant Standard Bank is a foreign bank incorporated in China with its principal place of business

---

[1] There are a few individual Plaintiffs who served as guarantors of the loan at issue in this action. Plaintiff Roger Schreiber is the Chief Financial Officer of Consortium USA and a member of Consortium China's board of directors.  (Doc. # 68-1, ¶ 4; Doc. # 57-2, ¶ 7). Plaintiffs Steven Oberst and Lynda Oberst are also directors of Consortium China.  Any titles that Plaintiffs Clinton and Susan Oberst may have held within the Consortium Companies are not clearly alleged.

[2] PNC is the successor in interest to National City Bank. For purposes of clarity and brevity, the Court will refer to both banks collectively as PNC.

2

in China.

### B.    The Standby Letter of Credit

In the summer of 2007, Consortium China entered into a loan agreement with Standard Bank for over $1 million.  To secure the loan, Standard Bank required Consortium China to procure a standby letter of credit.   Acting on Consortium China's behalf, Consortium USA applied to PNC for a standby letter of credit.   PNC approved the application and issued the "Irrevocable Standby Letter of Credit" (Doc. # 8-5) in August of 2007.  The Letter named Standard Bank as the beneficiary.  This meant that if Consortium China did not repay its loan to Standard Bank, Standard Bank could demand that PNC pay it off instead.

### C.    The Problem with the Standby Letter of Credit

As early as 2008, Standard Bank became concerned that Consortium China did not have enough capital to meet Chinese regulatory requirements.  Accordingly, Standard Bank asked Consortium USA to sign a letter of undertaking promising to inject additional capital into Consortium China.  Consortium USA agreed and executed a Letter of Undertaking in 2008.  Nevertheless, by early 2010, Consortium China remained undercapitalized.  Around this time, Plaintiffs learned that Consortium China's insufficient capital might cause a serious problem.  Standard Bank informed Plaintiffs that under Chinese regulations, it could not convert U.S. dollars to Chinese Renmibi on behalf of a company that was undercapitalized.  This meant that any payment PNC made to Standard Bank under the Letter could not be converted into Chinese currency and would therefore be ineffective to pay off Consortium China's loan.[3]

---

[3] Standard Bank alleges that it informed Plaintiffs of this problem in 2008.  However, for the purpose of the instant motion, it is irrelevant when Plaintiffs learned of the problem.

3

Around the same time, PNC notified Consortium USA that it would not renew the Letter, which was set to expire in July of 2010.  Plaintiffs knew that before the Letter expired, Standard Bank would demand that PNC pay off Consortium China's loan.  They also knew that if PNC attempted to make such a payment, it would be ineffective due to the currency conversion problem, and Consortium China would default on its loan.

### D.   The Solution: the Capital Contribution Authorization

To circumvent this problem, all parties (including Standard Bank, PNC, and both Consortium Companies) collaborated to devise a solution, ultimately agreeing on an alternative payment mechanism.  Since PNC could not pay Standard Bank directly under the Letter, it would pay them indirectly.  PNC would send Consortium China an amount of money equivalent to the outstanding balance on the loan, and Consortium China would then immediately turn around and use those funds to pay off its loan with Standard Bank. The plan's intent was to avoid a demand for payment under the Letter and to repay Consortium China's loan, while also discharging PNC's obligations to Standard Bank under the Letter.

Plaintiffs allege that PNC commemorated this plan in a document entitled "Capital Contribution Authorization."  (Doc. # 23-1).  This document provided that:

> "It is hereby acknowledged that under the authorization of Consortium Companies, Inc. and the credit facility and letter of credit previously established for Consortium Companies, Inc., PNC Bank, National Association is wiring funds on behalf of Consortium Companies, Inc. of USD 1,600,000 to Guangzhou Consortium Display Product Company Ltd. which Consortium Companies, Inc. advises it intends as capital."

(Doc. # 23-1).  Plaintiffs confirmed with PNC and Standard Bank that the Capital Contribution Authorization was acceptable, and then informed PNC that it could proceed with the transaction.

