UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

*Electronically Filed*

| | |
|---|---|
| GUANGZHOU CONSORTIUM PRODUCT DISPLAY COMPANY, ET AL. ) ) ) ) | |
| PLAINTIFF ) ) | |
| v. ) ) ) | CIVIL ACTION NO. 2:11-CV-00005-DLB |
| PNC BANK, NATIONAL ASSOCIATION ) ) ) | |
| DEFENDANT ) | |

**COMBINED RESPONSE TO THE MOTIONS FOR SUMMARY JUDGMENT OF THE GUARANTOR DEFENDANTS AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Counterclaim Plaintiff, PNC Bank, National Association ("PNC") hereby tenders the following combined response to the motions for summary judgment filed by Steven M. Oberst, Lynda Oberst, Clinton S. Oberst, Susan Oberst, and Roger C. Schreiber (hereinafter "the Guarantors").[1]  In addition, PNC tenders this memorandum in support of its cross-motion for summary judgment against the Guarantors.  The guaranty agreements signed by the Guarantors are enforceable and PNC is entitled to judgment thereon as a matter of law.

---

[1] Because the issues concerning enforceability of the guaranty agreements raised in the motion for summary judgment filed by the Oberst guarantors **[DN 127]** and the motion for partial summary judgment filed by Schreiber **[DN 126]** are identical, PNC has combined its responses to those motions as reflected herein.

# BACKGROUND[2]

### A.  The Guarantors Are Sophisticated Parties With Extensive Experience in Lending Transactions.

The Guarantors are the owners and officers of Consortium Companies Incorporated ("CCI"), a Kentucky corporation engaged in the business of manufacturing point of purchase displays and packaging. [*See* 5/31/12 Deposition of Steven Oberst [DN 110-1], 10-11]. Steven M. Oberst is CCI's President and Roger Schreiber served as the company's Chief Financial Officer. [*See* 8/15/12 Deposition of Roger Schreiber [DN 114-1], 155]. Schreiber joined CCI in the late 1990s after a 22 year career in a multi-billion dollar food service company where he served as treasurer, Chief Financial Officer, and Divisional Vice President. [*Id.* at 169-71].

CCI conducted business both domestically and internationally with operations in North America, Europe, Hong Kong, and China. [*See* 8/14/12 Steven Oberst Deposition [DN 112-2], 380]. CCI's Chinese affiliate, Guangzhou Consortium Product Display Company, Limited ("CCC") was engaged in the same line of business in China. [5/31/12 Oberst Depo. [DN 110-1], 10]. Prior to CCI moving its banking relationship to PNC, CCC's operations were funded through a line of credit with China

---

[2] The factual background relevant to the unfounded claims against PNC for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, and tortious interference was extensively briefed in the memoranda filed by PNC in support of its motion for summary judgment on those claims. PNC hereby adopts and fully incorporates herein by reference the Memorandum in Support of Motion for Summary Judgment of Defendant PNC Bank, National Association and the accompanying materials [DN 104-1], the Reply in Support of Defendant's Motion for Summary Judgment and accompanying materials [DN 124] and the Memorandum in Support of Motion for Summary Judgment of Counterclaim Plaintiff, PNC Bank, National Association [DN 133-1]. This response is limited to addressing the attacks on the enforceability of the Guaranty agreements that were provided to induce PNC to extend credit.

Merchants Bank ("China Merchants") that was secured by a standby letter of credit issued by ABN/AMRO. CCI's European operations were funded by a line of credit by Royal Bank of Scotland. [*See* 5/30/12 Schreiber Deposition **[DN 108-1]**, 203-204]. Thus, the Guarantors were sophisticated businessmen with significant experience in international trade and lending transactions.

### B. CCI Agreed to Reimburse PNC for Any Amount Drawn on the Standard Chartered Standby Letter of Credit.

On July 17, 2007, CCI submitted an Application for Irrevocable Standby Letter of Credit to PNC (the "Application"). [*Id.* at 310-12].[3] The Application requested PNC issue an Irrevocable Standby Letter of Credit in the amount of $1,000,000 US dollars for the benefit of Standard Chartered Bank (China) Limited ("Standard Chartered").[4] The Application required CCI to "date and officially sign the Reimbursement and Security Agreement included herein." [*Id.*]. The Reimbursement and Security Agreement (the "RSA") provided the terms under which the standby letter of credit would be issued.[5] Schreiber was authorized to sign both the Application and the

---

[3] The Application was submitted to PNC's predecessor, National City Bank, N.A. ("NCB"). PNC is the successor by merger to NCB and, therefore, is entitled to enforce the obligations that are the subject of this action. PNC and NCB are hereinafter collectively referred to as "PNC."

