# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
### COVINGTON DIVISION

| | | |
|---|---|---|
| **GUANGZHOU CONSORTIUM** | : | **Case No. 2:11-CV-00005-DLB** |
| **DISPLAY PRODUCT COMPANY,** *et al.* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **JUDGE DAVID L. BUNNING** |
| **vs.** | : | |
| | : | |
| **PNC BANK, NATIONAL** | : | |
| **ASSOCIATION,** *et al.* | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

---

## CONSORTIUM COMPANIES, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY [DOC. 128]

---

### INTRODUCTION[1]

Somewhere amidst PNC's rhetoric and snarkiness, one would expect to find a straightforward response to straightforward claims. Instead, PNC apparently adopts the "merry-go-round" approach – if you spin it long enough and hard enough, someone is bound do get dizzy and confused. In response to Consortium USA's Motion for Partial Summary Judgment as to Liability [Doc. 128], PNC recycles the same arguments, weaving both the irrelevant and the inflammatory. Then, in an act of ultimate hypocrisy, after it concedes that there may be disagreements as to the facts, it cavalierly attempts to dismiss those facts cited by Consortium USA by arguing they are somehow immaterial, "unreliable" or "misleading."

---

[1] Consortium USA hereby adopts and fully incorporates by reference its Memorandum in Opposition to PNC's first Motion for Summary Judgment [Doc. 117] and its Motion for Partial Summary Judgment as to Liability [Doc. 128].

There is nothing confusing, however, about Consortium USA's claims that PNC's breached the CCA, its fiduciary duty, and the implied covenant of good faith and fair dealing.  And, a closer review of PNC's theories and the evidence in the record expose the shortcomings in PNC's arguments.

To truly distill this case to its essence, the Court need only analyze the elements of each claim and defense to determine if PNC is liable as to Consortium USA's claims and to determine if Consortium USA is liable as to PNC's Counterclaim.  However, to properly do that, it is first necessary to "fact check" PNC's "factual assertions" which exposes the "wheat from the chaffe" in PNC Memorandum.    The following questions demonstrate that CCI, not PNC, is entitled to judgment as to liability on CCI's claims for breach of contract, breach of duties, and breach of the implied covenant of good faith and fair dealing.

**Q:    Did PNC agree to wire funds on behalf of Consortium USA for the benefit of Consortium China?**
**A:    Yes.**

There is no dispute that PNC executed the CCA after it hired outside counsel to review the agreement and re-drafted the agreement.  [Doc. 26-1; Doc. 116, 202:12-14, 215-216, 220-221.]  The plain, unambiguous language of the CCA provides for the direct wiring of funds to CCC's account on behalf of CCI.[2]  Significantly, this is a completely different process than that contemplated under the SBLC.  Under the earlier SBLC, the bank issuing the SBLC would pay the beneficiary directly once beneficiary draws on the

---

[2] It is hereby acknowledged that under the authorization of Consortium Companies, Inc. and the ***credit facility*** and ***letter of credit previously established for Consortium Companies, Inc***., PNC Bank, National Association is <u>wiring funds</u> on ***behalf of Consortium Companies, Inc***. of USD 1,600,00 to Guangzhou Consortium Display Product Company Ltd. which Consortium Companies, Inc. advises it intends as capital.  [Doc. 26-1 (emphasis added).]

2

SBLC through an authenticated swift. This, in and of itself, shows that the CCA was signed as an alternative to the SBLC.

**Q:   Does the CCA contain the requisite terms to be an enforceable contract?**
**A:   Yes.**

There is no dispute that the CCA expressly provides for the wiring of funds directly to Consortium China for the benefit of Consortium USA. As this Court indicated, the terms may be shown through extrinsic evidence. [Doc. 36, pp. 4-5 (*citing Kovacs v. Freeman*, 957 S.W.2d 251, 257 (Ky. 1997)).] The extrinsic evidence requested by the Court and admitted into the record establish the terms of repayment. [Doc. 117-18, 117-26, 117-28; Doc. 116, 224-225, 238:2-10.] Taken together, PNC's own written correspondence with Consortium USA, its proposed term note, its internal documentation, and the CCA make it clear that PNC's advance to pay off the Chinese line of credit would be paid under one term note that contained specific terms memorialized on the attached **Exhibit A**. Consequently, the advance would not be paid under the Reimbursement and Security Agreement that accompanied the SBLC. [Doc. 117-28.]

