# Exhibit A

## Extrinsic evidence to establish terms of CCA

DEPOSITION
EXHIBIT
189
9-12-12

**From:**      thomas.dodd@pnc.com
**Sent:**      Wednesday, April 14, 2010 3:54 PM
**To:**        Roger C. Schreiber
**Subject:**   Letter of Credit

Roger,

I am in the process of requesting the documents related to the letter of credit.  Questions:

-The term note will not be able to be signed until the draw amount is determined.  The timing of executing the note in order to fund the draw will be very tight.  Will the bank provide any type of payoff information a few days prior to the draw request?  If they will  the timing will be fine.  If not I will have to wait to put in the final amount on the day funding will be required.  In that case the owners will have to be available to sign with very short notice.
-Also, did we discuss updating the personal financial statements of the guarantors?  These will need to be completed prior to closing the loan.
I have attached the forms.

Thank You
Thomas Dodd
Vice President
Corporate Banking
thomas.dodd@PNC.com
PNC Bank, NA
3 East Fourth Street
B2-YO73-03-4
Cincinnati, OH  45202
513-639-5202  Phone
513-639-5413  Fax

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US Law. The postal address for PNC is 249 Fifth Avenue, Pittsburgh, PA 15222. If you do not wish to receive any additional advertising or promotional messages from PNC at this e-mail address, click here to unsubscribe.
https://pnc.p.delivery.net/m/u/pnc/uni/p.asp By unsubscribing to this message, you will be unsubscribed from all advertising or promotional messages from PNC. Removing your e-mail address from this mailing list will not affect your subscription to alerts, e-newsletters or account servicing e-mails.

CONS_10788

DEPOSITION EXHIBIT
19D

**From:** thomas.dodd@pnc.com
**Sent:** Friday, April 23, 2010 9:48 AM
**To:** Roger C. Schreiber
**Subject:** Re: PNC Note

Roger,

The attorney should have the draft documents by Monday.  Please continue to pay according to your email.

Thank You
Thomas Dodd
Vice President
Corporate Banking
thomas.dodd@PNC.com
PNC Bank, NA
3 East Fourth Street
B2-YD73-03-4
Cincinnati, OH  45202
513-639-5202  Phone
513-639-5413  Fax


From: "Roger C. Schreiber" <rschreiber@consortium-companies.com>
To:   <thomas.dodd@pnc.com>
Date: 04/22/2010 03:45 PM
Subject:    PNC Note

_____


Tom,

We received the attached invoice/statement today for the PNC note,
maturing on 4/30.

As I recall our discussion, since we fully expect the China LC to be exercised within the
next 60 days, you and I did not intend to go through a formal process of note renewal for the
< 60 day window.  I understood our plan is to basically have this considered a month-to-month
auto renewal for the next 60 days and continue to make
the $20K/mo principle plus interest (total approx $25K).

In the meantime, you were working to align approval for the terms of the new note;
1.      New LC amount to match actual exercised amount up to a max of
$1.7MM.
2.      This plus the current note balance (approx $.9MM) would be the
new note total.
3.      Requested $40K/mo principle payment plus applicable interest
payment.
a.      $2.6MM note; 5 Yr Am @ 7%  = $51,485/mo P&I
b.      Initial month interest amt ($2.6 @ 7%/12) would be $15.2K

c.      Regular amortized initial month principle amount would be
$36.3K; thus $40K/mo request.
4.      I also recall your desire for a floating rate with a current
approx 7% equiv.

I just wanted to clarify the understanding of the ongoing payments "as is" until the new note is established, fully expected within the next 60 days.

Does the mid month (15th) payments still work with this 4/30 maturity date?

Roger Schreiber
Consortium Companies, Inc.
W:    859-647-9910
F:     859-647-7140
M:    859-468-5468
www.consortium-companies.com
Think before you print. Please think before you print.
 [attachment "PNC note 4 22 10.pdf" deleted by Thomas A Dodd/CredPlcy/OHK/PNC]

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US Law. The postal address for PNC is 249 Fifth Avenue, Pittsburgh, PA 15222. If you do not wish to receive any additional advertising or promotional messages from PNC at this e-mail address, click here to unsubscribe.
https://pnc.p.delivery.net/m/u/pnc/uni/p.asp By unsubscribing to this message, you will be unsubscribed from all advertising or promotional messages from PNC. Removing your e-mail address from this mailing list will not affect your subscription to alerts, e-newsletters or account servicing e-mails.

