**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 11-5-DLB-JGW**

**GUANGZHOU CONSORTIUM DISPLAY PRODUCT**

**PLAINTIFFS**

**COMPANY, LTD., et al.**

**VS.**          **OMNIBUS MEMORANDUM OPINION AND ORDER**

**PNC BANK, NATIONAL ASSOCIATION, et al.**          **DEFENDANTS**

* * * * * * * * *

## I.    PROCEDURAL HISTORY AND POSTURE

This is primarily a breach of contract action brought by a Kentucky corporation, Plaintiff Consortium Companies, Incorporated ("Consortium USA"), its wholly-owned Chinese subsidiary, Guangzhou Consortium Display Product, Ltd ("Consortium China"), and several individual guarantors[1] ("the Guarantors") against Defendant PNC Bank, National Association.[2]  Plaintiffs allege that PNC failed to wire funds to Consortium China as required by a document entitled "Capital Contribution Authorization."[3]  Based on PNC's

---

[1] The individual guarantors include the following persons.  Roger Schreiber is the Chief Financial Officer of Consortium USA and a member of Consortium China's board of directors.  (Doc. # 68-1, ¶ 4; Doc. # 57-2, ¶ 7).  Schreiber assumed these roles in the late 1990's, following his 22-year career as treasurer, Chief Financial Officer, and Divisional Vice President with Schreiber Foods, a company with $1.5 billion in annual sales.  Steven Oberst is the President of Consortium USA.  His wife, Lynda Oberst, and his son, Clinton Oberst, are co-owners of Consortium USA.  Clinton is also an employee of Consortium USA.  Any titles or positions Susan Oberst might have held are not explained.

[2] PNC is the successor in interest to National City Bank. For purposes of clarity and brevity, the Court will refer to both banks collectively as PNC.

[3] Plaintiffs originally named Standard Chartered Bank (China) Limited ("Standard Bank") as a co-defendant, and PNC filed a cross-claim against Standard Bank seeking indemnity and/or contribution in

1

conduct, Plaintiffs' First Amended Complaint asserts claims for breach of contract, breach of fiduciary duty, tortious interference with contract, and breach of implied duty of good faith and fair dealing (Counts 1 - 4, respectively).  It also asserts miscellaneous claims in Counts 5 through 8.  In response, PNC filed a counter-claim for breach of contract against Consortium USA seeking reimbursement for two of its debt obligations to PNC.  PNC has also filed a counter-claim against the Guarantors seeking to enforce Guaranty Agreements in which they promised to repay Consortium USA's debt obligations.

This matter is currently before the Court on the cross motions for summary judgment on Plaintiffs' First Amended Complaint filed by PNC and Consortium USA (Docs. # 104 & 128), the cross motions for summary judgment on PNC's counter-claim against Consortium USA (Docs. # 128 & 133), and the cross motions for summary judgment on PNC's counter-claim against the Guarantors (Docs. # 126, 127, & 135).  All motions are fully briefed and thus ripe for review.

Because Plaintiffs cannot demonstrate that the Capital Contribution Authorization satisfies the statute of frauds, and because they have not carried their burden as to their remaining claims, the Court will grant summary judgment for PNC on Plaintiff's First Amended Complaint (Doc. # 104). In addition, because Consortium USA has failed to reimburse PNC for two of its debt obligations, the Court will grant summary judgment as to liability for PNC on its counter-claim against Consortium USA (Doc. # 133).  However, the Court will deny PNC summary judgment as to damages on its counter-claim because material issues of fact remain in dispute regarding the proper amounts owed.  Finally, the

the event that PNC was held liable for the claims in Plaintiffs' First Amended Complaint.  By prior Order, the Court granted Standard Bank's Motion To Dismiss for lack of personal jurisdiction.  (See Doc. # 121).

Court will grant summary judgment for the Guarantors (Docs. # 126 & 127) on PNC's counter-claim against them because the Guaranties at issue are unenforceable under K.R.S. § 371.065.

## II.   BACKGROUND

Plaintiff Consortium USA, a Kentucky corporation, is a manufacturer of point of purchase displays and a designer of product packaging.  Consortium China, a company organized under Chinese law and engaged in the same line of business, is Consortium USA's wholly-owned subsidiary.  In 2007, PNC successfully solicited Consortium USA's business.  Consortium USA switched its entire domestic and international banking relationship from the Bank of Kentucky to PNC.  PNC also introduced both Consortium Companies to Standard Bank, and ultimately, Consortium China switched its existing line of credit with China Merchants Bank to a new line of credit with Standard Bank.

### A.   The Standby Letter of Credit

Upon establishing this new line of credit, Consortium China entered into a loan agreement with Standard Bank for over $1 million.  To secure the loan, Standard Bank required Consortium China to procure a standby letter of credit.  Consortium USA, acting on Consortium China's behalf, applied to PNC for the standby letter of credit.  PNC approved the application and issued the "Irrevocable Standby Letter of Credit" (Doc. # 25-5) in August of 2007, naming Standard Bank as the beneficiary.  Contemporaneous with the issuance of the Standby Letter of Credit, PNC and Consortium USA signed a "Reimbursement and Security Agreement," which provided the terms under which the Letter would be issued, including Consortium USA's obligation to reimburse PNC for any

3

amounts drawn under the Standby Letter of Credit.  (Doc. # 133-2).

## B.    The Problem with the Standby Letter of Credit

As early as 2008, Standard Bank became concerned that Consortium China did not have enough capital to meet Chinese regulatory requirements.  Accordingly, Standard Bank asked Consortium USA to sign a letter of undertaking promising to inject additional capital into Consortium China.  Consortium USA agreed and executed a Letter of Undertaking in 2008.  Nevertheless, by early 2010, Consortium China remained undercapitalized.  Around this time, Plaintiffs learned that Consortium China's insufficient capital might cause a serious problem.[4]  Standard Bank informed Plaintiffs that under Chinese regulations, it could not convert U.S. dollars to Chinese Renmibi on behalf of a company that was undercapitalized.  This meant that any payment PNC made to Standard Bank under the Letter could not be converted into Chinese currency and would therefore be ineffective to pay off Consortium China's loan.[5]

Around the same time, PNC notified Consortium USA that it would not renew the Standby Letter of Credit, which was set to expire in July of 2010.  Plaintiffs knew that before the Letter expired, Standard Bank would demand payment under it.  They also knew that if PNC attempted to make such a payment, it would be ineffective due to the currency conversion problem, and Consortium China would default on its loan.

---

[4] The parties continue to dispute when Consortium USA first learned of this problem.  However, the exact timing of this revelation is immaterial to resolution of the instant motions.

[5] Although Plaintiffs acknowledge that undercapitalization was part of the currency conversion problem, they claim that the Standby Letter of Credit's wording was also to blame.  The exact cause of the currency conversion problem, while obviously important to Plaintiffs as a business matter, is immaterial to resolution of the instant motions for summary judgment.  What is material is the legal status of the proposed solution: the Capital Contribution Authorization ("the CCA").  As explained below, the CCA is not an enforceable contract because Plaintiffs have failed to show that it satisfies the statute of frauds.

**C.     The Solution: the Capital Contribution Authorization**

Plaintiff Consortium USA and Defendant PNC attempted to avert the currency conversion issue by executing a document entitled "Capital Contribution Authorization." (Doc. # 23-1) (hereinafter "the CCA").  This document was signed by both parties and provided that:

> It is hereby acknowledged that under the authorization of Consortium Companies, Inc. and the credit facility and letter of credit previously established for Consortium Companies, Inc., PNC Bank, National Association is wiring funds on behalf of Consortium Companies, Inc. of USD 1,600,000 to Guangzhou Consortium Display Product Company Ltd. which Consortium Companies, Inc. advises it intends as capital.

(Doc. # 23-1).

Plaintiffs allege that the CCA was a contract by which PNC agreed to loan money to Consortium China.  Consortium China would use the money to pay off its loan from Standard Bank.  With the loan paid off, Standard Bank would not attempt to draw funds under the Standby Letter of Credit.  The currency conversion problem would be avoided.