4

### E.    PNC's Failure to Follow the Capital Contribution Authorization

It is undisputed that PNC never wired the funds to Consortium China as contemplated by the Capital Contribution Authorization.  Consequently, Standard Bank demanded payment from PNC under the Letter in the amount of $1,760,000, and PNC complied, making payment on July 9, 2010.  As anticipated, due to the currency conversion problem, Standard Bank never effectively received this payment.  Consortium China not only defaulted on its loan, but was exposed to double liability, since it now owed $1,760,000 to PNC as well.  Plaintiffs contend that these events effectively shut down their Asian operations.

### F.    The Instant Litigation

Plaintiffs filed their original complaint in Boone Circuit Court on January 3, 2011. (Doc. # 1-1, at 8-9).  On January 10, 2011, Defendant PNC removed to federal court, on the basis of diversity jurisdiction.  (Doc. # 1).  Plaintiffs later filed their First Amended Complaint on April 27, 2011.  (Doc. # 23).  By their First Amended Complaint (Doc. # 23), Plaintiffs allege eight counts; however, only Count 2 for breach of fiduciary duty is alleged against Defendant Standard Bank.  The Court's jurisdiction is premised on diversity of citizenship under 28 U.S.C. § 1332.

On July 11, 2012, Defendant Standard Bank filed the instant Motion To Dismiss Plaintiffs' First Amended Complaint (Doc. # 57) which is ripe for decision.

## III.   ANALYSIS

Because a standby letter of credit stands at the heart of this litigation, it is important to understand what a standby letter of credit is and how it works.   A standby letter of credit is a security device, which operates like a surety or performance bond.  Lord, Richard A.,

5

*Williston on Contracts*, § 2.23 (4th ed. 1993).  It differs from a commercial letter of credit, which substitutes as the primary means of payment in a sale of goods.  *In re Graham Square, Inc.*, 126 F.3d 823, 827 (6th Cir. 1997).  A standby letter of credit is used secondarily in a nonsales transaction "as a guarantee against default on contractual obligations."  *Id.* (quotation and citation omitted).  It "substitutes the financial strength of the issuing bank for that of the applicant."  50 Am. Jur. 2d Letters of Credit § 9 (2006).

The most crucial aspect of a standby letter of credit is the so-called "independence rule."  The independence rule holds that an issuing bank's duty to pay the beneficiary is not dependent on whether the customer failed to perform the underlying contract.  *Williston*, *supra.*  As long as the beneficiary demands payment in the form specified by the letter, the bank must pay the beneficiary.  *Id.*  "The bank is not concerned with whether the [customer] has in fact performed; its only concern is [ ] whether the [beneficiary's] demand for payment complies with the letter of credit."  *Id.*  "Among other things, this means that the [bank] can generally ignore claims by its customer that the beneficiary has breached the contract . . . ."  *Id.*  The independence rule thus "requires that a letter of credit be kept separate from the underlying contract that generates it.  This 'insulates the letter of credit from disputes over performance of collateral agreements and allows the letter of credit to function as a swift and certain payment mechanism.'"  *In re Graham,* 126 F.3d at 827 (quoting Gerald T. McLaughlin, *Letters of Credit and Illegal Contracts: The Limits of the Independence Principle*, 49 Ohio St. L.J. 1197, 1197 (1989)).

A standby letter of credit does not stand alone; it typically represents one of three agreements forming a "tripartite contractual relationship" between a borrower, a lender, and a bank.  *Bouzo v. Citibank, N.A.*, 96 F.3d 51, 56 (2d Cir. 1996); *see also In re Graham,*

6

*supra* ("A letter of credit transaction comprises three separate contracts").  These three agreements are as follows:

> (1) "first, the underlying contract ... between the [borrower] and the [lender];"
>
> (2) "second, the agreement between the [bank] ... and [the borrower] ... in which the [bank] typically agrees to issue the letter of credit in return for [the borrower's] promise to reimburse it for any payments made under the credit plus a commission;" and
>
> (3) "third, the letter of credit itself[,] which is an engagement by the bank or other issuer that it will honor drafts or other demands for payment presented by the [lender] or a transferee beneficiary upon compliance with the terms and conditions specified in the credit."