[4] The Application has already been made part of the Court record, most recently as Exhibit 1 to the Memorandum in Support of Motion for Summary Judgment of Counterclaim Plaintiff PNC Bank, National Association **[DN 133-2]**.

[5] The RSA was also included in Exhibit 1 to the Memorandum in Support of Motion for Summary Judgment of Counterclaim Plaintiff PNC Bank, National Association **[DN 133-2]**.

RSA on behalf of CCI. [*Id.*]. PNC approved the Application and issued letter of credit No. SCL013861 (the "SBLC") on July 23, 2007.[6]

### C. Each of the Guarantors Signed Guaranty Agreements to Induce PNC to Extend Financing to CCI.

Beginning in June 2007, PNC extended an operating line of credit that was used to fund CCI's operations. In the summer of 2008, CCI fell out of compliance with its loan covenants regarding collateral position. To address that noncompliance, the Guarantors signed and delivered to PNC the Guaranty agreements at issue. Specifically, Roger Schreiber provided PNC with a Guaranty agreement dated August 27, 2008 that was limited to a maximum liability of $700,000.[7] Clint Oberst and Susan Oberst provided PNC with a Guaranty agreement dated September 2, 2008 that stipulated a maximum liability of $400,000.[8] Steven Oberst and Lynda Oberst provided PNC with a Guaranty agreement dated September 2, 2008 that stipulated a maximum liability of $1,400,00.[9] Each of the Guaranty agreements acknowledged that they were intended "to induce [PNC] to extend or continue to extend credit to Consortium Companies, Incorporated" and expressly reflected each of the Guarantors' "unconditional" guaranty to pay each and every obligation of CCI then existing or created thereafter. [*See*

---

[6] A copy of the SBLC has already been made part of the Court record most recently as Exhibit 2 to the Memorandum in Support of Motion for Summary Judgment of Counterclaim Plaintiff PNC Bank, National Association **[DN 133-3]**.

[7] A copy of Schreiber's Guaranty agreement is attached to Plaintiff Roger C. Schreiber's Motion for Partial Summary Judgment **[DN 126-2]**.

[8] A copy of the Guaranty agreement signed by Clint Oberst and Susan Oberst is attached as Exhibit 4 to PNC's Counterclaim **[DN 38-4]**.

[9] A copy of the Guaranty agreement signed by Steven Oberst and Lynda Oberst is attached as Exhibit 5 to PNC's Counterclaim **[DN 38-5]**.

4

Guaranty agreement **[DN 126-2]**, ¶1]. The Guaranty agreements further stated that the Guarantors waived "all defenses in law or equity" to the enforceability of the Guaranty agreements. [*Id*. at ¶3]. The Guarantors each represented and warranted that "this Guaranty constitutes a valid, binding, and legally enforceable obligation of Guarantors subject only to laws relating to bankruptcy and creditors rights generally." [*Id*. at ¶5]. The Guarantors consulted with their legal counsel before executing the Guaranty agreements. [*See* 5/30/12 Schreiber Deposition, Exhibit 24 **[DN 108-25]**, pg. 6]. The Guarantors do not dispute that the respective Guaranty agreements were executed by them and delivered to PNC.[10]

### D. CCI Signed a Term Note Reflecting Its Obligation to Repay the Amount Drawn on a Standby Letter of Credit Issued to Royal Bank of Scotland.

By the end of 2009, CCI had arranged to pay off its existing line of credit with PNC thereby reducing its outstanding obligations to the debt relating to two letters of credit – the $2,000,000 SBLC issued to Standard Chartered and a $1,000,000 standby letter of credit issued to Royal Bank of Scotland ("RBS"). [*See* 9/12/12 Deposition of Thomas Dodd, Exhibit 193 **[DN 116-43]**]. The parties agreed to convert the $1,000,000 RBS standby letter of credit to a term loan. On December 30, 2009, Roger Schreiber signed a term note on behalf of CCI in the principal amount of $1,000,000 (the "Term Note") and his signature was witnessed by CCI's president, Steve Oberst.[11] The Term

---

[10] *See* Co-Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment **[DN 127-1]**, 2.