**Q:   Does the CCA satisfy the Statute of Frauds under Kentucky law?**
**A:   Yes.**

Curiously, PNC argues that the CCA somehow fails to satisfy the Statute of Frauds.[3] Yet, a plain review of the CCA and the extrinsic evidence demonstrates that the CCA satisfies the Statute of Frauds, as separate writings may form the memorandum of

---

[3] PNC mischaracterizes this Court's November 21, 2011 Opinion [Doc. 36] by stating the Court has recognized the CCA does not satisfy the Statute of Frauds.

contract required by the Statue of Frauds.  *Byrd v. Packaging Unlimited, Inc.*, 2002-CA-002209-MR, 2004 WL 539125 *5 (Ky. App. Mar. 19, 2004).

Preliminarily, there is no dispute that the CCA includes a specific reference to the "credit facilities" that provide the terms of repayment.  PNC has itself to thank.  In its initial drafts, the CCA did not include any reference to "credit facilities" or "letter of credit."  [Doc. 124-2, pp. 2, 4.]  However, with the assistance of legal counsel, PNC insisted upon and made those changes to do exactly what it now claims is necessary to meet the Statute of Frauds.  [Doc. 124-2, p.6, where PNC added the reference to "credit facility" and "letter of credit" to the CCA.]  Through its own re-draft of the CCA, PNC ensured that the final draft of the CCA made specific reference to Consortium USA's credit facility. [Doc. 26-1.]  It is simply disingenuous for PNC to argue that there is no reference to other documents when PNC's own revisions to the CCA incorporated by reference the existing "credit facility."

When multiple documents are to be considered together to satisfy the statute of frauds, the initial document to be examined is the one containing the signature of the party to be charged.  *Id.*  In this case, that is the CCA.  The CCA specifically references "the credit facility and letter of credit previously established for Consortium Companies, Inc."  Here, as evidence by the written documents, the court can connect the CCA with the repayment terms for the credit facility established for Consortium USA that were previously negotiated between PNC and Consortium USA in anticipation of PNC's payoff of the Chinese line of credit.   [Doc. 117-26 discussing repayment to PNC once the "China LC" is exercised.]  This email correspondence between PNC and Consortium USA, together with the CCA, establish the terms of repayment of funds advanced by

PNC to payoff the Chinese line of credit.  Those terms are also confirmed in proposed loan documents, which specifically reference "all other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A."  [*See* Exhibit A.]

There is no dispute that PNC understood the terms of repayment for funds advanced under the CCA.  In an internal write-up drafted the very same day PNC executed the CCA, Tom Dodd outlines the expected arrangement and the exact terms of repayment.  [Doc. 117-18 referencing Consortium USA's credit facility and letters of credit.][4]  And, simultaneously with the signing of the CCA, the parties reflect the understanding that the funds advanced would be rolled into one new term loan.  [**Exhibit A**] Significantly, each one of these documents specifically references the credit facility established for Consortium USA.[5]

Here, there is no dispute that the CCA includes a specific reference to the "credit facility" that was in place for Consortium USA at the time of the execution of the CCA.  And, as Plaintiffs represented to the Court at oral argument on October 28, 2011, discovery has produced extrinsic evidence that, when read together, provide the necessary terms for the Court to find the existence of a contract in the CCA.  [Doc. 117-18; 117-26.]

---

[4] There is no dispute between the parties that PNC was going to pay off the Chinese line of credit out of "[*Consortium USA's] obligation*. What we would have paid out, that amount would have been added to the balance on the original term note, and then it would have been included with these draft documents." [Doc. 116, 238:1-10.]

[5] PNC argues that each document needs to specifically reference the CCA in order to satisfy the Statue of Frauds.  Following PNC's logic, the law would require the documents to *refer to each other*. However, the established body of case law (cited by PNC, nonetheless) requires the documents merely refer **one to the other**.

Finally, PNC tries to minimize the significance of the CCA by asking the Court to ignore its purpose as immaterial. [Doc. 136, p. 7]. However, the purpose of the CCA clearly shows the parties' intent to wire funds outside of the SBLC and to provide for repayment through the term note and its specific terms.

**Q:    Did PNC fulfill its obligations under the CCA?**
**A:    No.**

There is no dispute whatsoever that PNC did not wire the funds as required under the CCA. As a result, PNC breached its contractual agreement.