# C & I ART APPROVAL MEMO

**To: William C. Miles**                                      **Date: April 12, 2010**

**From: Tom Dodd**          **Tel.: 513-639-5202**

**Re: Consortium Companies, Inc.**          **CDHE: $2,000,000 MRE: $2,000,000**

**PD: 15          LGD: G**          **Syndicated Credit: N          PNC Agent: N/A**

### Action(s) Requested:

Consortium has a standby letter of credit set to expire on July 13, 2010. The letter of credit secured a line of credit for a foreign subsidiary located in China. The beneficiary of the L/C is Standard Chartered Bank China. The letter of credit will not be extended. The customer also has a term note used to fund a standby letter of credit which expired in January 2010. The term note is fully charged off. The officer request to fund the total obligations under the following terms and conditions:

- Terminate the existing term note (facility 0009971594) which has a balance of $939,805.54 as of April 12, 2010. The interest rate on this note is 7% and the monthly principal reduction is $20,000.
- Originate a new term loan with a maximum balance of $2,700M to pay off the existing term note (#0009971594) and fund the standby letter of credit to Standard Chartered Bank China. The exact balance will not be determined until the draw request is submitted by the beneficiary which is expected to occur by May 15th. The outstanding balance on the line of credit secured by the letter of credit is $1,600M; however currency fluctuations and fees will increase the total request. The borrower has committed to a maximum term loan of $2,700M to pay off the existing term note and the obligation for the letter of credit. The interest rate on the new term loan is to be prime +3.75% and the maturity date will be November 30, 2010. Closing fee of $5,000. Guarantors: Roger Schreiber-$700M; Steve and Lynda Oberst-$1,400; and Clint and Susan Oberst-$400M. Collateral for the loan will be a second position on all business assets.
- The new note will placed on non-accrual when closed.

### Rationale:

Total relationship exposure was approximately $6,874M as of March 31, 2009. The exposure consisted of a line of credit of $6,000M ($1,137M outstanding and 2 standby L/C's totaling $3,000M) and a term loan to a related real estate holding company (CCI Properties) with a balance of $874M. The company refinanced the line of credit balance and the real estate term note in late 2009. Based on collateral values the L/C's were essentially unsecured as the business assets narrowly covered the outstanding balance on the line.

PNC made the decision to accept payoff of the outstanding balance on the line of credit and retain the L/C exposure due to the company's poor financial performance. Consortium's revenue had dramatically decreased and was showing a loss of $213M YTD September 30, 2009. The action plan for the L/C exposure was to allow them to expire and term out with an amortization of 5 years while continuing to

PNC006532

pressure the company to either refinance the resulting debt or bring in an investor to pay off the debt. The company has hired a consultant to seek additional financing or an equity investor.

The approval request is in line with the original action plan to reduce exposure (line balance and real estate loan) and then term out the debt associated with the L/C's. The bank will continue to receive monthly financial reporting and discuss status of the search for an equity investor.

## Exposure Strategy:

Strategy for the relationship continues to be focused on reducing exposure. The company has not performed well over the past 15 months therefore refinancing options are limited. The request reduces the principal balance $40M per month which appears to be the maximum the company can afford at this time. If performance improves the principal reduction can be increased at maturity in November.

## Financial Analysis:

Consortium experienced a reduction in revenue due to reduced business with Procter and Gamble (P&G). Consortium was informed on 5/7/07 by P&G that contracts totaling $20MM annually would not be renewed. The impact of the lost business was not fully realized until the 2nd quarter of 2008, when monthly revenues dropped to $898M in April and $681M in May, down from $2,171M in March 2008. Total revenue for fiscal 2008 was $11,993M down $21,114M (64%) compared to fiscal 2007.

Consortium's management initially chose not to significantly reduce operating expenses to offset the decline in sales in order to retain employees they believed would be critical to the company when the sales levels increased. Management's refusal to reduce expenses in light of drastically decreasing revenue caused a loss of $467M in 2008.

Consortium's results for 2009, although improved still produced a loss. The company shows a loss of $119m for 2009 compared to a loss of $467M for 2008. Sales increased 11% in 2009 as the result of the company adding 3 new major customers (Johnson & Johnson; Shell Oil; and KAO Brands). According to management projects with the 3 new customers started much slower than anticipated. Also contributing to the poor results is Consortium's decision to reduce pricing on the new customers which has had the result of lowering their gross margins from 36% in 2008 to 24% 2009. To offset the lost margins the company did decide to reduce operating expenses which began to take effect in May 2009. Operating expenses were $1,883M lower when compared to 2008. The majority of the savings was the result of reducing employee head count ($1,212M), travel expenses ($191M), and depreciation ($195M).