**D.     PNC's Alleged Failure to Follow the Capital Contribution Authorization**

However, for reasons explained below, PNC never wired the funds to Consortium China.  With Consortium China's loan unpaid, and the Standby Letter of Credit expiring, Standard Bank demanded payment from PNC under the Letter in the amount of $1,760,000.  PNC complied, making payment on July 9, 2010.  As anticipated, due to the currency conversion problem, Standard Bank never effectively received this payment.  Consortium China not only defaulted on its loan, but was exposed to double liability, since it now owed $1,760,000 to PNC as well.  Plaintiffs contend that these events effectively shut down their Asian operations.  The instant litigation ensued.

## E.       The Instant Litigation

By their First Amended Complaint, Plaintiffs claim that by failing to make the alleged loan, PNC breached the CCA, breached its implied duty of good faith and fair dealing, breached its duty to act as their fiduciary, and tortuously interfered with their Asian business relationships.

By the instant Motion for Summary Judgment (Doc. # 104) on Plaintiffs' First Amended Complaint, Defendant PNC argues that the CCA does not satisfy the statute of frauds and is therefore not an enforceable contract.   PNC also disputes Plaintiffs' characterization of the CCA as a loan intended to avoid a draw under the Standby Letter of Credit.  It explains that the parties always anticipated a draw request, and the CCA was merely a letter characterizing the funds drawn under the Letter in such a way as to comply with Chinese financial regulations.   In addition, PNC denies any liability under Plaintiffs remaining causes of action, for reasons explained more fully below.  By their Response (Doc. # 117), Plaintiffs claim the CCA satisfies the statute of frauds through documentary evidence.  The Court now turns to evaluate that evidence.

## III.     ANALYSIS OF THE CROSS MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDED COMPLAINT FILED BY PNC AND CONSORTIUM USA (DOCS. # 104 & 128)

## A.      Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must view the evidence and draw all reasonable

6

inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

**B.     Count 1: Breach of Contract Regarding the Capital Contribution Authorization**

Kentucky's statute of frauds requires that agreements or contracts be in writing and signed by the party to be charged.  K.R.S. § 371.010(9).  "Separate writings may form the memorandum of contract required by the Statute of Frauds." *Lonnie Hayes & Sons Staves,*

*Inc. v. Bourbon Cooperage Co.*, 777 S.W.2d 940, 942 (Ky. Ct. App. 1989) (citations omitted).  However, the writings must refer to each other without the use of parol evidence.  *See, e.g., Nicholson v. Clark*, 802 S.W.2d 934, 938 (Ky. Ct. App. 1990).  The writings must also set forth the contract's essential terms without resort to parol evidence.  *Id.*

Plaintiffs claim that the statute of frauds is satisfied by three sources: (1) the CCA itself; (2) e-mails exchanged in April 2010 between Consortium USA's Chief Financial Officer, Roger Schreiber, and PNC representative, Thomas Dodd; and (3) a draft term note dated May of 2010.

Plaintiffs argue that these documents supply the essential terms of the alleged loan.  The April 2010 e-mails show Schreiber and Dodd negotiating these essential terms, they claim.  These terms were then supposedly memorialized in the draft term note.  According to Plaintiffs, all of these documents are connected for statute of frauds purposes by the CCA, which purportedly refers to both the e-mails and the draft term note by using the single phrase "existing credit facility."[6]

This argument is flawed in three ways.  First, none of these documents refer to each other, as required by the statute of frauds.  The e-mails and the draft term note do not mention the CCA at all.  Similarly, the CCA makes no mention of the e-mails or the draft term note.  Indeed, Plaintiffs never explain how the CCA's use of the term "existing credit facility" can be understood as referring to the e-mails and draft term note.

---

[6]  The exact wording of the CCA refers to the "authorization of Consortium Companies, Inc. and *the credit facility* and letter of credit previously established for Consortium Companies, Inc. . . ." (Doc. # 23-1).

8

Second, as PNC correctly argues, these documents do not relate to the CCA at all; they relate to an entirely different transaction.  That transaction had to do with how Consortium USA would repay PNC once Standard Bank demanded payment under the Standby Letter of Credit.  Thus, in April of 2010, fully expecting the Standby Letter of Credit to be exercised within 60 days,  the parties discussed a plan to add Consortium USA's new debt to its existing term note with PNC.

> For instance, in one of the April 2010 e-mails, Schreiber wrote to Dodd:
> Tom,
> We received the attached invoice/statement today for the PNC note maturing on 4/30.
>
> As I recall our discussion, *since we fully expect the* [*Standby Letter of Credit*] *to be exercised within the next 60 days*, you and I did not intend to go through a formal process of note renewal for the < 60 day window. I understood our plan is to basically have this considered a month-to-month auto renewal for the next 60 days and continue to make the $20K/mo principle plus interest (total approx $25K).
>
> In the meantime, *you were working to align approval for the terms of the new note*;
> 1.   *New* [*Standby Letter of Credit*] *amount to match actual exercised amount up to a max of $1.7MM.*
> 2.   *This plus the current note balance (approx $.9MM) would be the new note total.*
> 3.   Requested $40K/mo principle payment plus applicable interest payment....

(Doc. # 117-26 at 2-3) (emphasis added).  This e-mail shows that the parties "fully expect[ed] the [*Standby Letter of Credit*] to be exercised within the next 60 days," and that they planned to add the "actual exercised amount" under the Letter to the "current note balance." (Id.).  Thus, the April 2010 e-mails had nothing to do with the CCA; instead, they were concerned with how to repay the soon-to-be-incurred Standby Letter of Credit debt.

Third, the timing of these e-mails demonstrate that they had nothing to do with the CCA.  The April 2010 e-mails were exchanged *two months before* the CCA was even

9

contemplated.  It was not until June 14, 2010, that Schreiber pitched the idea for the CCA

to PNC's Thomas Dodd.  On that date, Schreiber e-mailed Dodd, explaining the currency

conversion problem, and proposing two options: (a) a loan outside the Standby Letter of

Credit, or (b) a letter characterizing the funds paid under the Standby Letter of Credit as a

capital infusion (i.e., the solution that became known as the CCA):

> 2.      (Where I need your cooperation) We are working to have the $1.6
> million go to China and be able to meet Chinese regulatory
> requirements as a "capital infusion" [sic] All China arrangements have
> been made to accomplish this on our end. To have the $1.6 M infused
> as capital to then repay the debt is significantly different for the
> ongoing capital structure and success of our China operation. In order
> for it to be verified in China as a capital infusion, funds need to come
> from [Consortium USA] or, at a min [sic], be verified as specifically
> authorized by [Consortium USA]. To accomplish this, we need to
> either:
>
> a.      *An alternative to LC exercise*:
> I. [Consortium USA] open a secured account with PNC;
> ii. PNC funds $1.6 M into [Consortium USA] account;
> iii. [Consortium USA] remits funds to SCB China to pay off LOC,
> *negating the $1.6M LC exercise*.
> b.      *A letter signed by you or someone at the bank stating the funds,
> exercised by the LC transaction, were sent under the direction of
> [Consortium USA]*. I have attached a short draft of this.

(Doc. # 104-22 at 3).  The "draft" Schreiber attached was the CCA.  In closing his e-mail,

Schreiber added that he preferred the loan option over the CCA option.  (Id.).

Dodd would not agree to the loan, however, as Schreiber explained to Plaintiffs

Steven and Clint Oberst in an e-mail dated the same day:

> Talked with Tom Dodd. He said he would like to cooperate and do whatever
> he can, but knows that *the [Consortium USA] account alternative outlined in
> 2a would be impossible*. Reason: for X hrs or days the bank would be double

exposed.[7]   This would require an increase in credit exposure requests.

(Id. at 2) (emphasis added).   Still, Dodd would agree to sign the CCA with slight modification.   (*See* Doc. # 104-23 at 2).

Schreiber understood that the CCA was not a loan meant to avoid a draw request. It specifically contemplated a draw request, Schreiber explained to Consortium China representative, Joyce Xu, in yet another June 14, 2010 e-mail.   He wrote that if the parties executed the CCA, it would still be "necessary for [Standard Bank] to exercise the SBLC per an authenticated SWIFT [draw request]." (Id.).   In his own words, the CCA was a "letter . . . stating the funds, *exercised by the LC transaction*, were sent under the direction of [Consortium USA]."   (Doc. # 104-22 at 3).   Thus, both the substance and the timing of these June 14, 2010 e-mails demonstrate that Plaintiffs' argument is entirely implausible.