*Bouzo*, 96 F.3d at 56 (internal citation omitted).  A standby letter of credit thus serves to assure the lender that if the borrower is unable to pay the amount it owes, the bank will pay it instead.  *See id.*  The borrower typically applies for the letter of credit, and is thus known as the "credit applicant."  The lender is typically named as the "beneficiary" under the letter, since he has the right to demand payment under the letter.  The bank that issues the letter is known as the "issuing bank."

Here, the Standby Letter of Credit constituted one part of a nearly-prototypical tripartite contractual relationship.  The first part was the underlying loan agreement between the lender/beneficiary, Standard Bank, and the borrower, Consortium China.  The second part was the Reimbursement Agreement between the credit applicant, Consortium USA, and the issuing bank, PNC.  The third part was the Standby Letter of Credit between the issuing bank, PNC, and the beneficiary, Standard Bank.  This three-way relationship was nearly-prototypical because it had one wrinkle: there was a fourth party.  Consortium China did not apply for the Standby Letter of Credit itself; Consortium USA applied for it on

Consortium China's behalf.

This fact—that a Kentucky corporation (Consortium USA) was the credit applicant for the Standby Letter of Credit—is vitally important to the instant Motion to Dismiss.  It forms the basis for Plaintiffs' central argument that Standard Bank subjected itself to personal jurisdiction in Kentucky by becoming a beneficiary of a Standby Letter of Credit issued on behalf of a Kentucky corporation.  Standard Bank, of course, contends that this facts does not subject it to personal jurisdiction in Kentucky.

Having set forth this background, the Court turns to the standard of review it will use to adjudicate the instant Motion to Dismiss.

### A.    Standard of Review

In considering a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff, as the party asserting personal jurisdiction, always bears the burden of demonstrating that jurisdiction exists.  *See Serras v. First Tenn. Bank Nat'l Assn.*, 875 F.2d 1212, 1214 (6th Cir. 1989); *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).  In opposing a Rule 12(b)(2) motion, a plaintiff asserting personal jurisdiction, "may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).  Here, Plaintiffs have submitted the Affidavit of Roger Schreiber, CFO of Consortium USA, along with many of the parties' e-mails.  (*See* Doc. # 68-1.)  For its part, Defendant Standard Bank has filed the Affidavit of Yunni Tang, one of its account managers.  (*See* Doc. # 57-2.)  Plaintiffs have also requested an evidentiary hearing as well as jurisdictional discovery.

8

In resolving of a Rule 12(b)(2) motion, the Court has three alternatives: "it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen*, 935 at 1458.  The method selected affects the plaintiff's burden of proof.  *Id.* When the court evaluates a jurisdictional motion relying solely on the affidavits, "the plaintiff should be required only to make a prima facie case of jurisdiction . . . [and] the burden of the plaintiff is relatively slight."  *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1168-69 (6th Cir. 1988).

Upon careful reflection, the Court concludes that it can decide Standard Bank's motion utilizing the first alternative without the need for discovery or an evidentiary hearing. When the district court forgoes an evidentiary hearing in resolving a Rule 12(b)(2) motion, it "must consider the pleadings and affidavits in a light most favorable to the plaintiff," *CompuServe*, 89 F.3d at 1262, and it "does not weigh the controverting assertions of the party seeking dismissal."  *Theunissen*, 935 F.2d at 1459 (citing *Serras*, 875 F.2d at 1214). Therefore, "[d]ismissal . . . is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction."  *CompuServe*, 89 F.3d at 1262 (citing *Theunissen*, 935 F.2d at 1459).

B.    **Personal Jurisdiction under the Due Process Clause[4]**

For personal jurisdiction to be proper under the Fourteenth Amendment's Due Process Clause, a defendant must have certain "minimum contacts" with the forum state,

---

[4] Because personal jurisdiction is not proper under the Due Process Clause,  there is no need for the Court to examine Kentucky long-arm jurisdiction. Thus, the Court will proceed directly to its due process inquiry. In so doing, the Court is well aware that Kentucky long-arm jurisdiction is not co-extensive with federal due process.  *See Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51 (Ky. 2011).  Even if long-arm jurisdiction were proper here, the Court would still dismiss on due process grounds.

such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal citation and quotation omitted).  There are two forms of personal jurisdiction: general and specific.