[11] A copy of the Term Note has already been made part of the record, most recently as Exhibit C to Plaintiff Roger Schreiber's Motion for Partial Summary Judgment **[DN 126-4]**.

Note provided, among other things, for a maturity date of April 30, 2010, an interest rate of 7%, and monthly principal payments of $20,000 plus interest beginning on January 15, 2010.  [*See* Term Note **[DN 126-4]**, ¶2(B)].  The Term Note also indicated that it was issued in connection with other documents, including a "letter agreement," the terms of which were incorporated therein by reference.  Specifically, the Term Note stated:

> 6.  **Other Loan Documents**.  This Note is issued in connection with a letter agreement or loan agreement between the Borrower and the Bank dated on or before the date hereof, and the other agreements and documents executed and/or delivered in connection therewith or referred to therein the terms of which are incorporated herein by reference (as amended, modified, or renewed from time to time, collectively the **"Loan Documents"**), and secured by the property (if any) described in the Loan Documents and by such other collateral as previously may have been or may in the future be granted to the Bank to secure this Note.

*Id.* at ¶6.  CCI and the Guarantors consulted with legal counsel extensively prior to executing the Term Note.  [*See* 5/30/12 Schreiber Depo., Exhibit 24 **[DN 108-25]**, pgs. 13-19].

### E.    The Guarantors Expressly Acknowledged that the Term Note Was Secured by the Guaranty Agreements.

As contemplated by paragraph 6 of the Term Note, the Guarantors executed various additional documents contemporaneously with the execution of that instrument.  Specifically, each of the Guarantors signed a "Letter Agreement – Term Loan" (the "Letter Agreement") dated December 30, 2009.[12]  The Letter Agreement indicated that it related to a $1,000,000 term loan to CCI the proceeds of which were to "be used to repay amounts drawn on a letter of credit that was issued for [CCI's]

---

[12] A copy of the Letter Agreement is attached as Exhibit 1 to the accompanying Affidavit of Thomas Dodd.

6

account" and defined that obligation as the "Loan." [Letter Agreement, Dodd Aff., Ex. 1, ¶1]. The Letter Agreement further reflected the Guarantors' acknowledgement that they had previously provided PNC with individual Guaranty agreements which were also being provided as security for the Loan. Specifically, the Letter Agreement stated:

> 5. **Security**. The Borrower has previously caused the following to be executed and delivered to the Bank in form and content satisfactory to the Bank as security for the Loan:
>
> (a) A Guaranty dated August 27, 2008, executed and delivered by Roger Schreiber; a Guaranty dated September 2, 2008, executed and delivered by Clint S. Oberst and Susan Oberst; and a Guaranty dated September 2, 2008, executed and delivered by Steven M. Oberst and Lynda G. Oberst (individually or collectively, the "Guarantor").

[*Id.*, ¶5]. In addition, the Letter Agreement acknowledged that the Guarantors "waived, released and relinquished any and all defenses" they had with respect to the Loan or any "documents or instruments … securing or in any way relating to the Loan …." [*Id.* at ¶10]. Once again, the Guarantors consulted extensively with their legal counsel prior to signing the Letter Agreement. [*See* 5/30/12 Schreiber Depo., Exhibit 24 **[DN 108-25]**, 13-15, 19, 21, 23, 26, 28].

### F. The Guarantors Also Reaffirmed that the Guaranty Agreements Were Provided to Secure Repayment Under the RSA.

The Guarantors also executed a Partial Payment and Partial Release Agreement dated as of December 30, 2009 (the "PPRA").[13] The PPRA acknowledged and described the instruments reflecting CCI's existing debt obligations to PNC, including the RSA:

---

[13] A copy of the PPRA is attached as Exhibit 2 to the accompanying Affidavit of Thomas Dodd.

7

> WHEREAS, Consortium executed and delivered to Lender a Commercial Note: Revolving Credit ("Note") and **Security Agreement ("SA") dated July 17, 2007** (SA and Note and all other documents executed in connection therewith are "Loan Documents") which evidence a loan in the face amount of $8,000,000 ("Loan") as more fully described in such Loan Documents….. (emphasis added)

[PPRA, Dodd Aff., Exhibit 2, pg. 1]. The PPRA also confirmed that the Guarantors had previously executed and delivered the Guaranty agreements securing CCI's obligations to PNC, including the RSA:

> WHEREAS, Schreiber, [Clint and Susan Oberst], and [Steven and Lynda Oberst] executed and delivered to Lender certain Guaranty agreements ("Guaranties") for the Loan extended by [PNC] to Consortium.