**Q:    Did Consortium USA somehow acknowledge that PNC would not advance additional funds in lieu of a draw on the SBLC?**
**A:    No.**

In arguing that Consortium USA somehow acknowledged the CCA was never meant to be paid, PNC patently distorts the record. PNC concludes that Consortium USA's "internal communications conclusively demonstrate that Schreiber understood that PNC would not advance additional funds in lieu of a draw on the SBLC …" [Doc. 136, p. 6.] In support, PNC cites Roger Schreiber's June 14, 2010 email [Doc. 104-23] as proof that (a) Consortium USA's "acknowledgement that PNC would not transfer any funds other than those required to satisfy a conforming draw on the SBLC…" and (b) "Schreiber clearly understood that the CCA was not an alternative payment mechanism because, even <u>after the CCA was signed</u>, he continued to state that it would be 'necessary for [Standard Chartered] to exercise the [SBLC] per an authenticated SWIFT message." [Doc. 136, pp. 4, 6.][6]

---

[6] Through that same document, PNC selectively quotes Mr. Schreiber to patch together a completely inaccurate assertion concerning the purpose of the CCA. [Doc. 136, p. 4.]

However, those assertions are patently false – as evidenced by a simple review of the dates – because the email cited by PNC was transmitted two days <u>before</u> PNC redrafted and signed the CCA on June 16, 2010. [Compare Doc. 104-23 dated Monday, June 14, 2010 with Doc. 26-1 dated Wednesday, June 16, 2010.] Therefore, like so many others in PNC's Memorandum, those assertions do nothing to alter the legal effect of the CCA PNC signed, as PNC suggests.  Further, the emails cited by PNC demonstrate that both Mr. Schreiber and Ms. Xu clearly expected that the claim for repayment would be handled through the Consortium China <u>capital account</u> to be funded through the CCA.  In other words, those emails support and don't contradict Consortium USA's assertion that PNC breached the CCA that Consortium USA expected PNC to fund the Consortium China capital account.[7]

**Q:** **Has PNC offered any explanation for why it re-drafted and signed the CCA and later requested that it be released from the CCA by Plaintiffs?**

**A:** **No.**

PNC acknowledges that there "may be a disagreement over the purpose of the CCA," but them attempts to dismiss it as immaterial.  [Doc. 37, 17:8-18.]  PNC's position is telling, particularly because it has never offered any explanation as to why it would re-draft and execute an agreement that PNC now claims has no legal meaning.  Moreover, why would PNC seek to have itself legally released from the CCA?  [Doc. 117-24.] Without question, PNC understood the CCA was as a legal undertaking but just wants to

---

[7] PNC is correct that, on June 22, 2010, Mr. Schreiber emailed Consortium China employee Joyce Xu that PNC was apparently not going to honor the CCA it signed six days earlier, directly in support of Consortium USA's claim that PNC breached the CCA. [Doc. 136, p. 6, citing Doc. 104-29.]

ignore it.  Even if PNC attempted to offer an explanation (which it does not), any explanation is simply not credible in the face of all of the evidence to the contrary.

**Q:    Did PNC assume a fiduciary relationship with Consortium USA?**
**A:    Yes.**

As outlined in CCI's Memorandum in Opposition to PNC's Motion for Summary Judgment [Doc. 117], PNC assumed from the outset a fiduciary role with Consortium USA, beyond merely a lender-borrower relationship.  Recognizing Consortium USA's desire to expand in Europe and China, PNC courted Consortium USA and offered to serve in numerous capacities as CCI's "one-stop shop" international banker and advisor. PNC repeatedly advised Consortium that it would provide "full international services for operations located in Europe and China," that it "offers substantial value to [Consortium] with [PNC's] expertise" and that "[PNC] can provide [Consortium] enhanced capabilities as [Consortium] goes to the next level.  [Doc. 117-5.]  According to PNC, it "offer[ed] [Consortium] experienced international banking and finance professionals to help [Consortium] navigate an increasingly complex global environment" including "[n]avigat[ing] the complex world of Chinese banking."  [Doc. 177-6.]  And, Jay Wuest told Consortium it was his responsibility "to understand the requirements and goals of [Consortium] and to deliver superior services, ideas and alternatives."  [Doc. 117-7.][8]

These representations worked.  Consortium USA moved all of its banking to and placed its full trust in PNC's predecessor, National City, for it to serve all of those domestic and international banking functions.