Forecast for 2010 is based on full year revenue from the 3 new customers while no increase in overhead expense. The company forecasts a profit in 2010 of $648M; however they showed a loss for the first 2 months of 2010 of $117M compared to a projected profit of $22M.

As of February 28, 2010, there was no availability on their factoring line of credit with Bibby Financial.

## Collateral Analysis

As stated above PNC is in second position behind Bibby Financial (factor). Therefore, the proposed term note is essentially unsecured.

*(Note: Below signature lines only used if loan has not been converted. Level 1 and Level 2 approvers should sign all approvals. If Level 3 is required, do not include the Level 4 signatures and vice versa.)*

2

PNC006533

Approved: _____          Date: _____
             Level 1 Approver -AM or RM

Approved: _____          Date: _____
             Level 2 Approver - Market Manager

I certify that I am the Highest Credit Signatory required for this request: _____

Attachments:
1) Most recent SAC Report or WLCR Report
2) PD and LGD ratings
3) MRE Report
4) Spreads
5) LID Form
6) TDR Checklist (if appropriate)

(Note: For converted credits, all attachments should be included in the CCM Document Library)

3

PNC006534

| From: | thomas.dodd@pnc.com |
|---|---|
| Sent: | Tuesday, April 27, 2010 8:31 AM |
| To: | Roger C. Schreiber |
| Subject: | Re: PNC Note |
| Attachments: | Consortium Amended and Restated Term Note.DOC; Consortium Amendment to Loan Documents.DOC; Corporate Resolution - Consortium Companies Incorporated (3).DOC |

Roger,

I have attached the draft versions of the loan modification documents.
The final amounts will need to be entered when you receive the final payoff from the Chinese
bank. Please review and let me know if you have questions. I believe the documents
represent what you and I have discussed.

Thank You

Thomas Dodd
Vice President
Corporate Banking
thomas.dodd@PNC.com
PNC Bank, NA
3 East Fourth Street
B2-YD73-03-4
Cincinnati, OH  45202
513-639-5202  Phone
513-639-5413  Fax

From: "Roger C. Schreiber" <rschreiber@consortium-companies.com>
To:     <thomas.dodd@pnc.com>
Date: 04/22/2010 03:45 PM
Subject:    PNC Note

Tom,

We received the attached invoice/statement today for the PNC note,
maturing on 4/30.

As I recall our discussion, since we fully expect the China LC to be exercised within the
next 60 days, you and I did not intend to go through a formal process of note renewal for the
< 60 day window. I understood our plan is to basically have this considered a month-to-month
auto renewal for the next 60 days and continue to make
the $20K/mo principle plus interest (total approx $25K).

In the meantime, you were working to align approval for the terms of the new note;
1.      New LC amount to match actual exercised amount up to a max of

$1.7MM.
2.       This plus the current note balance (approx $.9MM) would be the new note total.
3.       Requested $40K/mo principle payment plus applicable interest payment.   .
a.       $2.6MM note; 5 Yr Am @ 7%  = $51,485/mo P&I
b.       Initial month interest amt ($2.6 @ 7%/12) would be $15.2K
c.       Regular amortized initial month principle amount would be $36.3K; thus $40K/mo request.
4.       I also recall your desire for a floating rate with a current approx 7% equiv.

I just wanted to clarify the understanding of the ongoing payments "as is" until the new note is established, fully expected within the next 60 days.

Does the mid month (15th) payments still work with this 4/30 maturity date?

Roger Schreiber
Consortium Companies, Inc.
W:   859-647-9910
F:    859-647-7140
M:   859-468-5468
www.consortium-companies.com
Think before you print. Please think before you print.
 [attachment "PNC note 4 22 10.pdf" deleted by Thomas A Dodd/CredPlcy/OHK/PNC]

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US Law. The postal address for PNC is 249 Fifth Avenue, Pittsburgh, PA 15222. If you do not wish to receive any additional advertising or promotional messages from PNC at this e-mail address, click here to unsubscribe.
https://pnc.p.delivery.net/m/u/pnc/uni/p.asp By unsubscribing to this message, you will be unsubscribed from all advertising or promotional messages from PNC. Removing your e-mail address from this mailing list will not affect your subscription to alerts, e-newsletters or account servicing e-mails.