The same can be said of the May 2010 draft term note (Doc. # 117-27).   The draft term note, which as indicated by its title was never executed, was composed before the CCA was contemplated, and appears to formalize the parties' plan to add the new Standby Letter of Credit debt to Consortium USA's existing term note with PNC.   A reference to the CCA is conspicuously absent.

Plaintiffs make two final attempts to connect their documentary evidence to the CCA. First, they cite deposition testimony from Schreiber explaining how "the parties were in agreement on the terms [of the short term loan] and were simply going to include the actual amount of the wire into the documents that set forth all of the repayment terms."   (Doc. #

---

[7] PNC feared double exposure because if it loaned funds outside of the Standby Letter of Credit, it would still be obligated to honor a draw request under the Standby Letter of Credit.

117 at 19).   However, this deposition testimony constitutes parol evidence because it concerns the parties' oral statements and/or writings exchanged prior to the execution of the CCA, and parol evidence may not be used to comply with the statute of frauds.  *See, e.g.*, *Nicholson v. Clark*, 802 S.W.2d at 938 (explaining that under the statute of frauds, "contract terms must be ascertainable without resort to parol evidence.").

Second, Plaintiffs cite a hand-written note from PNC that reads "Term Loan set up to fund or pay the L/C *per Tom, do not use reimbursement agreement to fund."  (Doc. # 117-28).   Plaintiffs claim this note somehow supports its interpretation of the CCA.  However, as PNC correctly observes, this note is unauthenticated and undated.  Plaintiffs never identify who wrote the note, or how one can tell that the note's subject is the CCA.[8]  Thus, the note lends no support to Plaintiffs' argument.

Therefore, for all these reasons, the CCA fails to satisfy the statute of frauds.  Accordingly, PNC is entitled to summary judgment not only on Plaintiffs' claim for breach of contract (Count 1), but also on Plaintiffs' claim for breach of implied duty of good faith and fair dealing (Count 4).   Without a valid contract, the Court cannot assume that a duty of good faith and fair dealing ever arose.   "The duties of good faith and fair dealing arise from a contractual obligation and, in the absence of such contract, no duties exist under Kentucky law."  *Grisby v. UPS Ground Freight, Inc.*, No. 2007–CA–002401–MR, 2009 WL 1636293, at *3 (Ky. Ct. App. June 12, 2009) (citing *Farmer's Bank and Trust Company of Georgetown Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4 (Ky. 2005) and *RAM*

---

[8] Plaintiffs argue that the Court must accept their interpretation of the note because PNC allegedly refused to produce a Rule 30(b)(6) witness to testify about the note's meaning.  The Court is under no such obligation.  If they wished, Plaintiffs could have moved to compel PNC to produce such a witness, or moved for sanctions.  They did neither.

*Engineering and Construction, Inc. v. University of Louisville*, 127 S.W.3d 579, 585 (Ky. 2003)).

## C.    Count 2: Breach of Fiduciary Duty

### 1.    Facts

As described above, PNC successfully solicited Consortium USA's business in 2007. Throughout this solicitation, PNC promoted its international banking expertise.  PNC's promotional materials promised that it could "offer . . . experienced international banking and finance professionals to help . . . navigate an increasingly complex global environment" including "the complex world of Chinese banking."  (Doc. # 117 at 4).  It also promoted its "gateway program" with Standard Bank, stressing that it could help Consortium Companies establish a banking relationship with Standard Bank.  According to Schreiber, PNC even told Consortium at one point that it "had to use Standard."  (Doc. # 117 at 5).

In addition, PNC employees may have received financial incentives for promoting the gateway program with Standard Bank.  Nancy Downey and Jay Wuest, PNC employees, testified that they may have received some small financial compensation for promoting the gateway program, but they could not specifically recall how the compensation payments were structured, or how much they were worth.  (Doc. # 115-26 at 63; Doc. # 113-1 at 243-245).  Schreiber notes that throughout Consortium USA's discussions with PNC, it frequently told PNC that it would be relying on PNC for international banking advice.

For its part, PNC does not dispute that it provided information to Consortium Companies about Standard Bank, and that it arranged a meeting between Consortium USA

13

and Standard Bank in February 2007.   However, PNC contends that Consortium Companies did not choose Standard Bank solely based on PNC's recommendation.   It points to e-mails exchanged between Roger Schreiber and Joyce Xu, Consortium China's manager, discussing how they preferred Standard Bank's policies and practices over those of China Merchants Bank.  It also notes an e-mail from Schreiber to Plaintiff Oberst stating that "[PNC] didn't change us to anything. We found [Standard Bank] in China would do an [letter of credit] for us and went with them."  (Doc. # 104-9).   In addition, PNC's Nancy Downey claims that PNC "was not involved in any discussions concerning the services or products [Standard Bank] could provide."  (Doc. # 104-1 at 3).  PNC further asserts that it "had no involvement in the negotiation, issuance, or processing of [Consortium China's] line of credit [with Standard Bank]."  (Id. at 4).

### 2.    Analysis

A fiduciary duty is "the highest order of duty imposed by law."  *In re Sallee v. Fort Knox Nat'l Bank, N.A.*, 286 F.3d 878, 891 (6th Cir. 2002).  This duty exists where "a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence."  *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (quoting *Security Trust Co. v. Wilson*, 210 S.W.2d 336 (Ky. 1948)).  Where this duty arises, the fiduciary is obligated not just to deal fairly with the principal, but to place the principal's interests above his own.  *In re Sallee*, *supra*.

To prove that a fiduciary relationship existed, the aggrieved party must establish three elements: (1) the relationship existed before the transaction that is the subject of the action; (2) the aggrieved party's reliance was not merely subjective; and (3) the nature of

14

the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary. *Id.* at 892.

A fiduciary duty rarely arises in commercial relationships. *Id.* at 892-894. Thus, the Sixth Circuit has recognized that "except in special circumstances, a bank does not have a fiduciary duty with its borrowers." *In re Sallee*, 286 F.3d at 893; *see also*, *Steelvest, Inc.*, 807 S.W.2d at 485. This is because "[i]n an arms-length commercial transaction, [ ] each party is assumed to be protecting its own interest . . . ." *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 4 (Ky. Ct. App. 2012) (citing *In re Sallee*, 286 F.3d at 894).

In the present case, Plaintiffs argue that PNC owed them a fiduciary duty because PNC promoted its international banking experience to them, and consequently they placed "special trust and confidence in PNC" relating to their borrowing in China, and to the Standby Letter of Credit. However, Plaintiffs must show "more than mere subjective trust"; they must demonstrate that "such trust was reasonable under the circumstances." *In re Sallee*, 286 F.3d at 892. Here, it was patently unreasonable for Plaintiffs to believe that PNC would put their interests ahead of its own. *See id.* For instance, Plaintiffs signed the Reimbursement Security Agreement which expressly limited PNC's liability for any defects in the Standby Letter of Credit.[9] Thus, it should have been plain to Plaintiffs from the outset of the relationship that their interests were "obviously at odds" with those of PNC. *See id.* at 894. By executing the Reimbursement and Security Agreement, PNC clearly acted to

---

[9] As PNC notes, "the [Reimbursement and Security Agreement ] specifically advised [Consortium USA] that (1) PNC was not providing advice on whether the SBLC would satisfy [Consortium USA]'s needs; (2) [Consortium USA] should consult its own legal counsel concerning any questions about the SBLC; (3) PNC was not responsible for any circumstances whatsoever in making payment under the SBLC; (4) PNC was not responsible for any loss arising from the SBLC; and (5) PNC was not responsible for circumstances resulting from the laws of any foreign country." (Doc. # 124 at 13).

protect its own interests.

Plaintiffs also argue that PNC owed them a fiduciary duty because it purported to provide expert advice on the CCA.  But the Sixth Circuit has adopted the view that "advice in a commercial context does not create a fiduciary relationship."  By way of example, the Sixth Circuit has cited with approval the Ohio Supreme Court's decision in *Ed Schory & Sons, Inc. v. Society Nat'l Bank*, 75 Ohio St.3d 441 (1996).  In *Schory*, the court found no fiduciary relationship existed where a bank failed to offer additional construction loans to a long-time customer despite having allegedly given the customer advice in creating the construction development.  *Id.* at 443.