Plaintiffs only argue for the application of specific personal jurisdiction.  Specific jurisdiction "exposes the defendant to suit in the forum state only on claims that 'arise out of or relate to' a defendant's contacts with the forum."  *Kerry Steel v. Paragon Industries, Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-415 & nn. 8-10 (1984)).

In *Southern Machine Co. v. Mohasco Industries, Inc.*, the Sixth Circuit implemented a three prong test to determine the "outerlimits" of specific jurisdiction.  401 F.2d 374, 381 (6th Cir. 1968).  These criteria are stated as follows:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Id.*  As explained below, Plaintiffs have not established the first prong of the *Mohasco* test—"purposeful availment"; thus, the Court need not consider the remaining two prongs.  *See LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1303 (6th Cir. 1989) ("each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked").

Purposeful availment is the single most determinative factor in the personal jurisdiction inquiry.  *Mohasco*, 401 F.2d at 381-82.  The essence of purposeful availment

10

is whether a defendant should have "reasonably anticipate[d] out-of-state litigation." *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985) (internal citations omitted).   The Supreme Court has explained this foreseeability test as follows:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.  The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Id.* at 474-75 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).   A defendant engages in purposeful availment when he "deliberately" generates "substantial connections" with the forum state, engages in "significant activities" in the forum state, or creates "continuing obligations between himself and the residents of the forum." *Burger King*, 471 U.S. at 475-476.

With this framework in mind, the Court turns to Plaintiffs' arguments in favor of personal jurisdiction.  Plaintiffs contend that Standard Bank subjected itself to personal jurisdiction in Kentucky in connection with three documents: (1) the Standby Letter of Credit; (2) the Capital Contribution Authorization; and (3) the underlying loan agreement. The Court will proceed to evaluate each argument.

### 1.    The Standby Letter of Credit

Plaintiffs first argue that Standard Bank subjected itself to personal jurisdiction in Kentucky by becoming a beneficiary of a standby letter of credit issued on behalf of a Kentucky corporation.  This is an issue of first impression in the Sixth Circuit. [5]   However,

---

[5] The Sixth Circuit has addressed the role of the issuing bank in a letter of credit transaction, holding that "the mere issuance of a letter of credit naming a resident of a particular state as beneficiary does not subject the issuing bank to the jurisdiction of that state."  *Chandler v. Barclays Bank PLC*, 898 F.2d 1148,

the Ninth Circuit addressed a similar question in *Paccar International, Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058 (9th Cir. 1985), holding that merely becoming the beneficiary of a standby letter of credit does not subject the beneficiary to personal jurisdiction in a particular forum.

### a.    The *Paccar* Decision

*Paccar* involved a standby letter of credit issued by a California bank, naming a Kuwaiti bank as beneficiary.  The credit applicant was a Delaware subcontractor.  When the Kuwaiti bank demanded payment from the California bank, the Delaware subcontractor sought an injunction from a federal district court in California to compel the Kuwaiti bank to withdraw its demand.  *Id.* at 1061.  The Kuwaiti bank opposed the injunction on personal jurisdiction grounds.  It was undisputed that the Kuwaiti bank had only two contacts with California: "(1) the existence of the letter of credit, and (2) the Kuwaiti bank's attempt to draw under the letter of credit" from the California bank.  *Id.* at 1062.  Nevertheless, the district court granted the injunction, finding that "[the Kuwaiti Bank's] status as beneficiary of the letter of credit was sufficient to uphold jurisdiction."  *Id.*  The Kuwaiti bank appealed.