[*Id.*].[14] When they executed the PPRA, CCI and the Guarantors expressly acknowledged that they were "represented by counsel of their choice" and that they delivered the PPRA "of their own free will and choice." [*Id.*, ¶3]. Indeed, the record confirms that the Guarantors communicated extensively with their legal counsel prior to executing the PPRA. [*See* 5/30/12 Schreiber Depo., Exhibit 24 **[DN 108-25]**, 13-16, 19, 23-28]. In fact, legal counsel for four of the five Guarantors, Gregory McDowell, witnessed their individual signatures on the PPRA. [PPRA, Dodd Aff., Exhibit 2, pg. 4].

G. **PNC Complied With Standard Chartered's Demand for Payment Under the SBLC.**

On April 24, 2010, pursuant to the requirements set forth in the SBLC, PNC provided Standard Chartered with notice that it would not extend the SBLC past its

---

[14] The PPRA also confirmed that it was provided in connection with the Term Note, stating that CCI had agreed to sign and deliver "a note ("LOC Note") … to repay the expected draw on the [RBS standby letter of credit] which LOC Note will have a maturity date of April 30, 2010 with an interest rate of 7% with monthly principal payments of $20,000 per month plus interest beginning January 15, 2010…." [*Id.* at ¶1].

8

expiration date of July 13, 2010.[15] CCI was aware that PNC was not going to renew the SBLC and knew that PNC was required to notify Standard Chartered of that decision. [*See* 5/30/12 Schreiber Depo. **[DN 108-1]**, 323].

Two months later, on July 1, 2010, Standard Chartered drew on the SBLC by directing PNC to transfer $1,762,220.[16] As acknowledged by Schreiber, the draw request reflected the language required by the terms of the SBLC as amended. [*See* 5/30/12 Schreiber Depo. **[DN 108-1]**, 326-327]. PNC transferred $1,762,220 to the account designated by Standard Chartered on July 7, 2010.[17]

  H. **CCI and the Guarantors Have Refused to Honor PNC's Demand for Reimbursement of the Amount Drawn on the SBLC and Payment of the Amount Due on the Term Note.**

By letter dated November 16, 2010, PNC demanded reimbursement of the amount paid on the SBLC and the amount due under the Term Note.[18] It is undisputed that CCI and the Guarantors have failed and refused to honor PNC's request for payment of those obligations.

---

[15] A copy of PNC's notice of nonrenewal has already been made a part of the Court's record including as an attachment to PNC's Motion to Dismiss **[DN-25-10]**.

[16] A copy of Standard Chartered's draw request has already been made part of the Court record most recently as Exhibit 3 to the Memorandum in Support of Motion for Summary Judgment of Counterclaim Plaintiff PNC Bank, National Association **[DN 133-4]**.

[17] A copy of the confirmation that Standard Chartered received funds pursuant to the SBLC has already been made part of the Court's record including as an attachment to PNC's Motion to Dismiss **[DN 25-12]**.

[18] A copy of PNC's default and demand letter has already been made part of the Court's record including as an attachment to PNC's Counterclaim **[DN 38-7]**.

9

**ARGUMENT**

**I.  KRS 371.065 DOES NOT INVALIDATE THE GUARANTY AGREEMENTS.**

The Guarantors contend that the Guaranty agreements fail to comply with KRS 371.065(1) and are, therefore, unenforceable as a matter of law. [*See* Plaintiff Roger Schreiber's Motion for Partial Summary Judgment **[DN 126]**, 6-8; Motion for Summary Judgment **[DN 127]**, 4-9]. A guaranty can satisfy the requirements of the statute by either (1) being written on the instrument being guaranteed; (2) referring to the instrument being guaranteed; or (3) being signed by the guarantor and specifying the amount of the maximum liability and the date in which the guaranty terminates. *See BP Products N.Am., Inc. v. McGurk Oil Company, Inc.*, 2011 U.S. Dist. LEXIS 58897, *9 (W.D. Ky. 2011). If any one of the three requirements is met, the guaranty is valid and enforceable. *Wheeler & Clevenger Oil Company, Inc. v. Washburn*, 127 S.W.3d 609, 614 (Ky. 2004).