Contrary to PNC's assertion, PNC also assumed a role in CCI's Chinese banking relationships.  Not only did PNC act to directly advise Consortium USA on Chinese

---

[8] PNC's role was broad and varied.  There can be no dispute that PNC assumed the role and Consortium USA reposed confidence in PNC carrying out that role as more specifically set forth in Doc. 117.

matters, it brought its ally and "gateway" bank, Standard Chartered Bank, to the transaction as its "partner." [Doc. 108, 59:20-24, 60:1-4, 152:19-22, 157:19-22, 168, 206:13-21.] PNC promoted and received compensation in promoting that partnership to CCI and its affiliate. [Doc. 115, 242:6-10.] There is no dispute that PNC derived a financial benefit from the "gateway" relationship and that it now wants to ignore that for purposes of shunning its fiduciary role. [Doc. 113, 243:16-24; Doc. 115, 242:1-23.]

In addition, PNC also expressly assumed two distinct duties to act for and on behalf of Consortium USA under the CCA -- the duty of an agent and the duty to act in a manner that avoids a conflict of interest. [Doc. 26-1.] In doing so, PNC assumed the duty to act in its principal's interest and to protect its principal's interests over its own interests.

PNC tries to pigeonhole the entire fiduciary duty analysis by proclaiming that "[a]s a matter of Kentucky law, a bank does not have fiduciary duties to its borrowers and customers in the absence of special circumstances" and that "the only 'special circumstance'" recognized is the misappropriation of confidential information. [Doc. 136, p. 10.] This short-sighted view runs completely contrary to Kentucky law and the notion that a fiduciary duty and "special circumstances" are analyzed on a case-by-case basis. Otherwise, under PNC's reading, "special circumstances" would mean a "single circumstance."

A number of courts have recognized circumstances that may give rise to a fiduciary relationship between a bank and its customer. *See Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 521 (Fla. Dist. Ct. App. 1994)("[W]e recognize a fiduciary relationship between a bank and a customer where the bank knows or has reason to know of the

9

customer's trust and confidence under the circumstances exceeding an ordinary commercial transaction .... Where the lender has voluntarily assumed additional roles, accompanying responsibilities properly follow."); *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619 (1972)(holding a fiduciary relationship arises where "the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him"); *Tokarz v. Frontier Fed. Sav. & Loan Ass'n,* 33 Wash.App. 456, 656 P.2d 1089 (1982) (holding that "special circumstances" may impose a fiduciary duty on a bank, including where the lender 1) takes on extra services for a customer, 2) receives any greater economic benefit than from a typical transaction, or 3) exercises extensive control). *Tokarz v. Frontier Fed. Sav. & Loan Ass'n,* 33 Wash.App. 456, 656 P.2d 1089 (1982).

Those circumstances are all factually similar to this case.  Roger Schreiber testified that Consortium USA was "relying on [PNC] to be our international financial experts and to wade us through all of these complex Chinese regulations.  And that's how they touted their services."  [Doc. 114, 20:17-21.]  PNC took on many extra services beyond that of a bank to a depositor, and received economic benefit for it.[9]  And, even taking PNC's characterization of the CCA as true – that PNC signed the CCA as a "favor" to Consortium USA – establishes that PNC and Consortium USA <u>were not</u> dealing at arm's length in the typical lender/borrower relationship.  [Doc. 116, 205:5-16,

---

[9] Consortium USA followed PNC's advice to buy out the partnership that co-owned Consortium China in order for the foreign investment account receivables of Consortium China to be considered as collateral for Consortium USA's credit facility with PNC [Doc 112, 382-384]; Two PNC representatives traveled to China in December 2007 to visit Consortium China's operations, to discuss Consortium China's relationship with SCB, and recent Chinese regulations that placed restrictions on lending [Doc. 117-3]; Consortium USA routinely sought counsel from PNC about various obstacles and frustrations in its international banking.  [Doc. 117-12.]

242:1-14.]  Accordingly, Consortium USA has identified sufficient facts to demonstrate special circumstances that would require the imposition of a fiduciary duty.