CONS_11709

# Amended and Restated
# Term Note



$_____

May ___, 2010

FOR VALUE RECEIVED, CONSORTIUM COMPANIES INCORPORATED, a Kentucky corporation (the "Borrower"), with an address at 1438 Cox Avenue, Erlanger, Kentucky 41018, promises to pay to the order of PNC BANK, NATIONAL ASSOCIATION (the "Bank"), in lawful money of the United States of America in immediately available funds at its offices located at Three East Fourth Street, Cincinnati, Ohio 45202, or at such other location as the Bank may designate from time to time, the principal sum of _____ DOLLARS ($_____), together with interest accruing on the outstanding principal balance from the date hereof, all as provided below.

1.    **Rate of Interest.** Amounts outstanding under this Note will bear interest at a rate per annum which is at all times equal to the Prime Rate plus three hundred seventy five (375) basis points (3.75%). Interest will be calculated based on the actual number of days that principal is outstanding over a year of 360 days. If and when the Prime Rate changes, the rate of interest on this Note will change automatically without notice to the Borrower, effective on the date of any such change. In no event will the rate of interest hereunder exceed the maximum rate allowed by law. As used herein, "Prime Rate" shall mean the rate publicly announced by the Bank from time to time as its prime rate. The Prime Rate is determined from time to time by the Bank as a means of pricing some loans to its borrowers. The Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged by the Bank to any particular class or category of customers.

2.    **Payment Terms.** Principal shall be due and payable in monthly installments. The first monthly installment shall be in the amount of $20,000.00 and shall be due and payable on May 15, 2010. There shall be six (6) equal consecutive monthly installments in the amount of $40,000.00 each, commencing on June 15, 2010, and continuing on the 15th day of each month thereafter, and a final installment of $_____ on November 30, 2010. Interest shall be payable at the same times as the principal payments. Any outstanding principal and accrued interest shall be due and payable in full on November 30, 2010.

If any payment under this Note shall become due on a Saturday, Sunday or public holiday under the laws of the State where the Bank's office indicated above is located, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment. As used herein, "Business Day" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Cincinnati, Ohio. The Borrower hereby authorizes the Bank to charge the Borrower's deposit account at the Bank for any payment when due. Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order the Bank may choose, in its sole discretion.

3.    **Late Payments; Default Rate.** If the Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note within fifteen (15) calendar days of the date due and payable, the Borrower also shall pay to the Bank a late charge equal to the lesser of five percent (5%) of the amount of such payment or $100.00 (the "Late Charge"). Such fifteen (15) day period shall not be construed in any way to extend the due date of any such payment. Upon maturity, whether by acceleration, demand or otherwise, and at the Bank's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, each advance outstanding under this Note shall bear interest at a rate per annum (based on the actual number of days that principal is outstanding over a year of 360 days) which shall be three percentage points (3%) in excess of the interest rate in effect from time to time under this Note but not more than

the maximum rate allowed by law (the "**Default Rate**"). The Default Rate shall continue to apply whether or not judgment shall be entered on this Note. Both the Late Charge and the Default Rate are imposed as liquidated damages for the purpose of defraying the Bank's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, the Bank's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which the Bank may employ. In addition, the Default Rate reflects the increased credit risk to the Bank of carrying a loan that is in default. The Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by the Bank, and that the actual harm incurred by the Bank cannot be estimated with certainty and without difficulty.

4.    **Prepayment.** The Borrower shall have the right to prepay any advance hereunder at any time and from time to time, in whole or in part; subject, however, to payment of any break funding indemnification amounts owing pursuant to paragraph 5 below.

5.    **Break Funding Indemnification.** The Borrower agrees to indemnify the Bank against any liabilities, losses or expenses (including, without limitation, loss of margin, any loss or expense sustained or incurred in liquidating or employing deposits from third parties, and any loss or expense incurred in connection with funds acquired to effect, fund or maintain any advance (or any part thereof) bearing interest at a Fixed Rate) which the Bank sustains or incurs as a consequence of either (i) the Borrower's failure to make a payment on the due date thereof, (ii) the Borrower's revocation (expressly, by later inconsistent notices or otherwise) in whole or in part of any notice given to Bank to request, convert, renew or prepay any advance bearing interest at a Fixed Rate, or (iii) the Borrower's payment or prepayment (whether voluntary, after acceleration of the maturity of this Note or otherwise) or conversion of any advance bearing interest at a Fixed Rate on a day other than the regularly scheduled due date therefor. A notice as to any amounts payable pursuant to this paragraph given to the Borrower by the Bank shall, in the absence of manifest error, be conclusive and shall be payable upon demand. The Borrower's indemnification obligations hereunder shall survive the payment in full of the advances and all other amounts payable hereunder.