The instant facts are even less suggestive of a fiduciary relationship.  Consortium USA had no lengthy relationship with PNC.  They also did not advise Consortium USA on the CCA; rather, Consortium USA brought the idea for the CCA to PNC, and asked PNC to go along with it.  Like the *Schory* court, this Court finds no evidence of a fiduciary relationship.  Plaintiffs have thus failed to show that this was one of those "rare commercial cases" where it was reasonable to believe that a commercial bank had taken on a fiduciary role vis-a-vis a customer.

Plaintiffs rely on *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991) and *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420 (Ky. Ct. App. 1978) for the proposition that a fiduciary relationship can sometimes exist between a bank and a borrower.  However, the Sixth Circuit has emphasized that the key to the holdings in those cases was that each bank profited at the borrower's expense by misusing the borrower's confidential information.  *Id.* at 893; *accord Snow Pallet, Inc.*, 2012 WL 1370878, at *3 (concurring with *In re Sallee*'s analysis of *Steelvest* and *Henkin*).  In *Steelvest*, the bank

16

utilized the borrower's confidential business plans to assist one of the borrower's competitors and to generate new business for the bank. *Steelvest,* 807 S.W.2d at 485-86. Likewise, in *Henkin*, the borrower disclosed confidential information to the bank for the sole purpose of obtaining a loan to pay off a promissory note. *Henkin*, 566 S.W.2d at 422. The bank immediately used that information for its own benefit by purchasing the borrower's note at a discount from the original lender. *Id.* Even more egregious, when the borrower was a few days late on its first payment to the bank, the bank accelerated all future payments and commenced foreclosure proceedings. *Id.*

Both *Steelvest* and *Henkin* are easily distinguished from the instant case. Here, there is no allegation that Plaintiffs' confidential information was at issue. Plaintiffs argue that PNC profited from promoting its international banking services because certain PNC employees allegedly earned incentive payments for the promotion. The Court, however, agrees with PNC that "promoting a bank product hardly constitutes the type of improper self-dealing required to trigger a fiduciary obligation." (Doc. # 124 at 13 n.26).

Plaintiffs remaining attempts to establish a fiduciary duty lack merit. They claim that by signing the CCA, PNC undertook a duty to solve the currency conversion issue and thereby became their agent. However, an agency relationship only exists where the agent consents to the principal's control. *See, e.g.*, *Ernst & Young, LLP v. Clark*, 323 S.W.3d 682, 694 (Ky. 2010) (citing Restatement (Third) Of Agency § 1.01 (2006)). Here, there is no evidence that PNC consented to Plaintiffs' control. Even if the CCA were a loan, as Plaintiffs claim, a bank does not consent to borrower's control merely by extending a loan. Such routine commercial transactions do not create agency relationships.

17

Plaintiffs also argue that PNC "affirmatively undertook duties to serve as, among other things, Consortium USA's international banker and advisor" and that it was negligent in this role. (Doc. # 128-1 at 8). Plaintiffs cite the Declaration of T.O. Lee (Doc. # 117-1), an international banking expert, who claims that PNC failed to fulfill certain international banking standards of care. Even if this were true, however, the Reimbursement and Security Agreement limited PNC's liability for the issuance and effectiveness of the Standby Letter of Credit. Accordingly, any putative violations of international standard banking practice do not subject PNC to legal liability.

Finally, Plaintiffs argue that PNC failed in its duty as international banker because it improperly honored Standard Bank's draw request under the Standby Letter of Credit. The Court need not address this argument here because Plaintiffs' Complaint did not advance this claim. Thus, Plaintiffs' attempt to raise this claim for the first time in response to a summary judgment motion is impermissible. *See, e.g., Tucker v. Union of Needletrades, Industrial, And Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that a plaintiff cannot raise a new claim in response to a summary judgment motion).

For all these reasons, Plaintiffs have failed to demonstrate a fiduciary relationship with PNC, or any other relationship giving rise to legal liability.

**D.    Count 3: Tortious Interference With a Contractual Relationship**

In Kentucky, tortious interference with an existing contractual relationship is defined as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

18

*Harrodsburg Indus. Warehousing, Inc. v. MIGS*, *LLC*, 182 S.W.3d 529, 533 (Ky. Ct. App. 2005) (citing Restatement (Second) of Torts § 766 (1979)).

The Kentucky Supreme Court requires the party seeking recovery to prove "malice or some significantly wrongful conduct" because "interference cases have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it." *Id.* (citing *National Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky.1988)). Even if malice is proven, a party may "escape liability by showing that he acted in good faith to assert a legally protected interest of his own." *Hornung*, 754 S.W.2d at 858.

Plaintiffs' tortious interference claim is fatally flawed for two reasons. First, they cannot show that PNC intentionally interfered with any contract. They argue that PNC's failure to fund the CCA caused Consortium China to default on its loan, ruining the financing for their "business relationships in Asia" and thereby interfering with those relationships. They imply that PNC acted with intent because it was "aware" of their Asian business relationships. But Plaintiffs have not identified a single specific contract with which PNC allegedly interfered. Nor have they shown that PNC *intentionally* interfered with any contract. PNC's alleged "awareness" of Plaintiffs' business relationships does not equate to intent.

Second, Plaintiffs have failed to show that PNC acted with malice in failing to fund the CCA. Plaintiffs claim that PNC acted with malice because Roger Schreiber heard from PNC's Jay Wuest that PNC wanted them "out of the bank at all costs." (Doc. # 117 at 29). But Schreiber also explained that this alleged malice was not directed solely against Plaintiffs, but against all former National City accounts PNC inherited after merging with

19

National City.  (See Doc. # 114-1 at 146).  In addition, Plaintiffs have not shown that PNC's general disfavor of National City accounts informed its decision to not fund the CCA. Therefore, they have failed to establish the requisite malice to support a tortious interference claim.

### E.     Counts Five through Eight

In Count Five of the First Amended Complaint, Plaintiffs allege that PNC applied one of their payments to the wrong loan.   They specifically contend that "in September 2010, Consortium Companies directed that its payment of $25,062.16 be applied to Loan No. XXXXXXXX6567."  (Doc. # 23 at ¶ 48).  However, in their Response brief (Doc. # 117), Plaintiffs fail to cite any evidence in support of this claim.  Accordingly, PNC is entitled to judgment as a matter of law on this claim.

Counts Six and Seven were contingent upon Plaintiffs prevailing on Counts One through Four.   Count Six alleges that Plaintiffs are entitled to offset any amount they recover in this action against the amounts the Individual Plaintiffs owe to PNC. Count Seven alleges that Plaintiffs are entitled to punitive damages.  Because Plaintiffs have not prevailed on Counts One through Four, their claims in Counts Six and Seven also fail.

Count Eight merely alleges that Plaintiffs "intend to pursue all claims under Kentucky and/or federal law arising from the allegations fo the First Amended Complaint . . . ."  (Doc. # 23 at ¶ 60).  Plaintiffs have not pursued any such claims and therefore this Count fails as well.

For all these reasons, the Court will grant PNC's Motion for Summary Judgment (Doc. # 104) on Plaintiffs' First Amended Complaint.

**IV.    ANALYSIS OF THE CROSS MOTIONS FOR SUMMARY JUDGMENT ON PNC'S COUNTER-CLAIM AGAINST CONSORTIUM USA (DOCS. # 128 & 133)**

As previously noted, PNC's counter-claim for breach of contract seeks reimbursement from Consortium USA for two of its debt obligations to PNC.  Consortium USA now moves for partial summary judgment as to liability only, and PNC moves for summary judgment as to liability and damages.  Because Consortium USA has failed to reimburse PNC for its two debt obligations, the Court will grant summary judgment for PNC on its counter-claim as to liability.  However, the Court will deny PNC summary judgment as to damages because material issues of fact remain in dispute regarding the proper amounts owed.