The Ninth Circuit reversed, holding that merely becoming the beneficiary of a standby letter of credit does not subject a beneficiary to personal jurisdiction in a particular forum.  *Id.* at 1063-64.  The court articulated three grounds for its decision.  First, the court noted the absence of any allegation that the Kuwaiti bank had "participated in the selection of" the California bank as the issuing bank, or the "decision to employ [any] California bank" in the first place.  *Id.*  That fact was important because the California bank's presence in

---

1151 (6th Cir. 1990) (internal quotation omitted).

that state was the sole purported basis for personal jurisdiction in California.  Second, the court refuted the notion that parties to a letter of credit implicitly "rely on their ability to enforce the letter of credit in a particular forum."  *Id.*  On the contrary, the court explained, such parties may "anticipate enforcing the letter of credit in any one of several forums."  *Id.* Third, the court held that due process would be violated if the Kuwaiti bank could be subjected to personal jurisdiction in California without having committed a single "affirmative act" there.  *Id.* at 1063.  Such a result would vitiate the longstanding rule that "the mere existence of a contract is insufficient to confer personal jurisdiction," the court reasoned.  *Id.*

*Paccar* thus stands for the proposition that merely becoming a beneficiary of a standby letter of credit does not subject the beneficiary to personal jurisdiction in a particular forum.  Personal jurisdiction is only proper when the beneficiary purposefully avails itself of the privilege of conducting business in a particular forum by means of some affirmative act.  In the absence of controlling Sixth Circuit authority, the Court finds *Paccar*'s reasoning persuasive, and therefore adopts it for the purpose of the instant case.

### b.    Applying *Paccar*

Applying *Paccar* to the instant case, the Court finds that Standard Bank did not subject itself to personal jurisdiction in Kentucky merely by becoming the beneficiary of a standby letter of credit issued on behalf of a Kentucky corporation.  The three-part rationale of *Paccar* applies with equal force here.

First, Plaintiffs have not alleged that Standard Bank was involved in selecting Consortium USA as the credit applicant.  In fact, Plaintiffs never explain who made this selection.  Just as there was no allegation in *Paccar* that the Kuwaiti bank participated in

13

the decision to employ a California bank as the issuing bank, here there is no allegation that Standard Bank took part in the decision to employ a Kentucky corporation as the credit applicant.  Second, like the *Paccar* court, this Court will not assume that the Parties to the Standby Letter of Credit implicitly relied on their ability to enforce the Letter in Kentucky.  Third, Plaintiffs have failed to show that Standard Bank committed an affirmative act in Kentucky.

Plaintiffs argue that Standard Bank committed an affirmative act in the Commonwealth by negotiating the terms of a standby letter of credit on which a Kentucky corporation (Consortium USA) was the credit applicant.  However, the Court finds this argument insufficient for two reasons.  First, Plaintiffs have provided no evidence that Standard Bank was involved in negotiating the Letter's terms.  In the sole relevant e-mail, Standard Bank Assistant Vice President, Lucas Du, tells Consortium Companies CFO Roger Schreiber "[p]lease [note] that [Standard Bank] has agreed to the attached [Standby Letter of Credit] wording from [PNC]."  (Doc. # 68-1 at 24-25).  This e-mail indicates that Standard Bank *approved* the Letter's terms, not that it *negotiated* them.  However, even if this e-mail could be read as evidence of negotiation, Plaintiffs have not adequately explained how Standard Bank's negotiation *with PNC* (a Pennsylvania corporation) constitutes an affirmative act in Kentucky.  In the Court's view, this link is too tangential to form the basis for personal jurisdiction over a foreign bank, particularly because there is no allegation that Standard Bank had anything to do with selecting Consortium USA as the credit applicant.

### 2.    The Capital Contribution Authorization

Plaintiffs next argue that Standard Bank committed affirmative acts in Kentucky by

14

communicating through phone and e-mail with Consortium USA CFO Roger Schreiber in Kentucky regarding the Capital Contribution Authorization. (Doc. 68 at 12).[6]  Specifically, Plaintiffs contend the e-mails show that Standard Bank's Lucas Du was the idea man behind the Capital Contribution Authorization.  Plaintiffs appear to be correct.  The e-mails demonstrate that Mr. Du not only advised Consortium USA on the currency conversion problem, but also laid out in detail how to solve that problem through the capital injection plan that later became the Capital Contribution Authorization. (*See* Doc. 68-1 at 49-51) (two e-mails from Mr. Du to Consortium USA's Roger Schreiber regarding the capital injection plan).  Plaintiffs assert that they relied on this advice in forming the Capital Contribution Authorization, and thus argue that Standard Bank's communications regarding the Capital Contribution Authorization were affirmative acts purposefully directed at a Kentucky citizen (Consortium USA).