The purpose of KRS 371.065 is to protect guarantors from over-reaching guarantys and unintended obligations. *See Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 399 (6th Cir. 2000) ("the Kentucky statute on its face reflects a desire to protect against overbroad guaranties of indebtedness made without adequate disclosure"). The Kentucky Supreme Court has stated that the statute is "a consumer-protection provision designed to protect the guarantor by reducing the risk of a guarantor agreeing to guarantee an unknown obligation." *Wheeler & Clevenger Oil Co.*, at 615. The statute is not intended to provide a mechanism for sophisticated business persons and their legal counsel to escape obligations to which they knowingly and willingly agreed.

Here, the statute is satisfied by the reference to the Term Note, the RSA, and the individual Guaranty agreements in the Letter Agreement and the PPRA. The Letter Agreement was signed by each of the Guarantors, identifying their respective Guaranty agreements by date and acknowledging that the Guaranty agreements were being provided as security for the Loan reflected by the Term Note. Likewise, the PPRA was signed by each of the Guarantors contemporaneously with the Term Note reaffirming the individual Guaranty agreements and specifically describing the provisions of the Term Note. The Term Note referenced the Letter Agreement and incorporated that document by defining the Term Note, the Letter Agreement, and the "other agreements executed and/or delivered in connection therewith" as the integrated "Loan Documents." Thus, the Letter Agreement expressly stated that the Guaranty agreements were provided as security for the Term Note, and the Term Note incorporated the Letter Agreement as a Loan Document.

Likewise, the PPRA specifically referenced the RSA and acknowledged that the individual Guaranty agreements were provided as security for that instrument. [*See* PPRA, Dodd Aff., Exhibit 1, pg. 1]. The Guarantors agreed that the PPRA reflected an "integrated agreement of the parties with respect to the items listed in the prefatory recitations …." which included both the Guaranty agreements and the RSA. [*See* PPRA, Dodd Aff., Exhibit 2 ¶8]. Thus, the PPRA, which was signed by each of the Guarantors and witnessed by legal counsel for four of the five Guarantors, confirms and reflects the integrated agreement formed by the RSA and the Guaranty agreements.

Courts interpreting KRS 371.065 recognize that the required reference to the instrument being guaranteed can be found in the language of multiple documents.

11

For example, in *Smith v. Bethlehem Sand & Gravel Co., LLC*, 342 S.W.3d 288, 295 (Ky. App. 2011), the court found that a guaranty agreement complied with the statute when it referred to "a $500,000 term note" from the borrower to the lender and referenced an additional document entitled "Schedule 1" that described the obligation being guaranteed. The court held that the guaranty agreement effectively referenced the instrument it guaranteed within the meaning of the statute "[i]n light of the combined language of the guaranty agreement and Schedule 1 document …" *Id.* at 292. Since the combined documents satisfied the "referred to" requirement in the statute, the remainder of the statute was inapplicable. *Id.*

Similarly, in *Banterra Bank v. Hendrick*, 2011 WL 832455 (W.D. Ky. 2011) the court recognized that the statute does not require a detailed and specific reference to the instrument being guaranteed. Rather, the reference is sufficient if it allows the court to identify the instrument. The guaranty in *Banterra Bank*, stated that the guarantor guaranteed "the performance and discharge of all Borrower's obligations under the Note and the Related Documents." *Id.* at *9. The "Note" was defined in the guaranty as "[t]he promissory note from Borrower to Lender, bearing the same dates as this mortgage in the original amount equal to the maximum lien amount of this mortgage." *Id.* The court held that this somewhat oblique reference to the instrument guaranteed, "[w]hile perhaps not exact as this Court might like," was sufficient to satisfy KRS 371.065(1). *Id; see also General Electric Capital Corp. v. Kasey*, 2007 WL 162941 (W.D. Ky. 2007) (upholding a guaranty that referred only to "the Lease and its related documents." *4).

The necessary nexus between the Guaranty agreements and the instruments they guaranteed is provided by the Letter Agreement and the PPRA. The Guarantors signed the Letter Agreement on December 30, 2009 which was expressly incorporated in the Term Note and confirmed that the Guaranty agreements were provided as security for that instrument. The Guarantors also signed the PPRA on December 30, 2009 which specifically identified the RSA, described the Term Note, and reaffirmed their Guaranty agreements. In light of the language of those documents, the Guaranty agreements effectively reference the instruments guaranteed within the meaning of the statute and those agreements are valid and enforceable.