**Q:    Does the RSA constitute a waiver of Consortium USA's claims?**
**A:    No.**

PNC apparently looks to the RSA as its panacea for all claims asserted against it by Consortium USA.  Apparently, the theory is that, once Consortium USA signs the RSA in conjunction with the issuance of the SBLC, it somehow absolves PNC of every type of liability, including liability from legal duties, gross negligence, bad faith, and even subsequent agreements such as the CCA.

Undoubtedly, that is not the case.  While the RSA seeks to disclaim liability for most things related to the SBLC, it doesn't and can't disclaim liability for everything, as PNC suggests.  As to the Court is aware, the RSA is merely a repayment agreement for the SBLC and not a contract governing the entire relationship of the parties.  It is signed at a point in time in relation to a specific transaction.  It cannot relieve PNC from liability for future acts.  Moreover, nowhere in the RSA is there any specific disclaimer of all fiduciary duties.  In fact, the RSA makes specific exceptions in cases of bad faith and gross negligence.  Finally, the evidence establishes that the CCA was signed as an alternative to the RSA, three years after the RSA was signed and the SBLC was issued. [Doc. 117-28 "term loan set up to fund or pay the L/C *per Tom Dodd do not use Reimbursement Agreement to fund."]  In this way, the CCA not only contemplated a transaction outside of the RSA, it also imposed additional duties upon PNC to act as Consortium USA's agent and to act in a manner that protected Consortium USA's interests.

Here, there are several flaws in PNC's argument.  First, the RSA cannot be used to negate future contracts or PNC's future negligent conduct, whether the CCA or PNC's failure to respond to the currency conversion issue it said surfaced after the RSA was signed.  By its terms, it does not apply if PNC acts with gross negligence or in bad faith.  Further, as international banking expert, T.O. Lee, points out – PNC's ability to protect everyone's interest was not mutually exclusive.  [Doc. 117-1, ¶21.]  PNC could have included language in the CCA that ensured it would not be exposed to double liability.  In the end, however, it placed itself in a dilemma of choosing to protect its interests over CCI's, a violation of the duty it affirmatively assumed.

**Q:    Are T.O. Lee's opinions offered to abrogate existing case law or to override the terms of the RSA?**
**A.    No.**

T.O. Lee's opinions are not offered to change the terms of the RSA.  Instead, they establish (from an international banking and letter of credit expert) that PNC failed to fulfill the standard of care according to international banking practice for matters outside of the RSA, namely PNC's so-called international banking expertise.  [Doc. 117-1, *passum*.]  As it relates to the SBLC, Mr. Lee offers his opinion, based on international banking standards, that PNC failed to exercise even slight care and carelessly handled the CCA when it could have avoided the very conflict of interest it created in signing it.  [*Id.*]  PNC has never refuted these opinions which go to the breach of international banking standards and gross negligence in handling the SBLC.  Those are both factual issues in this case.

**Q:    Is Consortium USA seeking affirmative relief for PNC's improper payment of SCB's draw request?**
**A:    No.**

12

PNC completely misapprehends the discussion concerning PNC's improper payment of SCB's draw request. [*See* Doc. 136, pp. 14-22.] This is not a claim for relief that Consortium USA raises for the first time.[10] As a matter of fact, Consortium USA is simply connecting facts in the record to support its affirmative defense of negligence asserted in its Reply to PNC's Counterclaim. [Doc. 43.] Simply put, because PNC was grossly negligent in making the improper payment, it is barred from recovering under the RSA. Therefore, PNC's waiver argument does not apply. Moreover, as T.O. Lee (and the applicable case law) suggests, this is not a mere typo or minor deviation. It goes to the heart of who the Applicant is – one of the most fundamental issues in an SBLC. In fact, PNC recognizes the significance of this when it previously requested a waiver of discrepancy from Consortium USA regarding the Royal Bank of Scotland SBLC. That waiver provided that payment would not be made unless the discrepancy in the Applicant's name was waived. [Doc. 142-3.] It is disingenuous for PNC to now suggest the discrepancy is minor. In further support, Consortium USA incorporates by reference its Memorandum in Opposition to PNC's Second Motion for Summary Judgment [Doc. 142], as if fully rewritten herein.