6.    **Other Loan Documents.** This Note is issued in connection with a letter agreement or loan agreement between the Borrower and the Bank, dated on or before the date hereof, and the other agreements and documents executed and/or delivered in connection therewith or referred to therein, the terms of which are incorporated herein by reference (as amended, modified or renewed from time to time, collectively the "**Loan Documents**"), and is secured by the property (if any) described in the Loan Documents and by such other collateral as previously may have been or may in the future be granted to the Bank to secure this Note.

7.    **Events of Default.** The occurrence of any of the following events will be deemed to be an "**Event of Default**" under this Note: (i) the nonpayment of any principal, interest or other indebtedness under this Note when due; (ii) the occurrence of any event of default or any default and the lapse of any notice or cure period, or any Obligor's failure to observe or perform any covenant or other agreement, under or contained in any Loan Document or any other document now or in the future evidencing or securing any debt, liability or obligation of any Obligor to the Bank; (iii) the filing by or against any Obligor of any proceeding in bankruptcy, receivership, insolvency, reorganization, liquidation, conservatorship or similar proceeding (and, in the case of any such proceeding instituted against any Obligor, such proceeding is not dismissed or stayed within 30 days of the commencement thereof, provided that the Bank shall not be obligated to advance additional funds hereunder during such period); (iv) any assignment by any Obligor for the benefit of creditors, or any levy, garnishment, attachment or similar proceeding is instituted against any property of any Obligor held by or deposited with the Bank; (v) a default with respect to any other indebtedness of any Obligor for borrowed money, if the effect of such default is to cause or permit the acceleration of such debt; (vi) the commencement of any foreclosure or forfeiture proceeding, execution or attachment against any collateral securing the obligations of any Obligor to the Bank; (vii) the entry of a final judgment against any Obligor and the failure of such Obligor to discharge the judgment within ten (10) days of the entry thereof; (viii) any material adverse change in any Obligor's business, assets, operations, financial condition or results of operations; (ix) any Obligor ceases doing business as a going concern; (x) any representation or warranty made by any Obligor to the Bank in any Loan Document or any other

documents now or in the future evidencing or securing the obligations of any Obligor to the Bank, is false, erroneous or misleading in any material respect; (xi) the revocation or attempted revocation, in whole or in part, of any guarantee by any Obligor; or (xii) the death, incarceration, indictment or legal incompetency of any individual Obligor or, if any Obligor is a partnership or limited liability company, the death, incarceration, indictment or legal incompetency of any individual general partner or member. As used herein, the term "Obligor" means any Borrower and any guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Borrower's obligations to the Bank existing on the date of this Note or arising in the future.

Upon the occurrence of an Event of Default: (a) the Bank shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in clause (iii) or (iv) above shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind; (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at the Bank's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at the Bank's option, this Note will bear interest at the Default Rate from the date of the occurrence of the Event of Default; and (e) the Bank may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law. Notwithstanding the foregoing or anything contained herein to the contrary, the Bank's remedies are subject to the Intercreditor and Standstill Agreement among the Bank, the Borrower and Bibby Financial Services (Midwest), Inc.

**8.    Right of Setoff.** In addition to all liens upon and rights of setoff against the Borrower's money, securities or other property given to the Bank by law, the Bank shall have, with respect to the Borrower's obligations to the Bank under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and the Borrower hereby grants the Bank a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to the Bank, all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, the Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to the Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of the Bank, although the Bank may enter such setoff on its books and records at a later time.

**9.    Indemnity.** The Borrower agrees to indemnify each of the Bank, each legal entity, if any, who controls, is controlled by or is under common control with the Bank, and each of their respective directors, officers and employees (the "Indemnified Parties"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of the Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by the Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct. The indemnity agreement contained in this Section shall survive the termination of this Note, payment of any advance hereunder and the assignment of any rights hereunder. The Borrower may participate at its expense in the defense of any such action or claim.