**A.    Facts**

**1.    The Reimbursement and Security Agreement**

As noted above, in 2007, PNC and Consortium USA signed the Reimbursement and Security Agreement (the "RSA"), setting forth the terms under which the Standby Letter of Credit was issued, including Consortium USA's obligation to reimburse PNC for any amounts drawn under the Standby Letter of Credit.   Specifically, Consortium USA "unconditionally agree[d] [that] . . . [a]s to drafts under or purporting to be under the Credit we agree to reimburse you in cash . . . on demand . . . ." (Doc. # 133-2).  Two years later, in July of 2010, Standard Bank submitted a draw request under the Letter, directing PNC to transfer $1,762,220.   PNC honored the draw request and transferred the funds to Standard Bank, precipitating the current litigation.

**2.    The European Term Note**

PNC also provided funding for Consortium USA's European operations.   That

21

obligation is reflected in a Term Note dated December 30, 2009, in the principal amount of $1,000,000 ("the European Term Note") (Doc. # 126-4).  The European Term Note provides:

> Principal shall be due and payable in four (4) equal consecutive monthly installments in the amount of $20,000 each, commencing on January 15, 2010 and continuing on the 15th day of each month thereafter and a final installment of $920,000 on April 30, 2010 . . . Any outstanding principal and accrued interest shall be due and payable in full on April 30, 2010.

(*Id.* at 2).

### 3.   Demand for payment

On November 16, 2010, PNC notified Consortium USA that it was in default under the RSA and the European Term Note, and demanded that Consortium USA reimburse it for the amount due under both instruments.[10]  (*See* Doc. # 38-7).  Consortium USA received this demand, but has not honored it.  Accordingly, PNC filed a counter-claim asserting that by failing to make these payments, Consortium USA breached the RSA and the European Term Note.  PNC asserts that as of March 7, 2013, the outstanding principal under the RSA is $1,766,690.55, and the outstanding interest is $107,023.53.  It also asserts that the outstanding principal and interest on the European Term Note is $1,142,081.

Both PNC and Consortium USA now move for summary judgment on PNC's counter-claim.  PNC argues that Consortium USA breached its contractual duty to reimburse it under the RSA and the European Term Note, and that it has no legal excuse

---

[10] Consortium USA argues that this demand only referenced the European Term Note and not the RSA, and is therefore not a proper demand under the RSA. However, the demand clearly identifies the loan number for the RSA and the principal amount owed.

for failing to fulfill this duty.  By contrast, Consortium USA argues that it is legally excused from paying these obligations for several reasons: (1) PNC acted in bad faith by failing to abide by the CCA; (2) PNC was grossly negligent by wrongfully honoring Standard Bank's defective draw request; and (3) PNC should be equitably estopped from claiming reimbursement because it misled Consortium USA through its failure to abide by the CCA. Consortium USA also contends that summary judgment regarding damages on PNC's counter-claim is inappropriate, as explained below.

**B.    Analysis**

   **1.    PNC did not act in bad faith regarding the CCA**

   It is axiomatic that to establish a breach of contract, a party must demonstrate the existence and breach of a contractual duty.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001)(citing *Strong v. Louisville & Nashville R. Co.*, 240 Ky. 781, 43 S.W.2d 11, 13 (Ky. 1931)).  Here, it is undisputed that pursuant to the RSA, Consortium USA undertook a duty to reimburse PNC for any amounts it paid under the Standby Letter of Credit.  In Paragraph 1 of the RSA, cited above, Consortium USA "unconditionally agree[d] [that] [a]s to drafts under or purporting to be under the Credit we agree to reimburse you in cash . . . on demand **. . . .**"  (Doc. # 133-2, ¶ 1).

   Consortium USA now contends, however, that this reimbursement duty was conditioned on PNC acting in good faith.  It claims that this condition can be found in Paragraph 2 of the RSA, which provides:

> In furtherance and extension and not in limitation to the specific provisions hereinbefore set forth, we agree that any action taken by you or by any of your correspondents under or in connection with the Credit or the relative drafts, instruments, demands, documents or property *if taken in good faith*,

23

shall be binding on us and shall not put you or your correspondents under any resulting liability to us; and we make like agreement as to any inaction or omission, unless it is in *breach of good faith*.

(Doc. # 133-2, at 4 ¶ 2) (emphasis added).   PNC responds that Consortium USA's reimbursement duty, outlined in Paragraph 1 of the RSA, was not conditioned upon the good faith requirement outlined in Paragraph 2 of the RSA.  That reimbursement duty was independent of the good faith requirement, it claims, as evidenced by its placement in a separate paragraph.

This dispute is irrelevant, however, because even if Consortium USA's reimbursement obligation was contingent on PNC acting in good faith, Consortium USA has produced no evidence that PNC acted in bad faith regarding the CCA.  Consortium USA's argument is that PNC failed to act in good faith by honoring Standard Bank's draw request despite knowing that the payment constituted a breach of the CCA, and that the payment would be ineffective due to the currency conversion problem.  But PNC did not breach the CCA because the CCA is not an enforceable contract.[11]   What's more, the record evidence—described in detail above—shows that the CCA was not intended to cancel out the Standby Letter of Credit.  The parties always expected Standard Bank to submit a draw request, and understood that PNC was contractually obligated to comply with it.  More fundamentally, PNC was not contractually responsible for ensuring that its payment under the Standby Letter of Credit would be effective or otherwise comply with Chinese law. (*See*

---

[11] Nor was the CCA a novation, as Consortium USA argues for the first time in its Memorandum In Opposition To PNC's Second Motion For Summary Judgment (Doc. # 142 at 11).  A novation is "the substitution of a new obligation for an old one, with intent to extinguish the old one . . . ." *G.D. Deal Holdings, Inc. v. Baker Energy, Inc.*, 501 F. Supp. 2d 914, 919 (W.D. Ky. 2007).  "Intent is the essential element in proving the existence of a novation, and the burden of proving a novation is on the party seeking to enforce it." *Id.* at 920.  For the reasons already stated, Consortium USA has not shown that PNC intended for the CCA to replace the RSA.

Doc. 133-2 at ¶ 2).  In fact, by signing the RSA, Consortium USA had previously agreed that it was not "relying on [PNC] in any manner in connection with the wording of the SBLC," and acknowledged that PNC made no warranty "that the [Standby Letter of Credit would] satisfy [Consortium USA's] needs."  (Doc. 133-2, ¶ 14).

### 2.    PNC was not grossly negligent in honoring the draw request

The RSA shielded PNC from liability for honoring draw requests unless, in so doing, it was "grossly negligent" or displayed "willful misconduct."[12]  Consortium USA argues that under the RSA, PNC was grossly negligent in honoring Standard Bank's draw request because the request incorrectly named Consortium China, rather than Consortium USA, as the Standby Letter of Credit applicant.  As a result, Consortium USA argues that it is "not only legally excused from payment under the RSA, it is entitled to judgment against PNC." (Doc. # 142 at 8).

Under the RSA, any objection to an improper draw request not raised immediately is deemed waived.[13]  Despite this requirement, Consortium USA did not object to the draw request until the summary judgment stage of this litigation, more than two years after the draw request was made.[14]  Accordingly, Consortium USA waived this objection.

---

[12] Specifically, the RSA provided that PNC would not be responsible for "any loss or liability whatsoever arising from or in connection with the Credit, except . . . to the extent . . . of any direct . . . damages suffered by us which we prove were caused by (1) your gross negligence or willful misconduct in honoring a presentation under the Credit . . . ."  (Doc. # 133-2 at 5, ¶ 2).

[13] The RSA provided that: "[i]n case of any . . . variation between the documents called for by the [Standby Letter of Credit] and the documents accepted by you . . ., we shall be conclusively deemed to have waived any right to object to such variation with respect to any action by you, relating to such documents, and to have ratified and approved such action as having been taken on our direction, unless we, immediately upon receipt of such documents, file objection with you in writing." (Doc. # 133-2 at 8, ¶ 10).

[14] Consortium USA claims that it raised this issue as an affirmative defense in its Answer to PNC's Counterclaim (Doc. # 43 at 5).  That affirmative defense stated that PNC's Counterclaim was barred by its

Assuming *arguendo* that a reviewing court finds Consortium USA did not waive this objection, the Court finds that PNC was not grossly negligent in honoring the draw request.