It is doubtful, however, that a beneficiary to a standby letter of credit engages in purposeful availment by advising a credit applicant on the operation of a standby letter of credit.  *Paccar* is silent on this question.   However, under Sixth Circuit precedent, communication by e-mail and phone in the development of an interstate contract does not alone constitute purposeful availment.  For instance, in *LAK*, the Sixth Circuit held that the parties' long distance contract negotiations by phone "strike us as precisely the sort of 'random,' 'fortuitous,' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions."  885 F.2d at 1300-01.

---

[6]  Plaintiffs also reference Standard Bank's website, though they do not specifically argue that Standard Bank purposefully availed itself of the laws of Kentucky through the site. Given Plaintiffs lack of argument, the Court simply notes that the maintenance of a website does not typically constitute purposeful availment. *See, e.g., Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002). Moreover, Plaintiffs do not argue that they viewed or accessed Standard Bank's website.

The Sixth Circuit later characterized contract negotiations by phone and fax as "immaterial" in *Kerry Steel*. 106 F.3d at 151. The Sixth Circuit has also cited with approval the Fifth Circuit's decision in *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983), in which the court held that "the exchange of communications [by telex, telephone, and letter] between Texas and Alaska in the development of the contract . . . *in itself* is also insufficient to be characterized as [purposeful availment]." (emphasis added). Another example is *Capital Dredge & Dock Corp. v. Midwest Dredging Co.*, 573 F.2d 377, 380 (6th Cir. 1978), in which the Sixth Circuit held that the facts were "simply insufficient" to support personal jurisdiction where the parties negotiated modifications to the contract by phone from the forum state.

In the instant case, the fact that Standard Bank agreed to communicate with Roger Schreiber via phone and e-mail from Kentucky appears to have been merely a "convenience" to him. *See LAK*, 885 F.2d at 1302. Plaintiffs have failed to show that the real object of Standard Bank's financial advice was to have "ongoing," "far-reaching," "continuous," or "substantial" consequences in the Kentucky financial services market. *Cf. Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 911 (6th Cir. 1988) (upholding Michigan's exercise of personal jurisdiction over an out-of-state defendant on the ground that the "object of [defendant's] contacts with Michigan [was] to have ongoing, far-reaching consequences in the Michigan dental services market."). In fact, Plaintiffs have not even argued that any of Standard Bank's activities had a "realistic impact on the commerce of [the forum] state." *Mohasco*, 401 F.2d at 382. Although Plaintiffs assert that their U.S. operations suffered as a result of Standard Bank's actions, "the locus of such a monetary injury is immaterial, so long as the obligation did not arise from 'a privilege that the

16

defendant exercised in [the forum state].'" *Kerry Steel*, 106 F.3d at 151 (internal citation omitted). Here, Plaintiffs have failed to show how Standard Bank "exercised a privilege" in Kentucky by merely advising Consortium USA through phone and e-mail on the Standby Letter of Credit and the Capital Contribution Authorization. Accordingly, Standard Bank cannot be said to have formed a "continuing obligation or relationship" with Consortium USA in Kentucky. *See Burger King*, 471 U.S. at 473.

Plaintiffs cite two federal cases from Kentucky to support their argument that a defendant's phone calls and e-mails can support personal jurisdiction. However, neither case establishes that such communications alone can trigger personal jurisdiction. In fact, in both cases, the courts grounded their finding of personal jurisdiction on the defendants' extensive Kentucky contacts.

 In the first case, *Ivan Ware & Son, Inc. v. Delta Aliraq, Inc.*, No. 3:10-CV-484-H, 2010 WL 5186730 (W.D. Ky. Dec. 15, 2010), the defendant played a particularly "active role" over the course of two years soliciting services and funds from the plaintiff in Kentucky, and the contractual obligations at issue were performed in Kentucky. In the second case, *United States v. Bacara Partners, LLC*, No. 11-342-JBC, 2012 WL 1984012 (E.D. Ky. May 31, 2012), a case recently reassigned to the undersigned judge, the defendant generated over $3 million in revenue as a result of its Kentucky contacts under an agreement governed by Kentucky law. The defendant also solicited "the purchase of federal tax refund claims held by [a third party Kentucky resident]" and sent "fifty percent of the net proceeds from the tax refund claims back into Kentucky on at least three separate occasions." *Id.* at *1. Former Chief Judge Jennifer Coffman characterized these Kentucky contacts as "intentional, significant, and sustained." *Id.*