## II. THE GUARANTOR DEFENDANTS WAIVED ANY ALLEGED DEFECTS IN THE GUARANTY AGREEMENTS.

To induce PNC to continue to extend credit to CCI, the Guarantors signed the Guaranty agreements which expressly provided that the Guarantors waived all legal and equitable defenses to the enforceability of those agreements. A year later, each of them signed the Letter Agreement stating: "[E]ach guarantor and their respective heirs, legal representatives, successors and assigns, hereby; (a) expressly waive, release, and relinquish any and all defenses, affirmative defenses … of any kind or nature whatsoever which … any guarantor … might assert, against the bank with respect to the Loan, the Loan Documents, or … any other documents or instruments … securing or in any way relating to the Loan." [Letter Agreement, ¶10]. Those waivers preclude the Guarantors from now attacking the enforceability of the Guaranty agreements based on the alleged failure to comply with KRS 371.065.

A waiver is "a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might

13

have demanded or insisted upon." *Dunn v. Gordon Food Servs, Inc.*, 780 F. Supp. 2d 570, 576 (W.D. Ky. 2011). When determining whether a waiver is voluntary and intentional, a court looks to "(1) plaintiff's experience, background, and education; (2) the amount of time plaintiff had to consider whether to sign the waiver, including whether ... [there was] an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; (5) the totality of the circumstances." *Id*.

Here, the Guarantors are educated, sophisticated professionals with substantial experience in international trade and lending transactions. They not only had ample time to read and consider the documents in which the waiver provisions were clearly and explicitly presented, they also had the benefit of consulting with legal counsel prior to executing both documents. "[O]ne who signs a contract is presumed to know its contents . . . It is a rule in this state that a party who can read and has an opportunity to read the contract which he signs must stand by the words of his contract." *Ky. Road Oiling Co. v. Sharp*, 257 Ky. 378, 78 S.W.2d 38, 42 (1934); *see also Shadeh v. Circuit City Stores, Inc.*, 334 F. Supp. 2d 938, 941 (W.D. Ky. 2004). When dealing with "an agreement voluntarily entered into by sophisticated and knowledgeable businessmen concerning a financial transaction of considerable magnitude . . . [there is] no real support for the proposition that one of the parties is free to repudiate his promise." *Fite & Warmath Const. Co., Inc. v. MYS Corp.*, 559 S.W.2d 729, 735 (Ky. 1977).

Not only have Kentucky courts given effect to waivers that are intentional and voluntary, they have repeatedly recognized that rights and protections provided by statute can be waived. *See, e.g., Sackett v. Citizens First Bank*, 2004-CA-001324-MR, 2006 WL 2382506 (Ky. App. Aug. 18, 2006). In *Sackett*, a lender extended a revolving

14

credit loan to a borrower and obtained guarantees thereon from three parties. *Id.* at *1. When the borrower was unable to meet the initial maturity date of the loan, the borrower's president executed a renewal note that extended the maturity date by three months. *Id.* The lender sued the guarantors to collect the debt when the borrower was still unable to meet its obligations. *Id.* The guarantors argued they were discharged from liability by operation of KRS 355.3-605(3), which then provided that if a person entitled to enforce an instrument agrees to an extension of the due date, the extension will discharge the guarantors if it causes a loss regarding their right to recourse. *Id.* The *Sackett* court acknowledged this statute "provide(s) various protections to guarantors" but explained "these provisions may be waived or altered by contract." *Id.* at *2. The court held that because the guarantors, in their guaranty agreement, authorized the lender to extend the maturity date of the loan without notice, the guarantors had waived the protection of the statute and therefore were not discharged from liability for the amount of the loan. *Id.*

Similarly, in *Walter J. Hieb Sand & Gravel, Inc. v. Universal C. I. T. Credit Corp.*, 332 S.W.2d 619, 622 (Ky. 1959), the court enforced a contract in which the plaintiff waived the right, as provided by KRS 371.040, to raise certain defenses against an assignee of a contract. *Id.* at 621. The contract in question was assigned to a third party and when the plaintiff attempted to raise defenses against the assignee in subsequent litigation the assignee argued that the plaintiff was prevented from doing so by the contractual waiver. *Id.* The court agreed, holding that "the waiver of defenses contained in the conditional sales agreement does not offend the public policy of this state and, as a consequence, the trial court properly ignored [plaintiff's] defense and

15

correctly adjudged [defendant] entitled . . . ." *Id*. at 622. Thus, waiver of a statutory protection or defense is valid and enforceable.