**Q:    Did PNC act in bad faith?**
**A:    Yes.**

Once again, PNC (in one breath) claims that any disagreement concerning facts in support of Consortium USA's claim is immaterial, yet (in another breath) cites facts that are completely incorrect. [Doc. 136, pp. 22-25.] This time, PNC makes this argument in

---

[10] Even if it were, PNC was well on notice of the issue through the disclosure of Mr. Lee's expert report. PNC elected to file summary judgment within 11 days of that disclosure and over two months before discovery cutoff (which it has now agreed to stay). It cannot now argue that it didn't have notice of this issue.

connection with Consortium USA's claim that PNC breached the implied covenant of good faith and fair dealing.

By signing the CCA, PNC adopted a subsequent agreement in place of the SBLC and acted in bad faith to unilaterally ignore the CCA.[11]   This was compounded by multiple requests to PNC from SCB to carry out the CCA as agreed, with assurances that it could do so without facing double liability.  [Doc. 128-2, 128-3.]  Equity requires PNC to effectuate justice according to the understanding of the parties as represented by the CCA.  *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 157 (Ky. 1991).

PNC's suggestion that PNC did not know about the currency conversion problem or the CCA as a fix is simply disingenuous.  As early as March 2010, Tom Dodd was advised of the currency conversation issue and fully understood that Consortium USA was working with SCB to design a way to avoid it.  [Doc. 117-17.]  Consortium USA even requested that PNC and Plaintiffs "work closely between SCB and PNC's global ops group to assure the proper details are followed" in order to address the currency conversion issue.  [*Id.*]  While PNC represented on March 10, 2010 that it wanted to make sure "we don't have any issues" with the anticipated draw on the SBLC, the evidence suggests that PNC didn't spend time to understand the issues.  [*Id.*; 116, 340:1-6.]  PNC cannot close its eyes to the facts and claim it could not act in bad faith when it knew of the problem that the CCA was designed to fix.  This knowing behavior is, indeed, tantamount to bad faith.

## Q:   Does the RSA save PNC from its bad faith conduct?
## A:   No.

---

[11] The CCA had the effect of a novation.  The new agreement would replace the old agreement, thereby terminating it.

By its express terms, the RSA provides that Consortium USA is only bound to perform under the RSA if PNC acts in good faith. Here, because PNC did not act in good faith, Consortium USA did not waive any requirement that PNC act in good faith. [*See* Doc. 142.]

## CONCLUSION

Based on the foregoing, the Court should grant Consortium USA judgment as to liability as to Consortium USA's breach of contract, breach of duty, and breach of implied duty of good faith and fair dealing claims. Likewise, the Court should grant Consortium USA judgment as to PNC's Counterclaims, at a minimum, permit the issue to go to trial as to the amount to which Consortium USA is entitled after set off.

Respectfully submitted,

**FLAGEL & PAPAKIRK LLC**

/s/ Allison Bisig Oswall
James Papakirk (*pro hac vice*)
Allison Bisig Oswall (KBA #94641)
50 E Business Way, Suite 410
Cincinnati, OH 45241
513-984-8111
jpapakirk@fp-legal.com
*Co-counsel for Guangzhou*
*Consortium Display Product*
*Company, Ltd., and Consortium*
*Companies, Incorporated*

**GREGORY W. McDOWELL, P.S.C.**

/s/ Gregory W. McDowell
Gregory   W.   McDowell   (KBA
83227)
7405 Burlington Pike, Suite 201
Florence, Kentucky 41042
 (859) 371-7774
gmcdowell@assuredtitle.com
*Co-counsel for Guangzhou*

*Consortium Display Product Company, Ltd., and Consortium Companies, Incorporated*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed with the Clerk using the CM/ECF system this 15th day of April, 2013, which will serve the following:

| | |
|---|---|
| Cornelius E. Coryell, II | ccoryell@wyattfirm.com |
| Christopher Tyson Gorman | tgorman@wyattfirm.com |
| Byron E. Leet | bleet@wyattfirm.com |
| Kevin Ray Feazell | krf@corsbassett.com |
| Gregory W. McDowell | gmcdowell@assuredtitle.com |
| John Shannon Bouchillon | Shannon@haydencraiggrant.com |
| P. Blaine Grant | blaine@haydencraiggrant.com |
| Matthew Decker | Matt.Decker@alston.com |
| Kal Geercken | Karl.Geercken@alston.com |
| Alex Hood | Alex.Hood@alston.com |

/s/ Allison Bisig Oswall
Allison Bisig Oswall (KBA #94641)