CONS_11712

**10.     Miscellaneous.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("Notices") must be in writing (except as may be agreed otherwise above with respect to borrowing requests) and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail.  Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this paragraph.  No delay or omission on the Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Bank's action or inaction impair any such right or power.  The Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Bank may have under other agreements, at law or in equity.  No modification, amendment or waiver of, or consent to any departure by the Borrower from, any provision of this Note will be effective unless made in a writing signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  The Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by the Bank in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of the Bank's counsel.  If any provision of this Note is found to be invalid, illegal or unenforceable in any respect by a court, all the other provisions of this Note will remain in full force and effect.  The Borrower and all other makers and indorsers of this Note hereby forever waive presentment, protest, notice of dishonor and notice of non-payment.  The Borrower also waives all defenses based on suretyship or impairment of collateral.  If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several.  This Note shall bind the Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of the Bank and its successors and assigns; provided, however, that the Borrower may not assign this Note in whole or in part without the Bank's written consent and the Bank at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by the Bank and will be deemed to be made in the Commonwealth of Kentucky.  THIS NOTE WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE BANK AND THE BORROWER DETERMINED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF KENTUCKY, EXCLUDING ITS CONFLICT OF LAWS RULES.  The Borrower hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in Boone County, Kentucky; provided that nothing contained in this Note will prevent the Bank from bringing any action, enforcing any award or judgment or exercising any rights against the Borrower individually, against any security or against any property of the Borrower within any other county, state or other foreign or domestic jurisdiction.  The Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both the Bank and the Borrower.  The Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

**11.     Commercial Purpose.**  The Borrower represents that the indebtedness evidenced by this Note is being incurred by the Borrower solely for the purpose of acquiring or carrying on a business, professional or commercial activity, and not for personal, family or household purposes.

**12.     Amendment and Restatement.**  This Note amends and restates, and is in substitution for, that certain Term Note in the original principal amount of $1,000,000.00 payable to the order of the Bank and dated December 30, 2009 (the "Existing Note").  However, without duplication, this Note shall in no way extinguish, cancel or satisfy the Borrower's unconditional obligation to repay all indebtedness evidenced by the Existing Note or constitute a novation of the Existing Note.  Nothing herein is intended to extinguish, cancel or impair the lien priority or effect of any security agreement, pledge agreement or mortgage with respect to any Obligor's obligations hereunder and under any other document relating hereto.

**13.     WAIVER OF JURY TRIAL.**  THE BORROWER IRREVOCABLY WAIVES ANY AND ALL RIGHTS THE BORROWER MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS NOTE, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS NOTE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS.  THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

The Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.

**WITNESS** the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

WITNESS / ATTEST:

CONSORTIUM COMPANIES
INCORPORATED

_____

By:_____

(SEAL)

Print Name:_____

Print Name:_____

Title:_____

Title:_____

(Include title only if an officer of entity signing to the right)

# Amendment to Loan Documents

 **PNC**

**BACKGROUND**

**THIS AMENDMENT TO LOAN DOCUMENTS** (this "Amendment") is made as of May ___, 2010, by and between **CONSORTIUM COMPANIES INCORPORATED**, a Kentucky corporation (the "**Borrower**"), and **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**").

**BACKGROUND**

    A.    The Borrower has executed and delivered to the Bank (or a predecessor which is now known by the Bank's name as set forth above), one or more promissory notes, letter agreements, loan agreements, security agreements, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents, some or all of which are more fully described on attached Exhibit A, which is made a part of this Amendment (collectively as amended from time to time, the "**Loan Documents**") which evidence or secure some or all of the Borrower's obligations to the Bank for one or more loans or other extensions of credit (the "**Obligations**").

    B.    The Borrower and the Bank desire to amend the Loan Documents as provided for in this Amendment.

    **NOW, THEREFORE,** in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

    1.    Certain of the Loan Documents are amended as set forth in Exhibit A. Any and all references to any Loan Document in any other Loan Document shall be deemed to refer to such Loan Document as amended by this Amendment. This Amendment is deemed incorporated into each of the Loan Documents. Any initially capitalized terms used in this Amendment without definition shall have the meanings assigned to those terms in the Loan Documents. To the extent that any term or provision of this Amendment is or may be inconsistent with any term or provision in any Loan Document, the terms and provisions of this Amendment shall control.