The Standby Letter of Credit required any draw request to contain the following language

> We have been advised that [PNC Standby Letter of Credit] No. SCL013861 will not be extended beyond the current expiration date of (insert date). We hereby draw USD (insert amount) under [Letter of Credit] No. SCL013861 being the outstanding amount of the aggregate principal, accrued interest, fees, costs, expenses and taxes, if any, regarding the general banking facility denominated in any currency which we have made available to *Consortium Companies, Inc.*
>
> We shall effect payment as per your instructions upon receipt of the above mentioned authenticated swift message sent to NATCUS3

(Doc. # 133-3) (emphasis added).

> The draw request sent by Standard Bank to PNC on July 1, 2010 read:
>
> WE HAVE BEEN ADVISED THAT PNC BANK, NATIONAL ASSOCIATION LETTER OF CREDIT NO. 12500762-00-000 WILL NOT BE EXTENDED BEYOND THE CURRENT EXPIRATION DATE OF JULY 13, 2010. WE HEREBY DRAW USD 1762220.00 UNDER LETTER OF CREDIT NO. 12500762-00-000 BEING THE OUTSTANDING AMOUNT OF THE AGGREGATE PRINCIPAL, ACCRUED INTEREST, FEES, COSTS, EXPENSES AND TAXES, IF ANY REGARDING THE GENERAL BANKING FACILITY DENOMINATED IN ANY CURRENCY WHICH WE HAVE MADE AVAILABLE TO *GUANGZHOU CONSORTIUM DISPLAY PRODUCT COMPANY LTD.* PLEASE REMIT PROCEEDS BY TT WITHOUT DEDUCTION OUR NEW YORK OFFICE (CHIPS) NO. ABA 256/SWIFT CODE SCBLUS33) FOR CREDIT TO SCB SHANG HAI USD A/C NO. 3582-088515-001 (UIV254960) WITH THEM UNDER SWIFT ADVICE TO US QUOTING OUR REFERENCE.

(Doc. # 133-4) (emphasis added). The draw request thus contained all requisite language, except the correct name of the credit applicant.

---

"negligence." (Id.). Even assuming this was enough to preserve its objection to PNC's honoring of the draw request, it cannot be said that Consortium USA "immediately" raised this objection. The Answer was filed on November 30, 2011, about eighteen months after the draw request was made.

In Kentucky, gross negligence is defined as "being something more than the failure to exercise slight care . . . there must be an element either of malice or willfulness or such an utter and wanton disregard of the rights of others as from which it may be assumed the act was malicious or willful." *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003) (citing *Cooper v. Barth*, 464 S.W.2d 233, 234 (Ky. 1971)). That standard is met here, Consortium USA contends, because PNC failed to comply with the doctrine of strict compliance used in international standard banking practice for examining draw requests.[15] However, a failure to abide by international banking standards does not equate to gross negligence. Gross negligence requires proof of malice, and Consortium USA has offered no such proof here. In addition, Consortium USA fails to explain how the draw request's misidentification of the credit applicant misled PNC in any way. Accordingly, the Court finds that PNC was not grossly negligent.

### 3.    PNC should not be equitably estopped from claiming reimbursement

Next, Consortium USA argues that PNC should be estopped from claiming reimbursement under the RSA because Consortium USA relied on its understanding that the CCA would be funded through a separate term note rather than through the Standby Letter of Credit. Because the Court has already found that Consortium USA has not produced evidence to support this understanding, the Court rejects Consortium USA's estoppel argument.

---

[15] It cites the Declaration of T.O. Lee (Doc. # 117-1), an international banking expert, who explains that strict compliance is both the prevailing norm in international banking practice, and a requirement of Article 14 of the International Chamber of Commerce's Uniform Customs and Practice for Documentary Credits 600 ("the UCP 600"), which governed the Standby Letter of Credit. Article 14 of the UCP 600 provides that the wording of a draw request "need not be identical to, but must not conflict with . . . the [letter of credit]." (Doc. # 117-1 at 22).

For the foregoing reasons, the Court will grant PNC's motion for summary judgment on its counter-claim against Consortium USA (Doc. # 133) as to liability.  The Court now turns its attention to the issue of damages.

### 4.      Consortium USA is not entitled to a setoff

Consortium USA argues that if it is liable to PNC under the RSA, genuine issues of material fact remain in dispute regarding damages.  It says it is entitled to a full setoff of the entire amount paid under the Standby Letter of Credit because of PNC's alleged negligence and breach of the CCA.  This request lacks merit, however, as the Court has already determined that PNC was not negligent and did not breach the CCA.   In addition, in the RSA, Consortium USA agreed to reimburse PNC notwithstanding "any claim, setoff, defense, or other rights."  (Doc. 133-2, at ¶ 7).  Thus, Consortium USA agreed to waive its right to setoff, unless it could prove that PNC was grossly negligent.  Since it has failed to make this showing, the Court finds that it waived any right it might have to a setoff under the Standby Letter of Credit.

Consortium USA also argues that it is entitled to a setoff to the European Term Note.  Because it offers no legal or factual support for this argument, the Court rejects it.

### 5.      Material Issues of Fact Remain in Dispute Regarding Damages

Finally, Consortium USA argues that material issues of fact remain in dispute regarding damages.  It points out that PNC originally demanded $1,749,279.21 in principal on the Standby Letter of Credit payment, but now demands $1,766,690.55.  Likewise, it notes that PNC originally demanded $842,370.78 in principal on the European Term Note, but now demands $822.370.78.

PNC explains that "[t]he alleged discrepancy . . . reflects the reapplication of the payment that is the subject of Count V of the First Amended Complaint." (Doc. # 147 at 15). In Count V, Plaintiffs allege that they made a payment of $25,062.16 in September of 2010, and that PNC misapplied that payment toward the amount due under the Standby Letter of Credit. PNC now cites to Thomas Dodd's deposition as proof that it "redirected" that payment. Perhaps it did, but that fact is not confirmed by Dodd's deposition. Dodd testified that he "[made] a request to have the funds moved from one term note to another." (Doc. # 116-57 at 26). However, he did not testify that the funds were actually moved, and he did not explain which term note the payment was ultimately applied to. In addition, PNC has not explained the approximately $20,000 difference between its demands on the European Term Note.

The Court thus finds that there is a discrepancy in damages owed, and will therefore deny PNC's motion for summary judgment on its counter-claim against Consortium USA (Doc. # 133) as to damages.

## V.   ANALYSIS OF THE CROSS MOTIONS FOR SUMMARY JUDGMENT ON PNC'S COUNTER-CLAIM AGAINST THE GUARANTORS (DOCS. # 126, 127, & 135)

PNC's counter-claim against the Guarantors seeks to enforce three Guaranty Agreements they executed promising to repay Consortium USA's debts under the Standby Letter of Credit and the European Term Note. By the instant cross-motions for summary judgment (Docs. # 126, 127 & 135), PNC and the Guarantors each argue that they are entitled to summary judgment as to liability on PNC's counter-claim. Because the Court finds that the Guaranties are unenforceable under K.R.S. § 371.065, the Court will grant summary judgment for the Guarantors on PNC's counter-claim.

29

## A.    Facts

### 1.    The Guaranty Agreements

In August and September of 2008, the Guarantors executed three Guaranty Agreements promising to repay Consortium USA's debts to PNC.  (Docs. # 38-3, 38-4 & 38-5).   Roger Schreiber signed a Guaranty Agreement with a maximum liability of $700,000.  Clinton and Susan Oberst signed a Guaranty Agreement with a maximum liability of $400,000.  Steven and Lynda Oberst signed a Guaranty Agreement with a maximum liability of $1,400.  The Guaranty Agreements stated that for the purpose of "induc[ing] [PNC] to extend or continue to extend credit" to Consortium USA, the Guarantors

> unconditionally guarantee[d] the prompt payment of *each and every obligation* of [Consortium USA] to [PNC] when due, whether direct, indirect or contingent, *now existing or hereafter created,* arising or acquired, and howsoever evidenced or secured . . . .

(Id.) (emphasis added).  The Guaranty Agreements also contained a paragraph waiving "all defenses in law or equity."  (Id. at ¶ 3).  The Guarantors consulted with legal counsel before signing the Agreements.