17

While both the *Ware* and *Bacara* court cited phone and e-mail communications as one factor supporting personal jurisdiction, both courts made it clear that these communications were not the sole factor supporting personal jurisdiction. This distinguishes *Ware* and *Bacara* from the instant case, where Standard Bank's only contact with a Kentucky citizen was its phone and e-mail contact with Consortium USA regarding the Capital Contribution Authorization.

Plaintiffs emphasize that Standard Bank's e-mails spanned a three-year period. However, this statement is misleading because most of the e-mails were directed at Consortium China, not Consortium USA. Moreover, in the Sixth Circuit, purposeful availment is judged by the quality, not the quantity of e-mail communications. *LAK*, 885 F.2d at 1301 ("A numerical count of the calls and letters has no talismanic significance: 'The quality of the contacts as demonstrating purposeful availment is the issue, not their number or their status as pre- or post-agreement communications.'") (internal citation omitted)). The number of e-mails Plaintiffs cite is therefore not controlling.

### 3.     The Underlying Loan from Standard Bank to Consortium China

It is undisputed that the sole parties to the underlying loan agreement were two Chinese companies: Standard Bank and Consortium China. On its face, then, it would seem that the loan clearly does not support personal jurisdiction over Standard Bank in Kentucky. Yet, Plaintiffs argue that it does. They contend that Consortium China was essentially the alter ego of Consortium USA, and that Standard Bank was well aware of this fact. For instance, they note that Standard Bank held in-person loan meetings with Roger Schreiber, who serves in a dual capacity as Consortium USA's CFO, and as a member of Consortium China's board of directors. Accordingly, Plaintiffs reason that when Standard

18

Bank formed a "banking relationship" with Consortium China, it effectively formed a "banking relationship" with Consortium China's parent corporation, Consortium USA.

As Standard Bank notes, this argument ignores Plaintiffs' own cited authority, *Law of the People's Republic of China on Wholly-Foreign Owned Enterprises*, which provides that a "wholly-foreign owned enterprise" (such as Consortium China) is an independent person under Chinese law. (*See* Doc. 68, at 4; 68-1, at ¶ 3).[7] Plaintiffs cite no authority for the proposition that the Court can disregard a company's independent legal status to establish personal jurisdiction over a foreign entity.

Plaintiffs' argument also entirely ignores the record evidence showing that the Parties' entire course of dealing and performance occurred in China between two Chinese businesses (Standard Bank and Consortium China). For example, the loan was signed by Joyce Zu, a Consortium China employee, who was authorized by a resolution of Consortium China's board of directors to do so. Ms. Xu acted as Standard Bank's main point of contact on the loan for the next several years. All loan payments were made from Consortium China's office in China. Additionally, no Standard Bank employee ever traveled to the United States to meet with Consortium USA.[8] Even Consortium USA's Roger

---

[7] A wholly-foreign owned enterprise is an "investment vehicle that is solely owned and operated by a foreign investor or combination of investors in China." The US-China Business Council, Wholly Foreign-Owned Enterprise Fact Sheet (May 2011), https://www.uschina.org/public/documents/2011/05/wfoe-fact-sheet-2011.pdf; Ministry of Commerce, People's Republic of China, Law on Wholly-Foreign Owned Enterprises (November 26, 1988), Art. 1, http://englishmofcom.gov.cn/aarticle/lawsdata/chineselaw/200411/20041100311068.html. These entities are considered independent persons under Chinese law. Law on Wholly-Foreign Owned Enterprises, *supra*, at Art. 8.

[8] Plaintiffs have not disputed these facts, taken from the Affidavit of Yunni Tang (Doc. # 57-2). Since they are uncontroverted, the Court accepts them as true for the purposes of the instant motion. *See Theunissen*, 935 F.2d at 1459 (holding that the district court is only prohibited from weighing the "*controverting* assertions of the party seeking dismissal") (emphasis added).