Like the parties in *Sackett* and *Hieb Sand & Gravel*, the waivers reflected in the Guaranty agreements and the Letter Agreement are valid. The Guarantors are sophisticated businesspeople who, with the benefit of counsel, intentionally and knowingly waived the protection provided by KRS 371.065(1) in exchange for a substantial financial benefit. They should not now, to the detriment of PNC, be allowed to avoid obligations to which they willingly agreed.

### III. THE GUARANTORS ARE ESTOPPED FROM CLAIMING THAT THE GUARANTY AGREEMENTS ARE UNENFORCEABLE.

Each of the Guarantors signed the Letter Agreement and PPRA in December 2009 specifically reaffirming the validity of their respective Guaranty agreements. The Guarantors acknowledged that they were signing those documents to induce PNC to continue to extend credit. Under Kentucky law, the doctrine of equitable estoppel precludes a party from asserting a claim or defense that is inconsistent with a position in which he is previously acquiesced, where another party has relied upon that position to his detriment. *e.g.*, *U.S. Achievement Academy, LLC v. Pitney Bowes, Inc.*, 458 F. Supp.2d 389, 408 (E.D. Ky. 2006); *see also Cent. Contractors Serv., Inc. v. Ohio County Stone Co., Inc.*, 255 S.W.2d 17, 20-21 (Ky. 1952) (estopping defendant from contesting the validity of a lien on his property where defendant previously took action recognizing the validity of the lien). That doctrine is directly applicable to the situation at hand.

Equitable estoppel overlaps with another well established principal of Kentucky law: "[w]here one accepts and retains benefits of a transaction or of an

16

instrument which he was not required to take, an estoppel operates to prevent the party that benefited from questioning the validity of the transaction or basis of it." *Hicks v. Combs*, 223 S.W.2d 379, 381 (Ky. 1949). In other words, a party is precluded from "questioning the existence or effect of a contract when he has asserted its existence to his benefit or the other party's detriment." *Scheck Mech. Corp. v. Borden, Inc.*, 186 F. Supp.2d 724, 734-35 (W.D. Ky. 2001) (citing *Stewart v. Siddens*, 687 S.W.2d 536, 539 (Ky. App. 1984)).

Here, the Guarantors expressly and specifically reaffirmed and acknowledged the enforceability of the Guaranty agreements not once, but twice, in order to induce PNC to continue to provide financing. Both the Letter Agreement and the PPRA referenced the Guaranty agreements and indicate that those agreements were being provided as security for CCI's obligations. Having represented to PNC that the Guaranty agreements are valid in order to induce PNC to continue to provide financing, and having benefited from that representation, the Guarantors cannot now claim that the Guaranty agreements are invalid.

## **CONCLUSION**

For the reasons set forth herein, the guarantor defendants' motion for summary judgment must be denied. Moreover, PNC's cross-motion for summary judgment on its counterclaims against the Guarantors should be granted.

Respectfully submitted,


/s/ Cornelius E. Coryell II
Cornelius E. Coryell II
ccoryell@wyattfirm.com
Rachel K. Mulloy
rmulloy@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898
502.589.5235

Counsel for PNC Bank, National Association

### CERTIFICATE OF SERVICE

        I hereby certify that on March 27, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

| | |
|---|---|
| Gregory W. McDowell<br>GREGORY W. MCDOWELL, P.S.C.<br>7415 Burlington Pike, Suite B<br>Florence, KY 41042<br><br>*Co-counsel for Guangzhou Consortium Display Product Company, Ltd. and Consortium Companies, Incorporated*<br><br>*Attorney for Steven M. Oberst, Lynda S. Oberst, Clinton S. Oberst, and Susan J. Oberst*<br><br>Todd J. Flagel<br>James Papakirk<br>FLAGEL & PAPAKIRK LLC<br>50 E Business Way, Suite 410<br>Cincinnati, OH 45241<br><br>*Co-Counsel for Guangzhou Consortium Display Product Company, Ltd. and Consortium Companies, Incorporated* | Kevin R. Feazell<br>CORS & BASSETT<br>537 East Pete Rose Way, Suite 400<br>Cincinnati, OH 45202-3502<br><br>*Attorney for Roger C. Schreiber* |

                                              /s/ Cornelius E. Coryell, II

60334337.1