    2.    The Borrower hereby certifies that: (a) all of its representations and warranties in the Loan Documents, as amended by this Amendment, are, except as may otherwise be stated in this Amendment: (i) true and correct as of the date of this Amendment, (ii) ratified and confirmed without condition as if made anew, and (iii) incorporated into this Amendment by reference, (b) no Event of Default or event which, with the passage of time or the giving of notice or both, would constitute an Event of Default, exists under any Loan Document which will not be cured by the execution and effectiveness of this Amendment, (c) no consent, approval, order or authorization of, or registration or filing with, any third party is required in connection with the execution, delivery and carrying out of this Amendment or, if required, has been obtained, and (d) this Amendment has been duly authorized, executed and delivered so that it constitutes the legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms. The Borrower confirms that the Obligations remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Amendment.

    3.    The Borrower hereby confirms that any collateral for the Obligations, including liens, security interests, mortgages, and pledges granted by the Borrower or third parties (if applicable), shall continue unimpaired and in full force and effect, and shall cover and secure all of the Borrower's existing and future Obligations to the Bank, as modified by this Amendment.

    4.    As a condition precedent to the effectiveness of this Amendment, the Borrower shall comply with the terms and conditions (if any) specified in Exhibit A.

5. To induce the Bank to enter into this Amendment, the Borrower waives and releases and forever discharges the Bank and its officers, directors, attorneys, agents, and employees from any liability, damage, claim, loss or expense of any kind that it may have against the Bank or any of them arising out of or relating to the Obligations. The Borrower further agrees to indemnify and hold the Bank and its officers, directors, attorneys, agents and employees harmless from any loss, damage, judgment, liability or expense (including attorneys' fees) suffered by or rendered against the Bank or any of them on account of any claims arising out of or relating to the Obligations. The Borrower further states that it has carefully read the foregoing release and indemnity, knows the contents thereof and grants the same as its own free act and deed.

6. This Amendment may be signed in any number of counterpart copies and by the parties to this Amendment on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Amendment by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

7. This Amendment will be binding upon and inure to the benefit of the Borrower and the Bank and their respective heirs, executors, administrators, successors and assigns.

8. This Amendment has been delivered to and accepted by the Bank and will be deemed to be made in the Commonwealth of Kentucky. This Amendment will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the Commonwealth of Kentucky, excluding its conflict of laws rules.

9. Except as amended hereby, the terms and provisions of the Loan Documents remain unchanged, are and shall remain in full force and effect unless and until modified or amended in writing in accordance with their terms, and are hereby ratified and confirmed. Except as expressly provided herein, this Amendment shall not constitute an amendment, waiver, consent or release with respect to any provision of any Loan Document, a waiver of any default or Event of Default under any Loan Document, or a waiver or release of any of the Bank's rights and remedies (all of which are hereby reserved). **The Borrower expressly ratifies and confirms the waiver of jury trial provisions contained in the Loan Documents.**

**WITNESS** the due execution of this Amendment as a document under seal as of the date first written above.

WITNESS / ATTEST:

**CONSORTIUM COMPANIES INCORPORATED**

By: _____

(SEAL)

Print Name: _____     Print Name: _____
Title: _____     Title: _____
(Include title only if an officer of entity signing to the right)

CONS_11716

**EXHIBIT A TO
AMENDMENT TO LOAN DOCUMENTS
DATED AS OF MAY ____, 2010**

A.    The "Loan Documents" that are the subject of this Amendment include the following (as any of the foregoing have previously been amended, modified or otherwise supplemented):

   1.    $1,000,000.00 Term Note dated December 30, 2009 executed by the Borrower and made payable to the Bank (the "Note");

   2.    Letter Agreement – Term Loan dated December 29, 2009 among the Borrower, Roger Schreiber, Clint S. Oberst, Susan Oberst, Steven M. Oberst, Lynda G. Oberst and the Bank (the "Letter Agreement");

   3.    Guaranty from Clint Oberst and Susan Oberst dated September 2, 2008;

   4.    Guaranty from Steve Oberst and Lynda Oberst dated September 2, 2008;

   5.    Guaranty from Roger Schreiber dated September 2, 2008;

   6.    Security Agreement dated July 17, 2007 executed by the Borrower in favor of the Bank;

   7.    Intercreditor and Standstill Agreement dated December 30, 2009 among the Bank, the Borrower and Bibby Financial Services (Midwest), Inc.; and

   8.    All other documents, instruments, agreements, and certificates executed and delivered in connection with the Loan Documents listed in this Section A.