### 2.    The European Term Note, the Letter Agreement, and the Partial Payment and Partial Release Agreement

As previously explained, on December 30, 2009, Consortium USA and PNC signed the European Term Note—a $1,000,000 loan for Consortium USA's European operations. (*See* Doc. # 126-4).   The Note provided that it was issued in connection with other documents, including a "letter agreement."   Specifically, the Term Note stated:

> 6.    <u>Other Loan Documents</u>. This Note is issued in connection with a letter agreement or loan agreement between the Borrower and the Bank dated on

or before the date hereof . . . and secured by the property (if any) described in the Loan Documents and by such other collateral as previously may have been or may in the future be granted to the Bank to secure this Note.

(Id. at ¶ 6).  Consortium USA consulted with legal counsel before executing the Note.

On the same date, the Guarantors executed two documents: a "Letter Agreement — Term Loan," and a "Partial Payment and Partial Release Agreement."  The Letter Agreement noted that PNC bank had approved a $1 million term loan in favor of Consortium USA and that the Guaranty  Agreements constituted security for that loan. (Doc. # 134-2).  More specifically, the Letter Agreement provided

> 5.   Security. The Borrower has previously caused the following to be executed and delivered to the Bank . . . as security for the Loan:
>
> (a)   A Guaranty dated August 27, 2008, executed and delivered by Roger Schreiber; a Guaranty dated September 2, 2008, executed and delivered by Clint S. Oberst and Susan Oberst; and a Guaranty dated September 2, 2008, executed and delivered by Steven M. Oberst and Lynda G. Oberst (individually or collectively, the "Guarantor").

(Id. at ¶ 5).

> The Letter Agreement further acknowledged that the Guarantors
>
> *expressly waive*, release and relinquish *any and all defenses*, affirmative defenses . . . of any kind or nature whatsoever *which . . . any Guarantor . . . might assert*, against [PNC] *with respect to the Loan*, the Loan Documents or the indebtedness evidenced and secured thereby, *or with respect to any other documents* or instruments now or heretofore evidencing, *securing or in any way relating to the Loan* . . . .

(Id. at ¶ 10) (emphasis added).

The Partial Payment and Partial Release Agreement (Doc. # 134-3) noted that the Guarantors had guaranteed Consortium USA's Standby Letter of Credit debt (which debt was formalized in the RSA).  Again, the Guarantors spoke with their legal counsel before signing both the Letter Agreement and the Partial Payment and Partial Release Agreement.

31

B.    **Analysis**

1.    **Whether the Guaranty Agreements comply with K.R.S. § 371.065[16]**

The primary issue for the Court is whether the Guaranty Agreements comply with K.R.S. Section 371.065.[17] "In order for a guarantee to be enforceable under K.R.S. § 371.065, it must: (1) be written on the instrument being guaranteed; or (2) expressly refer to the instrument being guaranteed; or (3) be signed by the guarantor and contain provisions specifying the amount of the maximum aggregate liability and the date on which the guaranty terminates." *BP Products N. Am. Inc. v. McGuirk Oil Co., Inc.*, 2011 U.S. Dist. LEXIS 58897, at *9 (W.D. Ky. 2011) (citing *Wheeler & Clevenger Oil Co. v. Washburn*, 127 S.W.3d 609 (Ky. 2004)).  To be valid, a guaranty need only comply with one of these requirements.  The statute "is a consumer-protection provision designed to protect the guarantor by reducing the risk of a guarantor agreeing to guarantee an unknown obligation." *Wheeler & Clevenger Oil Co.*, 127 S.W.3d at 615.

Here, it is undisputed that the Guaranties fail to meet the first and third

---

[16] The Guaranty Agreements contain a choice of law provision stating that they will be governed by federal law and, to the extent not preempted by federal law, the laws of the state in which PNC's banking office is located.  The Guaranty Agreements note that PNC's banking office is located in Fort Wright, Kentucky.  Neither PNC nor the Guarantors assert that federal law preempts the Guaranty Agreements, and the Court is unaware of any federal law which would preempt the Agreements. Accordingly, the Court finds that Kentucky law controls.

[17] The statute provides: "No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates. Termination of the guaranty on that date shall not affect the liability of the guarantor with respect to: (a) Obligations created or incurred prior to the date; or (b) Extensions or renewals of, interest accruing on, or fees, costs or expenses incurred with respect to, the obligations on or after the date."  K.R.S. § 371.065.

requirements.[18]    However, the parties dispute whether they meet the second requirement—that they refer to the instrument being guaranteed.  The Guarantors correctly point out that the Guaranties contain no reference to the RSA or the European Term Note.  PNC concedes this fact, but argues that the Guaranties "effectively reference the instruments guaranteed" through two other loan documents, the Letter Agreement and the Partial Payment and Partial Release Agreement.  It cites *Smith v. Bethlehem Sand & Gravel Co., LLC*, and *Banterra Bank v. Hendrick*, 2011 WL 832455 (W.D. Ky. 2011), for the proposition that "the [statute's] required reference to the instrument being guaranteed can be found in the language of multiple documents."  (Doc. # 134 at 11).

PNC misreads *Smith* and *Banterra Bank*.  Those cases do not hold that the statute is satisfied as long as *some* document *somewhere* refers to the instrument guaranteed.  Instead, they hold that either (1) the *guaranty itself* must either refer to the instrument guaranteed, or (2) the guaranty must clearly refer to a document, such as an exhibit or attachment, that references the instrument guaranteed.  In *Smith*, for instance, the guaranty at issue did both: it explicitly referred to the instrument guaranteed, and it referred to a document entitled "Schedule 1," which was included as the guaranty's last page, and referred to the instrument guaranteed.  The court concluded that in these two ways, the guaranty "effectively referenced" the guaranteed instrument and thus complied with the statute.

*Banterra Bank*'s holding is similar to *Smith's*.  Under the guaranty in *Banterra Bank*, the guarantor promised to repay the lender for "the performance and discharge of all [the

---

[18] The Guaranties fail under these requirements because they are not written on the RSA or the European Term Note, and they fail to specify the date on which they terminate.

borrower's] obligations under the Note and the Related Documents."  2011 WL 832455,

at *24-25.  In the Definitions section, "Note" was defined as:

> The promissory note from Borrower to Lender, bearing the same dates as
> this mortgage in the original amount equal to the maximum lien amount of
> this mortgage, together with all renewals or replacements of, extensions of,
> modifications of, refinancings of, consolidations of, and substitutions for the
> promissory note or agreement.

*Id.* at 25.  The guaranty, the mortgage, and the promissory note all contained the same

dates.  Thus, the United States District Court for the Western District of Kentucky held that

the guaranty's language, "[w]hile perhaps not as exact as this Court might like," satisfied

the statute's reference requirement.  *Id.* at *25-26.

The instant Guaranties are starkly distinguishable from those at issue in the two

foregoing cases.  They do not directly refer to the guaranteed instruments—the RSA and

the European Term Note—nor do they refer to a document that itself references those

instruments.  On the contrary, they sweepingly guarantee "each and every" debt which

Consortium USA might owe to PNC, whether "now existing or hereafter created."  (Docs.

# 38-3, 38-4 & 38-5).  This broad and vague language is similar to the language found to

be deficient in *BP Products*.  The guaranty at issue there stated in pertinent part

> For Value Received and to Induce . . . BP Exploration & Oil, Inc. . . . to lend
> money or otherwise extend financial accommodation . . . [the guarantor]
> Unconditionally Guarantee(s) Payment When Due . . . of any and all
> Indebtedness . . . however such indebtedness may arise . . . .

*Id.* at *3.  The Western District of Kentucky found that this overly broad prose did not refer

to the instrument guaranteed and thus failed to meet the statute's reference requirement.

*Id.* at *12-16.  The same can be said of the instant Guaranties.  They lack any reference

to the RSA and the European Term Note and thus fail to comply with the statute's

reference requirement.   On this basis, the Guarantors urge the Court to void the Guaranties.

### 2.   Whether the Guarantors waived the right to assert the statute as a defense

PNC argues, however, that the Guarantors twice waived the right to assert Section 371.065 as a defense.  The Guaranties themselves purported to waive "all defenses in law or equity."  (Docs. # 38-3, 38-4 & 38-5, at ¶ 3).  In addition, the Letter Agreement, executed more than one year after the Guaranties, likewise ostensibly waived "any and all defenses . . . of any kind or nature whatsoever . . . ."  (Doc. # 134-2 at ¶ 10).  PNC asserts that the Guarantors should not be permitted to repudiate the Guaranties because they are "educated, sophisticated professionals with substantial experience in international trade and lending transactions" who had the opportunity to review the Guaranties and consult with counsel before signing them.  (Doc. # 134 at 14).  They also assert that Kentucky law permits the waiver of statutory rights.