Schreiber acknowledged in an e-mail to Standard Bank that the sole parties to the lending relationship were Standard Bank and Consortium China.  (*See* Doc. 68-1 at 32) (Schreiber writing during loan negotiations that he "felt that [Standard Bank] and [Consortium China] could develop a very positive and mutually beneficial relationship that could last for many years.").

These facts demonstrate that Standard Bank did not "reach out" from China and "create continuing obligations" with a Kentucky citizen.  *Burger King*, 471 U.S. at 473.  In analyzing whether a party has "reached out," the Sixth Circuit has considered it significant that a defendant did not advertise in the forum state, did not have a "program" to generate clients in the forum state, did not have offices or employees in the forum state, and did not travel to the forum state to conduct business.  *LAK*, 885 F.2d at 1300; *Kerry Steel*, 106 F.3d at 151.  None of these factors are present here.

Consortium USA also argues that it had direct contact with Standard Bank regarding the loan by means of two documents: the Letter of Undertaking and the Subordination Agreement.  (Doc. # 68 at 6).[9]  It is true that Consortium USA produced both of these documents at Standard Bank's request.  However, the documents' purpose was to support the pre-existing lending relationship between Standard Bank and Consortium China.  Standard Bank did not use the documents to create a separate "continuing obligation or relationship" with Consortium USA.  *See Burger King*, 471 U.S. at 473.

---

[9]  Plaintiffs also point out that as a prerequisite to opening Standard Bank bank accounts for Consortium China, Standard Bank required Consortium USA (as the sole owner) to furnish various documents including: "business account opening forms, a declaration of the beneficial owners of Consortium USA (on Consortium USA letterhead), an organization chart (on Consortium USA letterhead), and a verified copy of Consortium USA's certificate of existence issued by the Commonwealth of Kentucky."  (Doc. # 68, p. 6; *see also* Doc. # 68-1, ¶ 5). These facts simply have no jurisdictional significance.

The Letter of Undertaking, for instance, simply represented Consortium USA's promise to inject additional capital into Consortium China. This Letter was meant to assure Standard Bank that Consortium China would be adequately capitalized so as to satisfy Chinese regulatory requirements. Moreover, Consortium USA signed the Letter in its capacity as a Consortium China shareholder. The Letter of Undertaking was therefore incidental to the underlying loan. In the same way, the Subordination Agreement has no independent jurisdictional significance. The Agreement was merely intended to assure Standard Bank that its loan to Consortium China would hold priority over any debt Consortium China might owe to Consortium USA. (*See* Doc. # 68-1, at 44-46) (e-mail from Du explaining that the Subordination Agreement was meant to "assur[e] [Standard Bank] that the [Consortium USA] will not ask [Consortium China] to repay [any] shareholder loan[s] before [the] bank loan has been repaid."). Accordingly, neither the Letter of Undertaking nor the Subordination Agreement serve as a basis for personal jurisdiction over Standard Bank.

## IV.   CONCLUSION

For all the reasons stated herein, Plaintiffs have not made a *prima facie* showing that Standard Bank purposefully availed itself of the laws of Kentucky. Since Plaintiffs have not established the "purposeful availment" prong of the *Mohasco* test, the Court need not consider the remaining two prongs. *See LAK*, 885 F.2d at 1303. The Court will therefore grant the instant Motion to Dismiss on personal jurisdiction grounds, and need not address Standard Bank's argument regarding the legal sufficiency of Plaintiffs' breach of fiduciary duty claim (Count 2) under Rule 12(b)(6). Accordingly,

21

**IT IS ORDERED** as follows:

(1)     Defendant Standard Chartered Bank (China) Limited's Motion To Dismiss Plaintiffs' First Amended Complaint (Doc. # 57) be, and is hereby **GRANTED**; and

(2)     Count 2 of Plaintiffs' First Amended Complaint (Doc. # 23) is hereby **DISMISSED WITHOUT PREJUDICE** as to Defendant Standard Bank.

This 14th day of February, 2013.

Signed By:

*David L. Bunning*   *DB*

United States District Judge

G:\DATA\Opinions\Covington\2011\11-5 MOO Granting MTD.wpd