B.    The Loan Documents are amended as follows:

   1.    Restated Note. Concurrently with the execution and delivery of this Amendment, the Borrower shall execute and deliver to the Bank a restated note (the "Restated Note"), evidencing the Loan in the principal amount of $_____ in form and substance satisfactory to the Bank. Upon receipt by the Bank of the Restated Note, the existing Note shall be canceled; the Loan and all accrued and unpaid interest on the existing Note shall thereafter be evidenced by the Restated Note; and all references to the "Note" evidencing the Loan in any documents relating thereto shall thereafter be deemed to refer to the Restated Note. Without duplication, the Restated Note shall not constitute a novation and shall in no way extinguish the Borrower's unconditional obligation to repay all indebtedness, including accrued and unpaid interest, evidenced by the existing Note.

   2.    The Letter Agreement is hereby amended by deleting all references to "$1,000,000.00" and replacing them with "$_____".

   3.    Section 1 of the Letter Agreement is hereby amended and restated in its entirety to read as follows:

         1.    Facility and Use of Proceeds.   This is a term loan in the amount of $_____ (the "Term Loan" or the "Loan").  The proceeds of the Term

Loan will be used to repay amounts drawn on letters of credit that were issued for the Borrower's account.

4. The reference to "August 27, 2008" in Section 5(a) of the Letter Agreement is hereby replaced with "September 2, 2008".

C. Conditions to Effectiveness of Amendment: The Bank's willingness to agree to the amendments set forth in this Amendment is subject to the prior satisfaction of the following conditions:

1. Execution by all parties and delivery to the Bank of this Amendment, including the attached Consent, the Restated Note and the Resolutions for Extensions of Credit and Incumbency Certificate.

2. Payment by the Borrower to the Bank of an amendment fee in the amount of $5,000.00, and reimbursement of the fees and expenses of the Bank's outside and in-house counsel in connection with this Amendment, which fees and expenses as of the date of this Amendment are $_____.

**From:** Roger C. Schreiber
**Sent:** Thursday, June 17, 2010 3:05 PM
**To:** Jennifer Allen
**Subject:** FW: Two things
**Attachments:** 6.17.10 PNC Term Note pmt.pdf

Roger Schreiber

Consortium Companies, Inc.

W:  859-647-9910

F:    859-647-7140

M:  859-468-5468

www.consortium-companies.com

Think before you print. Please think before you print.

From: Roger C. Schreiber
Sent: Thursday, June 17, 2010 2:08 PM
To: thomas.dodd@pnc.com
Cc: Steven M. Oberst
Subject: Two things

Tom,

1.       Wanted you to know I did pick up the authorization letter you
signed.  Thank you again.  Hopefully there shouldn't be anything additional on this for our
admin, except signing the new term loan docs.

2.       Attached is the receipt for the term loan pmt we made today.  I
believe my principle numbers are very close. If they are, the note principle balance after
this payment should be:  $899.8K - $20K = $879.8K.  Wanted you to have this number in mind.
I'm sure PNC will have their own records of exact amount.  This would be added to $1,600K
expected in from the China LC.  Expected total amount for the new term loan should be very
close to $1,600K + $879.8K = $2,479.8K.

Roger Schreiber

CONS_01458

Consortium Companies, Inc.

W: 859-647-9910

F:   859-647-7140

M: 859-468-5468

www.consortium-companies.com

Think before you print. Please think before you print.

CONS_01459

CONSORTIUM COMPANIES INCORPORATED

19855

PNC                                06/17/10

Term Loan Int    $899,805.54 @ 7.0% / 360 * 31                     5,423.03
Term Loan Pmt    # 1798209398 - 0052629607                        20,000.00



PNC Loan #: 1060 4072 4743 3366 567

019855
SAFEGUARD

25,423.83

---

**PNCBANK**

050
CRESCENT SPRINGS (280)
585 CLOCK TOWER WAY
CRESCENT SPRINGS KY 41017
Cashbox 02 AM

* Commercial Loan Payment
12:48            JUN 17 2010
Account Number   XXXXXXXXXXXXXXXX6567
Tran Amount      $25,423.83
Check Amt 1      $25,423.83

W/S ID WWS02587   Sequence Number 00040
Batch 900
Principal                 $0.00

This deposit or payment is accepted subject to
verification and to the rules and regulations of
this bank. Deposits may not be available for
immediate withdrawal. Receipt should be held
until verified with your statement.