The Guarantors take the opposite view.  They argue that Kentucky law does not permit the waiver of statutory rights.  They further argue that PNC has produced no evidence proving that they knowingly and voluntarily waived Section 371.065 as a defense.

The Court begins by recognizing that under Kentucky law, the general rule is that a statutory right, privilege, or defense can be waived.  *See, e.g.*, *Edwards v. Hambel*, No. 2003-CA-000940-MR, 2005 WL 3116096, at *2 (Ky. Ct. App. Nov. 23, 2005) (holding that a statutory right can be waived unless the statute was "enacted for the protection of the public or to serve a public purpose"); *Walter J. Hieb Sand & Gravel, Inc. v. Universal C.I.T. Credit Corp.*, 332 S.W.2d 619, 621-622 (Ky. 1960) (holding that a waiver of a statutory right

was valid because it did not "offend the public policy of this state"); *Hale v. Blue Cross & Blue Shield of Kentucky, Inc.*, 862 S.W.2d 905, 907–08 (Ky. Ct. App. 1993) (upholding waiver of statute of limitations in insurance contract); *Edmondson v. Pa. Nat. Mut. Cas. Ins. Co.*, 781 S.W.2d 753, 755–56 (Ky. 1989) (same); *but see Said v. Lackey*, 731 S.W. 2d 7 (Ky. Ct. App. 1987) (refusing to enforce a contractual waiver of a statutory right and suggesting that statutory rights are non-waivable). Here, however, the language of Section 371.065 and the cases interpreting it suggest that the statute is not waivable.

The statute clearly and unequivocally states that no guaranty which fails to meet the statute's requirements "shall be valid or enforceable." K.R.S. § 371.075. Moreover, unlike some other Kentucky statutes, Section 371.065 does not contain a provision allowing a party to waive its applicability. *Cf. Sackett v. Citizens First Bank*, 2004-CA-001324-MR, 2006 WL 2382506 (Ky. App. Aug. 18, 2006) (holding that K.R.S. § 355.3-605, which provides certain protections to guarantors, can be waived by contract because another provision of that statute expressly allows waiver). Furthermore, the limited number of courts to have interpreted the statute have uniformly held that ". . . noncompliance with the statute renders the guarantee unenforceable, regardless of any equitable considerations." *Duckett v. Kubota Tractor Corp.*, 2002 U.S. Dist. LEXIS 28296, at *8 (W.D. Ky. 2002) (voiding statutorily non-compliant guaranties despite the windfall it produced for the guarantors); *accord Wallace Hardware Company, Inc. v. Abrams*, 223 F.3d 382, 400 n. 17 (6th Cir. 2000) (upholding the district court's decision not to enforce a statutorily non-compliant guaranty even though the guarantors were seasoned business professionals).

It thus appears that guaranties which run afoul of the statute are void *ab initio.* For this reason, the Kentucky Supreme Court would likely hold that the statute's requirements

are not waivable.  A statutorily non-compliant guaranty simply cannot be rehabilitated by a waiver.  To hold otherwise would be to misinterpret the plain meaning of the statute.  It would also permit lenders to avoid the statute's requirements merely by inserting a "catch-all" waiver—like the one used by PNC here—in its all of its guaranties.  This result would render the statute meaningless and thwart its public policy goal: to protect guarantors from guaranteeing unknown obligations.  *See Wheeler & Clevenger Oil Co.*, 127 S.W.3d at 615.

However, even assuming *arguendo* that the statute is waivable, PNC has failed to demonstrate that the Guarantors knowingly and voluntarily waived it here.  Under Kentucky law,  waiver is "a voluntary and intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon."  *Dunn v. Gordon Food Servs., Inc.*, 780 F. Supp. 2d 570, 576 (W.D. Ky. 2011).  To determine whether a waiver is voluntary and intentional, courts look to "(1) plaintiff's experience, background, and education; (2) the amount of time plaintiff had to consider whether to sign the waiver, including whether ... [there was] an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; (5) the totality of the circumstances."  *Id.* (internal citations omitted).  Courts also insist that the party said to have waived a statutory right must have known that the right existed. Kentucky's highest court has described this knowledge as "an essential prerequisite to its relinquishment.  No one can be said to have waived that which he does not know, or where he has acted under a misapprehension of the facts."  *Harris Bros. Constr. v. Crider*, 497 S.W.2d 731, 733 (Ky. 1973); *accord Dallas v. Henry*, No. 2011–CA–001521–MR, 2012 WL 4746099, at *5 (Ky. Ct. App. Oct. 5, 2012).

37

In the instant case, PNC has offered no proof that the Guarantors were aware of their rights under Section 371.065.  While it is certainly true that Roger Schreiber and Steven Oberst were "sophisticated businesspeople" who consulted with legal counsel (see Doc. # 134 at 16), it does not automatically follow that they were aware of their rights under the statute.  As for Lynda, Clint and Susan Oberst, PNC has not established that they possessed any business savvy or relevant experience, or that they attained a certain level of education.  PNC has also not deposed these latter three guarantors or otherwise demonstrated that they knew of their statutory rights.  It is also important to observe that the waiver's language contains no reference to the statute and thus lacks the requisite specificity.  *See, e.g.*, *Banterra Bank*, 2011 WL 832455 at *16-17 (holding that waivers must employ specific and unambiguous language); *Coombs v. Beneficial Finance Company*, 549 S.W.2d 327, 328 (Ky. Ct. App. 1977) (holding that the waiver of "any and all exemptions permitted by law to be waived" was overly broad).  The Court also notes PNC's failure to allege that the Guarantors received specific consideration for waiving the protections of Section 371.065.  In addition, it is irrelevant that the Letter Agreement also contained a waiver of all possible defenses.  This waiver was executed more than one year after the Guaranties and contained no reference to the statute; it thus cannot be said to have retroactively waived the statute.  Under the totality of the circumstances, therefore, the Court concludes that the Guarantors did not knowingly and voluntarily waive their rights under the statute.

Finally, PNC argues that the Guarantors should be equitably estopped from asserting the statute's protections since they received a substantial financial benefit in exchange for the Guaranties.  In light of the foregoing authorities establishing that equitable

38

considerations do not affect the enforceability of the statute, the Court rejects this argument. *See, e.g.*, *Duckett*, 2002 U.S. Dist. LEXIS 28296, at *8 (". . . noncompliance with the statute renders the guarantee unenforceable, regardless of any equitable considerations.").

## VI.   CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)   PNC's Motion for Summary Judgment (Doc. # 104) on Plaintiffs' First Amended Complaint is hereby **GRANTED**;

(2)   Consortium USA's Motion for Partial Summary Judgment as to Liability (Doc. # 128) on the claims in Plaintiffs' First Amended Complaint is hereby **DENIED**;

(3)   PNC's Motion for Summary Judgment (Doc. # 133) on its counter-claim against Consortium USA is hereby **GRANTED as to liability only**;

(4)   Consortium USA's Motion for Partial Summary Judgment as to Liability (Doc. # 128) on PNC's counter-claim against it is hereby **DENIED**;

(5)   The Guarantors' Motions for Summary Judgment (Docs. # 126 & 127) on PNC's counter-claim against them are hereby **GRANTED**;

(6)   PNC's Motion for Summary Judgment (Doc. # 135) on its counter-claim against the Guarantors is hereby **DENIED**;

(7)   PNC's Motion to Stay Discovery (Doc. # 105) and Plaintiffs' Motion For Hearing and Oral Argument (Doc. # 118) are hereby **DENIED as moot**; and

(8)   **Not later than July 24, 2013**, PNC and Consortium USA shall file a **Joint Status Report** addressing how the Court should resolve the remaining issue of the amount

of damages on PNC's counter-claim against Consortium USA.

      This 10th day of July, 2013.



Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\Covington\2011\11-5 MOO granting in part and denying in part summary judgment.wpd